1

2

3

4

5

6

7

8

9

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| | |
|---|---|
| Estate of NATHAN PRASAD, deceased, by and through MARY PRASAD; MARY PRASAD; T.P., a minor; and A.P., a minor,<br><br>      Plaintiffs,<br><br>      v.<br><br>COUNTY OF SUTTER; J. PAUL PARKER, Sutter County Sheriff's Department Sheriff; DAVID SAMSON, Sutter County Jail Division Commander; NORMAN BIDWELL, Sutter County Jail Corrections Lieutenant; LOU ANNE CUMMINGS, Sutter County Health Officer; AMERJIT BHATTAL, Sutter County Assistant Director of Human Services – Health Division; BRENT GARBETT, Sutter County Jail Nurse Program Manager; DORIS BROWN, Sutter County Jail Advanced Registered Nurse Practitioner; MELODY YOUNG, Sutter County Jail Licensed Vocational Nurse; KIMBERLY WEISS, Sutter County Jail Licensed Vocational Nurse; GURKIRAT BHANGU, Sutter County Jail Licensed Vocational Nurse; CHRISTINA STOHLMAN, Sutter County Jail Correctional Officer; LESTER EATON, Sutter County Jail Correctional Officer; MIGUEL AGUILAR, Sutter County Jail Deputy Officer; OLGA TAHARA, Sutter County Jail Deputy Officer; ROSA DIAZ, Sutter County Deputy Officer; ERIC CRAWFORD, Sutter County Jail Deputy Officer; BALJINDER RAI, Sutter County Jail Deputy Officer; SHANE DICKSON, Sutter County Jail Deputy Officer; UNKNOWN JAIL EMPLOYEE I; FREMONT-RIDEOUT HEALTH GROUP; MICHAEL FRATERS, D.O., | 2:12-cv-00592-TLN-GGH<br><br><u>ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO DISMISS AND STRIKE SECOND AMENDED COMPLAINT</u> |

1

Defendants.                                                    )
_____                               )

Defendants County of Sutter, J. Paul Parker, David Samson, Norman Bidwell, Lou Anne Cummings, Amerjit Bhattal, Brent Garbett, Doris Brown, Melody Young, Kimberly Weiss, Gurkirat Bhangu, Christina Stohlman, Lester Eaton, Miguel Aguilar, Olga Tahara, Rosa Diaz, Eric Crawford, Baljinder Rai, Shane Dickson, (collectively the "Sutter Defendants"), Michael Fraters, M.D., and Fremont-Rideout Health Group[1] ("Rideout") move to dismiss Plaintiffs' Second Amended Complaint under Federal Rule of Civil Procedure ("Rule") 12(b)(6). Fraters and Rideout also move to strike portions of Plaintiffs' complaint under Rule 12(f). Plaintiffs oppose Defendants' motions.

## I. FACTUAL ALLEGATIONS

Plaintiffs allege the following in their Second Amended Complaint ("SAC"). On January 21, 2011, Nathan Prasad was booked into Sutter County Jail ("Jail") on minor parole-related charges. (SAC ¶¶ 1, 44.) While in Jail custody for the next week, Prasad experienced multiple organ failure, bronchopneumonia, severe sepsis, cyanosis, chills, fever, radiating bruising, swelling, and excruciating pain. (Id. ¶¶ 46, 56, 61, 73, 75.) Prasad's condition was caused by a spreading bacterial infection that could have been treated with a course of antibiotics. (Id. ¶ 75.) Prasad was not provided with necessary medical care, however, and he died from this infection hours after he was transported from the Jail to Rideout. (Id. ¶¶ 75, 78.) Prasad was thirty years old when he died. (Id. ¶ 6.)

Prasad initially contracted an antibiotic resistant *Staphylococcus aureus* infection a year before this while in Jail custody. (Id. ¶ 43.) Jail officials and employees knew that the Jail had a long-standing and trenchant problem with contagious bacterial infections, and medical staff at that time documented Prasad's recurrent Methicillin-resistant *Staphylococcus aureus* ("MRSA") infections. (Id. ¶ 43.) When Prasad was rebooked at the Jail in January 2011, County officials—including Deputies Aguilar, Tahara, Diaz, Crawford, Rai, and Dickson; Correctional Officers Stohlman and Eaton;

_____

[1] The Second Amended Complaint names "Fremont-Rideout Health Group" as a Defendant. Motions to dismiss and strike the complaint were subsequently filed by "Rideout Memorial Hospital erroneously sued herein as Fremont Rideout Health Group." This Defendant is referred to as "Rideout" for purposes of the pending motions. No position is taken on the legal name or status of this Defendant.

1 | Vocational Nurses Young, Weiss, and Bhangu; Nurse Practitioner Brown; and Health Officer
2 | Cummings—reviewed documentation of Prasad's history of mental illness  and recurrent MRSA
3 | infections. (Id. ¶¶ 43, 54.)

4 |        Soon after his arrival at the Jail, Prasad reported to Jail staff that he was experiencing
5 | significant pain in his lower extremities. (Id. ¶ 46.) He was also displaying bruising on his legs. (Id. ¶ 3.)
6 | After several days of reported and documented medical concerns, on January 26, Brown evaluated
7 | Prasad, and following consultation with Cummings, referred Prasad to the Emergency Department at
8 | Rideout. (Id. ¶¶ 48, 50.) By contract, Rideout was the sole facility to which Jail inmates were transported
9 | to receive emergency medical care. (Id. ¶ 2.) Because of this contract and the significant and ongoing
10 | coordination between Rideout and the Jail, (id. ¶ 34), Rideout and its staff knew that the Jail failed to
11 | provide sufficient around-the-clock access to medical care and could not supply the access to emergency
12 | medical treatment necessary for individuals with serious medical needs. (Id. ¶¶ 2, 51, 52.)

13 |        At the Jail, Cummings, Assistant Human Services Director Bhattal, and Nurse Program
14 | Manager Garbett authorized and implemented a policy whereby Jail medical staff were available only
15 | from 4:00 a.m. to midnight. (Id. ¶ 82.) This policy was maintained even though Sheriff Parker, Jail
16 | Commander Samson, Jail Lieutenant Bidwell, Cummings, Bhattal, and Garbett were on notice from prior
17 | documented reports that medical staff should be available at the Jail seven days a week, twenty-four
18 | hours a day. (Id. ¶¶ 82, 85.) Despite the lack of 24-hour medical staff and the consequent danger to
19 | inmates with emergency medical needs, Parker, Samson, and Bidwell created and enforced a policy
20 | whereby only medical staff were responsible for obtaining medical care for inmates. (Id. ¶¶ 74, 83.) The
21 | County, Cummings, Garbett, and Bhattal also failed to consistently transmit critical medical information
22 | about Jail inmates to inmates' health care providers. (Id. ¶¶ 49, 81.)

23 |        During his January 26 examination, information about Prasad's clinically significant
24 | history of recurrent MRSA infections was not shared with Rideout or Dr. Fraters, Prasad's Emergency
25 | Department treating physician. (Id. ¶ 49.) Had this information been provided, it could have signaled the
26 | need for a simple blood test that would have identified Prasad's advancing infection and enabled prompt,
27 | life-saving antibiotic treatment. (Id. ¶ 49.) Instead, Fraters discharged Prasad. (Id. ¶ 50.) Fraters knew that
28 | Prasad was exhibiting signs of a serious and life-threatening condition and would need access to

emergency medical treatment if his symptoms worsened or new symptoms developed. (Id. ¶ 50.) Prasad's safe discharge to the Jail depended on a capacity for emergency medical response that Fraters and Rideout both knew did not exist there. (Id. ¶¶ 34, 35.) Fraters discharged Prasad with orders that if Prasad's symptoms worsened or new symptoms developed, he was to be returned to the Emergency Department immediately. (Id. ¶ 50.)

When Prasad returned to the Jail from his short Emergency Department admission, Jail staff—including Bidwell, Cummings, Brown, Young, Weiss, Bhangu, Stohlman, Eaton, Aguilar, Tahara, Diaz, Crawford, Rai, and Dickson—were all made aware of Prasad's discharge instructions ordering that he be taken to the Emergency Department immediately if his symptoms worsened or new symptoms developed. (Id. ¶¶ 53, 54.) Nonetheless, on multiple occasions over the next two days, these Defendants observed Prasad's serious and deteriorating medical conditions, but did not comply with the discharge instructions or secure Prasad timely or adequate medical care. (Id. ¶¶ 46, 60.)

On the evening of January 26, Weiss documented that Prasad was suffering from uncontrollable pain and spoke to Brown about it. (Id. ¶ 56.) Despite the discharge instructions, Prasad was neither evaluated later that night nor returned to the Emergency Department. (Id. ¶ 56.) From January 26 to January 28, Prasad stated aloud repeatedly that he was in extreme pain and having trouble breathing. (Id. ¶ 57.) He reported to Brown, Young, Weiss, Bhangu, Aguilar, Tahara, Diaz, Crawford, Rai, and Dickson that he thought he was going to die unless he received immediate medical attention. (Id. ¶ 57, 104f.) He completed and submitted at least one written request for medical treatment, relaying that he was suffering "extreme pain" and required "emergency" medical attention. (Id. ¶ 47.)

Observing Prasad's worsening condition, several fellow inmates notified Jail staff, including Young, Weiss, Bhangu, Aguilar, Rai, and Dickson, of Prasad's condition. (Id. ¶ 58.) Jail staff responded that Prasad "was faking his pain and other symptoms and that he and the other inmates needed to 'get over it.'" (Id. ¶ 58.) Attempting to help Prasad, fellow inmates collected blood Prasad had coughed up in an empty milk carton and showed it to Young and Rai, along with Brown and Dickson. (Id. ¶ 59, 104j.) Neither Young nor Rai evaluated Prasad or provided medical treatment for him. (Id. ¶ 60.)

At 9:00 a.m. on January 27, Brown documented Prasad's dangerous vital signs, recording his abnormally high pulse rate, precipitous drop in blood pressure, low grade fever, marked dehydration,

1  and spreading bruising through his midsection. (Id. ¶¶ 3, 61.) Brown was aware of Prasad's rapidly

2  worsening condition and need for immediate treatment, but only prescribed Prasad an additional pain

3  killer. (Id. ¶ 61.)

4        During the January 27 evening medication pass, Prasad's serious illness, intense distress

5  and need for immediate emergency medical care were evident. (Id. ¶ 62.) Vocational Nurse Bhangu

6  observed Prasad's dire condition, but failed to document Prasad's symptoms, provide for his treatment, or

7  secure any emergency medical care. (Id. ¶ 62.) Aguilar witnessed Prasad's condition and was told by

8  Prasad and other inmates that Prasad required immediate medical attention. (Id. ¶ 63.) Aguilar made no

9  effort to secure medical care or address Prasad's urgent medical needs. (Id. ¶ 63.) Dickson observed

10  Prasad screaming in pain and begging to be taken to the hospital. (Id. ¶ 64.) In response, Dickson ignored

11  Prasad's medical needs and ridiculed Prasad as "the type of person who comes to jail because he wants to

12  get free medical care." (Id. ¶ 64.)

13        In the pre-dawn hours of January 28, after many hours of pleading for help and of

14  deterioration, Rai and Young observed that Prasad's blood pressure and blood-oxygen saturation were

15  dangerously low, that he was vomiting up blood, and was dizzy, sweating, cold, and clammy. (Id. ¶ 65.)

16  Young documented all of this. (Id. ¶ 65.) Prasad reported to Rai and Young that he felt like he was "going

17  to die." (Id. ¶ 65.) In response, Rai and Young placed Prasad in a Jail office, but provided no medical

18  treatment, made no arrangements for his transport to the hospital, and failed to monitor his eroding

19  health. (Id. ¶ 66.) Prasad was made to sit in the Jail room without medical attention of any kind for the

20  next four hours as his condition continued to deteriorate. (Id. ¶ 67.)

21        Diaz and Tahara heard Prasad's pleas for help and reports that he felt like he was "going to

22  die," and they heard Young tell Prasad that she would do nothing for him. (Id. ¶ 68.) Together, Young,

23  Diaz, and Tahara locked Prasad back in the Jail office without providing or summoning any medical care.

24  (Id. ¶ 68.) Crawford listened as Prasad kicked the locked door to the Jail office, repeatedly and

25  desperately yelling "I can't breathe! I can't breathe!" (Id. ¶ 69.) In response, Crawford ordered Prasad to

26  stop yelling and lie down. (Id. ¶ 69.) Crawford did not report these observations or make any effort to

27  secure Prasad medical care. (Id. ¶ 69.)

28  ///

1   As the Officer in Charge, Eaton was aware that Prasad had been reporting difficultly

2   breathing for at least several hours, and that he was locked in the Jail office and not receiving any medical

3   care. (Id. ¶¶ 70, 71.) At the end of his 6:00 a.m. shift, Eaton conveyed this information to Stohlman. (Id. ¶

4   71.) Neither Eaton nor Stohlman made any effort to summon medical care for Prasad. (Id. ¶ 72.) Garbett,

5   too, was informed of Prasad's critical condition, but did nothing to summon emergency care. (Id. ¶ 67.)

6   Not until nearly four hours after Prasad was placed in the Jail office exhibiting dangerous

7   symptoms was an ambulance summoned. (Id. ¶ 73.) By that time, Prasad's skin had turned blue due to

8   severe oxygen deficiency and cyanosis; his blood pressure could no longer be detected; and he was

9   suffering from severe sepsis. (Id. ¶ 73.) Prasad experienced severe bronchopneumonia, multiple organ

10  failure, and excruciating pain. (Id. ¶ 75.) When he finally reached the Intensive Care Unit ("ICU") at

11  Rideout, he was unconscious and in critical condition. (Id. ¶ 75.)

12  Once Prasad reached the ICU, Parker, Samson, Bidwell, and Stohlman attempted to

13  distance the Jail from Prasad's dire condition, taking steps to drop all pending charges and "release"

14  Prasad on his own recognizance. (Id. ¶ 77.) Prasad was in a coma at the time. (Id.) Stohlman personally

15  signed paperwork effecting Prasad's release on his own recognizance, collected Prasad's belongings from

16  Jail, and transported them to Rideout as Prasad lay dying. (Id. ¶ 77.)

17  Meanwhile, no Defendant timely contacted Prasad's family. (Id. ¶ 76.) At 4:19 p.m. on

18  January 28, Prasad was pronounced dead by Rideout staff at the age of thirty. (Id. ¶¶ 6, 78.) Prasad's

19  mother, Mary Prasad, his children, T.P. and A.P., then six and seven years old, and his other family

20  members were unable to make it to Rideout while Prasad was still alive. (Id. ¶¶ 6, 76.) Throughout his

21  life Prasad had supported his children emotionally and financially and remained exceptionally close with

22  his mother. (Id. ¶ 6.) Prasad's mother and children have been profoundly harmed by his death. (Id. ¶¶

23  100—02.)

24  **II. LEGAL STANDARD**

25  **A. Motion to Dismiss**

26  Decision on a Rule 12(b)(6) dismissal motion requires determination of "whether the

27  complaint's factual allegations, together with all reasonable inferences, state a plausible claim for relief."

28  United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc., 637 F.3d 1047, 1054 (9th Cir. 2011) (citing

Ashcroft v. Iqbal, 556 U.S. 662, 678—79 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007)).

In evaluating a Rule 12(b)(6) motion, the court "accepts the complaint's well-pleaded factual allegations as true and draws all reasonable inferences in the light most favorable to the plaintiff." Adams v. U.S. Forest Serv., 671 F.3d 1138, 1142—43 (9th Cir. 2012) (citing Twombly, 544 U.S. at 555—56). However, this tenet does not apply to "legal conclusions . . . cast in the form for factual allegations." Fayer v. Vaughn, 649 F.3d 1061, 1064 (9th Cir. 2011) (internal quotation marks omitted). "Therefore, conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." Id. (internal quotation marks omitted); see also Iqbal, 556 U.S. at 678 ("A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" (quoting Twombly, 550 U.S. at 555)).

**B. Motion to Strike**

Rule 12(f) permits a court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Since interpretation of the Rule begins with its plain meaning, a motion to strike will not be granted unless the matter to be stricken is "(1) an insufficient defense; (2) redundant; (3) immaterial; (4) impertinent; or (5) scandalous." Whittlestone, Inc. v. Handi-Craft Co., 618 F.3d 970, 973—74 (9th Cir. 2010).

As the movants, Fraters and Rideout bear the burden on their motions to strike, SEC v. Sands, 902 F. Supp. 1149, 1166—67 (C.D. Cal. 1995), and their motions will not be granted unless the matter to be stricken could have no possible bearing on the controversy. Neveu v. City of Fresno, 392 F. Supp. 2d 1159, 1170 (E.D. Cal. 2005); see Nat'l Res. Def. Council v. Kempthorne, 539 F. Supp. 2d 1155, 1162 (E.D. Cal. 2008) (noting such motions are disfavored and infrequently granted). Further, when ruling on the motions to strike, the court accepts Plaintiffs' allegations as true and liberally construes the complaint in the light most favorable to Plaintiffs. Stearns v. Select Comfort Retail Corp., 763 F. Supp. 2d 1128, 1140 (N.D. Cal. 2010); Multimedia Patent Trust v. Microsoft Corp., 525 F. Supp. 2d 1200, 1211 (S.D. Cal. 2007); Lazar v. Trans Union LLC, 195 F.R.D. 665, 669 (C.D. Cal. 2000).

1  ///

2  **III. DISCUSSION**

3  **C. Sutter County, Parker, Samson, Bidwell, Cummings, Bhattal, Garbett, Brown, Young, Weiss,**

4  **Bhangu, Stohlman, Eaton, Aguilar, Tahara, Diaz, Crawford, Rai, and Dickson's Dismissal Motion**

5  Plaintiffs allege claims against the Sutter Defendants for cruel and unusual punishment

6  based on theories of direct, supervisory, and municipal liability, (SAC ¶¶ 103—26); substantive due

7  process interference with the right to family integrity, (id. ¶¶ 127—30); failure to furnish or summon

8  medical care, (id. ¶¶ 131—36); and wrongful death. (Id. ¶¶ 137—42.) The Sutter Defendants move to

9  dismiss each of these claims. (Sutter Defs.' Mot. to Dismiss ("Sutter Defs.' Mot."), ECF No. 61,

10  6:18—18:9.)

11  **(1) Causation**

12  The Sutter Defendants first argue that the entire complaint "contains insufficient and/or

13  inconsistent facts for the purpose of showing Defendants' conduct caused the decedent's death" because

14  the complaint (1) fails to individuate its causal allegations against each of the Sutter Defendants, (Sutter

15  Defs.' Mot. 6:16—8:10); (2) states via Attachment B that "it is . . . *probably unlikely* that an earlier

16  transport to the hospital would have changed" Prasad's death, (id. 6:17—18, 7:3—4); and (3) admits that

17  Prasad's condition "further deteriorated at the hospital . . . before he died." (Id. 7:10—13.) Plaintiffs

18  counter that the Sutter Defendants ignore the complaint's individualized and "express" allegations of

19  causation, (Pls.' Opp'n to Sutter Defs.' Mot. to Dismiss ("Pls.' Opp'n"), ECF No. 63, 6:17), misconstrue

20  the weight and legal effect of Rideout employees' self-serving speculation in Attachment B, (id.

21  6:22—8:2), and disregard the Ninth Circuit's "emphatic" rejection of "the idea that jail staff cannot be

22  liable for contributing to an inmate's death simply because they transfer [the inmate] . . . to a hospital

23  before he dies." (Id. 8:4—6.) The Sutter Defendants' arguments are addressed in turn.

24  **(a) Individualized Allegations**

25  Section 1983 authorizes imposition of liability only on a defendant who "subjects, or

26  causes [any person] to be subjected" to the deprivation of any rights guaranteed by federal law. 42

27  U.S.C. § 1983. Thus "'a plaintiff must plead that each government-official defendant, through the

28  official's own individual actions, [] violated the Constitution.'" OSU Student Alliance v. Ray, 699 F.3d

8

1   1053, 1069 (9th Cir. 2012) (quoting Iqbal, 556 U.S. at 676). Because the Sutter Defendants have not

2   shown that Plaintiffs fail to include individual allegations supporting liability against each of them, see

3   infra (assessing these arguments in detail), this portion of the Sutter Defendants' motion is denied.

4                    **(b) Attachment B**

5            The Sutter Defendants argue that the complaint does not allege cause in fact and

6   proximate causation against them since Plaintiffs "allege via Attachment B to Plaintiffs' SAC that 'it is

7   unknown and *probably unlikely* than an earlier transport to the hospital would have changed'" Prasad's

8   death. (Sutter Defs.' Mot. 7:3—7.) Plaintiffs argue that the "purported statements by Rideout

9   physicians" in Attachment B do not implicate or contradict the complaint's detailed causation

10  allegations. (Pls.' Opp'n 7:8.)

11           Generally, on a 12(b)(6) motion the court must accept all well-pleaded material factual

12  allegations as true. Putnam Family P'ship v. City of Yucaipa, Cal., 673 F.3d 920, 925 (9th Cir. 2012).

13  However, exhibits to the complaint are part of the complaint for all purposes, Hartmann v. Cal. Dep't of

14  Corr. & Rehab., 707 F.3d 1114, 1124 (9th Cir. 2013), and the court need not "accept as true allegations

15  that *contradict* exhibits attached to the [c]omplaint." Daniels-Hall v. Nat'l Educ. Ass'n, 629 F.3d 992,

16  998 (9th Cir. 2010) (emphasis added); accord Interstate Natural Gas Co. v. S. Cal. Gas Co., 209 F.2d

17  380, 384 (9th Cir. 1953) (noting that a "motion to dismiss . . . does not admit . . . facts which are

18  revealed to be unfounded by documents included in the pleadings"). In practice, to warrant departure

19  from the traditional rule that a complaint's well—pleaded factual allegations are accepted as true, the

20  contradiction between the complaint and its exhibit "must be virtually inescapable." William W.

21  Schwarzer et al., California Practice Guide: Federal Civil Procedure Before Trial § 9:226 (2013). Thus a

22  plaintiff is not required "to adopt every word within the exhibits as true for purposes of pleading simply

23  because the documents were attached to the complaint to support an alleged fact." N. Ind. Gun &

24  Outdoor Shows, Inc. v. City of S. Bend, 163 F.3d 449, 455 (7th Cir. 1998). Nor are a complaint's

25  allegations contradicted by "authorities' possibly self-serving statements" in "a report *asserting* that

26  defendants did everything possible to . . . protect plaintiff." Scanlan v. Sisto, CIV S-09-2808 LKK CKD

27  P, 2012 WL 1130668, at *3 (E.D. Cal. Mar. 28, 2012); see Jones v. City of Cincinnati, 521 F.3d 555,

28  561 (6th Cir. 2008) (recognizing that treating an attachment "as part of a pleading does not mean that we

                                                      9

assume everything [defendants] said in [the attachment] is true"); <u>Gant v. Wallingford Bd. of Educ.</u>, 69

F.3d 669, 675 (2d Cir. 1995) (explaining that plaintiffs may attach an exhibit prepared or authored by a

defendant "as a self-serving document rather than a particularization of their claim").

      Here, the statement in Exhibit B by Rideout employees that an earlier transport to the

hospital "probably" would not have changed Prasad's death is a "possibly self serving statement[]" by

employees of a Defendant in this action. <u>Scanlan</u>, 2012 WL 1130668, at *3. Thus Exhibit B does not

"contradict" Plaintiffs' express allegations that Prasad's death was unnecessary and avoidable. <u>Daniels-</u>

<u>Hall</u>, 629 F.3d at 998. Nor does it reveal Plaintiffs allegations to be "unfounded."[2] <u>Interstate Natural Gas</u>

<u>Co.</u>, 209 F.2d at 384. Accordingly, this portion of the Sutter Defendants' dismissal motion is denied.

**(c) Prasad's Death at Rideout**

      The Sutter Defendants argue Plaintiffs fail to allege that they caused Prasad's death

"because decedent's condition allegedly further deteriorated at the hospital . . . before he died." (Sutter

Defs.' Mot. 7:10—13.) Plaintiffs respond that the "Ninth Circuit has emphatically rejected the idea that

jail staff cannot be liable for contributing to an inmate's death simply because they transfer [the inmate] .

. . to a hospital before he dies." (Pls.' Opp'n 8:4—6.) Plaintiffs are correct. The fact that Prasad did not

die until several hours after he reached Rideout neither precludes liability by the Sutter Defendants nor

undermines Plaintiffs' causation allegations against them. <u>See</u> <u>Ortiz v. City of Imperial</u>, 884 F.2d 1312,

1313—14 (9th Cir. 1989) (per curiam) (reversing grant of summary judgment for jail nurses and doctor

where inmate died ten days after he was transported from jail to the hospital); <u>see generally</u> <u>Estelle v.</u>

<u>Gamble</u>, 429 U.S. 97, 103 (1976) (contemplating § 1983 liability where lack of medical care produces

prisoner's "'lingering death'") (quoting <u>In re Kemmler</u>, 136 U.S. 436, 447 (1890)). Further, "even if [the

Sutter Defendants are] correct that death was not a foreseeable consequence of [their] deliberate

indifference, this argument does not exonerate [them]" from liability under § 1983 if "[d]eath was not

---

    [2] At most, Attachment B constitutes an alternative statement of Plaintiffs' claim, which Plaintiffs are entitled to set forth. <u>See</u> Rule 8(d)(2) ("A party may set out 2 or more statements of a claim . . . . If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient."); <u>see also</u> <u>Aholelei</u> <u>v. Dep't of Pub. Safety</u>, 488 F.3d 1144, 1149 (9th Cir. 2007) (recognizing that "'a pleading should not be construed as an admission against another alternative or inconsistent pleading in the same case'") (quoting <u>Molsbergen v. United States</u>, 757 F.2d 1016, 1019 (9th Cir. 1985)).

1  the only [severe] injury [Prasad] suffered at the hands of [the Sutter Defendants]." Gibson v. Cnty. of
2  Washoe, Nev., 290 F.3d 1175, 1192 (9th Cir. 2002) (rejecting county's argument that its deliberate
3  indifference did not proximately cause decedent's death since "[d]eath was not the only injury
4  [decedent] suffered at the hands of the [c]ounty"). Accordingly, this portion of the Sutter Defendants'
5  dismissal motion is denied.

6       **(2) Deliberate Indifference to Serious Medical Needs**

7       Deputies Dickson, Rai, Aguilar, Tahara, Diaz, and Crawford (the "Deputies") argue
8  Plaintiffs fail to allege their deliberate indifference to a serious medical need since "'a non-medical
9  prison official will generally be justified in believing that the prisoner is in capable hands'" when the
10 "'prisoner is under the care of medical experts,'" (Sutter Defs.' Mot. 9:1—21 (quoting Spruill v. Gillis,
11 372 F.3d 218, 236 (3d Cir. 2004))), and here, the complaint does not specifically allege that the Deputies
12 were present with Prasad when members of the nursing staff were not. (Id. 9:9—16.) Plaintiffs counter
13 that for four "hours each day . . . the custody staff were the *only* individuals in a position to address the
14 emergency medical needs of inmates like Mr. Prasad," and "[e]ven the non-controlling case the Sutter
15 Defendants cite—Spruill v. Gillis—held only that a claim against custody staff is inadequate 'absent a
16 reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not
17 treating) a prisoner.'" (Pls.' Opp'n 11:24—12:2 (quoting Spruill, 372 F.3d at 236).) Here, the complaint
18 "alleges that [the Deputies] knew that Mr. Prasad was not receiving medical treatment." (Id. 12:2—3.)

19      Deliberate indifference to a pretrial detainee's serious medical needs violates the
20 Fourteenth Amendment, whether the indifference is manifested by doctors, guards, or other personnel.
21 Erickson v. Pardus, 551 U.S. 89, 90 (2007) (per curiam); Estelle, 429 U.S. at 104—05. To establish
22 deliberate indifference, a detainee "need not prove that he was completely denied medical care." Lopez
23 v. Smith, 203 F.3d 1122, 1132 (9th Cir. 2000) (en banc); see Snow v. McDaniel, 681 F.3d 978, 986 (9th
24 Cir. 2012) (finding medical and custodial prison staff deliberately indifferent to prisoner's serious
25 medical needs even though prisoner was "provided [with] medical care, medications, and specialist
26 referrals . . . during the period in question"). Instead, the detainee must show (1) a serious medical need
27 and (2) a deliberately indifferent response, such as defendants' "den[ial], delay or intentional
28 interference with medical treatment." Jett, 439 F.3d at 1096.

1   ///

2   "[A]llegations that a prison official has ignored the instructions of a prisoner's treating

3   physician are sufficient to state a claim for deliberate indifference." Wakefield v. Thompson, 177 F.3d

4   1160, 1165 (9th Cir. 1999). Thus a prisoner states a cognizable deliberate indifference claim when

5   prison staff "unreasonably rely[] on their own non-specialized conclusions" in contravention of a

6   treating physician's directive. Snow, 681 F.3d at 986; see also Lopez, 203 F.3d at 1131—32. Similarly,

7   allegations that prison officials ignored the instructions of treating or specialized physicians in favor of

8   non-treating or non-specialized medical providers suffice to state a deliberate indifference claim. See

9   Snow, 681 F.3d at 986—87 (finding triable deliberate indifference issue where defendants ignored

10  medical instructions from prisoner's board certified treating physicians, but followed the medical

11  recommendation of a panel of non-specialized physicians who largely did not treat the prisoner);

12  Hamilton v. Endell, 981 F.2d 1062, 1064 (9th Cir. 1992) (finding triable deliberate indifference issue

13  where prison officials ignored treating physician's instruction and followed non-treating physician's

14  contrary and likely inferior recommendation "based upon his personal experience and his consultation

15  with a[ relevant] specialist") abrogated in part on other grounds by Estate of Ford v. Ramirez-Palmer,

16  301 F.3d 1043, 1045 (9th Cir. 2002).

17  According to the complaint, Prasad was taken to see Dr. Fraters for specialized

18  emergency treatment. (SAC ¶¶ 48—50.) When Fraters discharged Prasad, he did so with specific

19  instructions that Prasad be returned to the emergency department immediately should his symptoms

20  worsen or new symptoms develop. (Id. ¶ 50.) The Deputies knew all of this. (Id. ¶ 54.) They then

21  observed Prasad's condition dramatically worsen and develop. (Id. ¶¶ 63—69.) Neither the Deputies nor

22  Jail medical staff returned Prasad to the emergency room as required by the discharge order. (Id. ¶¶

23  73—74.) Under these circumstances—where the Deputies knew Jail medical staff were treating Prasad,

24  but ignoring Prasad's treating, specialized physician's discharge instructions—the Deputies were not

25  "justified in believing that [Prasad wa]s in capable hands." Spruill, 372 F.3d at 236. By ignoring

26  Prasad's discharge instructions, the Deputies were deliberately indifferent to Prasad's serious medical

27  needs. See Wakefield, 177 F.3d at 1165. Accordingly, this portion of the Sutter Defendants' dismissal

28  motion is denied.

1    ///

2         **(3) Supervisory Liability**

3              Sheriff Parker, Jail Commander Samson, Jail Lieutenant Bidwell, Health Officer

4    Cummings, Assistant Human Services Director Bhattal, Nurse Program Manager Garbett ("Supervisory

5    Defendants"), and Correctional Officers Stohlman and Eaton argue that Plaintiffs allege neither their

6    knowledge of, nor personal participation in, the deprivation of Prasad's constitutional rights. (Sutter

7    Defs.' Mot. 10:18-11:11.) The Supervisory Defendants contend that the only direct allegations against

8    them are that Cummings "treated Prasad for pain on January 26, 2011," (id. 10:27-28), and that Garbett

9    was "informed of Prasad's condition." (Id. 11:2.) They also argue that Plaintiffs' remaining,

10   policymaking allegations against them fail since Plaintiffs allege they "failed to implement curative

11   policies, without any allegations that [they] knew of past constitutional violations" relevant to preventing

12   the injury in this case. (Sutter Defs.' Mot. 11:7-19.) Plaintiffs respond that "widespread failures to

13   provide minimally adequate policies, procedures and training in the face of [a court order directing the

14   same] were known to and thus consciously tolerated or undertaken by the Supervisory Defendants,"

15   (Pls.' Opp'n 14:23-26), and that the Supervisory Defendants' arguments about their lack of direct

16   knowledge and personal participation are "plainly false" with respect to Cummings and Garbett. (Pls.'

17   Opp'n 13:20-21 (citing SAC ¶¶ 48, 54, 67, 70-72).)

18              "'Supervisory liability exists even without overt personal participation in the offensive act

19   if supervisory officials implement a policy so deficient that the policy itself is a repudiation of

20   constitutional rights and is the moving force of a constitutional violation.'" Clement v. Gomez, 298 F.3d

21   898, 905 (9th Cir. 2002) (quoting Redman v. Cnty. of San Diego, 942 F.2d 1435, 1446 (9th Cir. 1991)

22   (en banc)). Where a complaint "specifically alleges . . . that [a supervisory defendant] was given notice,

23   in several reports, of systematic problems," and he "did not take action to protect inmates under his care

24   despite the dangers . . . of which he had been made aware," such allegations "plausibly suggest that [he]

25   acquiesced in the unconstitutional conduct of his subordinates, and was thereby deliberately indifferent

26   to the danger posed to [plaintiff]." Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011). Here, the

27   complaint pleads just that. Plaintiffs allege that Cummings, Bhattal, and Garbett authorized and

28   implemented a policy whereby Jail medical staff were available only from 4:00 a.m. to midnight, (SAC ¶

13

82), and despite the lack of 24-hour medical staff and the consequent danger to inmates with emergency medical needs, Parker, Samson, and Bidwell created and enforced a policy whereby only medical staff obtained medical care for inmates. (Id. ¶¶ 74, 83.) Plaintiffs further allege that the Supervisory Defendants were on notice from earlier documented reports that medical staff should be at the Jail seven days a week, twenty-four hours a day. (Id. ¶¶ 82, 85.) This is enough to state a claim for deliberate indifference against the Supervisory Defendants.

The non-policymaking Defendants, Stohlman and Eaton, contend that the only direct allegations against them are that Eaton "'became aware' of Prasad" sometime between the evening of January 27 and 6:00 a.m. on January 28, (id. 11:5—6), and that Stohlman was "'informed,' after the start of her shift at 6:00 a.m. on January 28, 2011, that Prasad had been moved to the [J]ail office and seen by Nurse Young." (Id. 11:7-8.) Plaintiffs again counter that these arguments are "plainly false." (Pls.' Opp'n 13:20-21 (citing SAC ¶¶ 48, 54, 67, 70-72).)

Plaintiffs specifically allege that as the Officers in Charge Stohlman and Eaton (1) reviewed Prasad's discharge instructions ordering his immediate return to Rideout should his symptoms worsen or develop (SAC ¶ 54); (2) knew Prasad had been complaining of severe difficulty breathing for at least several hours after his return from Rideout, (id. ¶¶ 70, 71); and (3) yet did nothing to help Prasad or to affect the inaction of the officers under their supervision. (Id. ¶ 72.) These allegations establish that Stohlman and Eaton acquiesced in the constitutional deprivation by "'knowingly refus[ing] to terminate a series of acts by others, which [they] knew or reasonably should have known would cause others to inflict a constitutional injury.'" Starr, 652 F.3d at 1207—08 (quoting Dubner v. City & Cnty. of S.F., 266 F.3d 959, 968 (9th Cir. 2001)). Thus, the complaint states a claim against Stohlman and Eaton based on their supervisory liability. Id. at 1208. Accordingly, this portion of the Sutter Defendants' dismissal motion is denied.

### (4) Municipal Liability

The County advances four basis for dismissal of Plaintiffs' Monell claim against it, all of which attack the sufficiency of Plaintiffs' pleading of a municipal policy that was the moving force behind the alleged constitutional violation. Specifically, the County argues that Plaintiffs fail to state a claim since (1) a plan or policy that does not exist "necessarily could not be the moving force behind an

1  alleged constitutional violation," (Sutter Defs.' Mot. 13:9—10); (2) the "policy of allowing no one but

2  medical staff to summon outside emergency care . . . was not the moving force behind the decedent's

3  death," (id. 13:13—15); (3) Plaintiffs' claim that the County failed to "'maintain . . . and transmit[]

4  critical medical information about Jail inmates to affiliated health care providers'" is "internally

5  inconsistent" because Plaintiffs also allege the County "'maintained'" medical documentation (id.

6  14:1—3, 13:26 (quoting SAC ¶¶ 49, 42); and (4) Plaintiffs "fail[] to allege deliberately indifferent

7  policies" because they merely attack the County's failure to adhere to its own policies. (Id. 15:3—4.)

8         Plaintiffs counter that (1) "'a local governmental body may be liable if it has a policy of

9  inaction and such inaction amounts to a failure to protect constitutional rights,'" (Pls.' Opp'n 18:8-10

10  (quoting Berry v. Baca, 379 F.3d 764, 767 (9th Cir. 2004); (2) the complaint "plainly alleges" that Jail

11  staff's failure to summon emergency medical care contributed to Prasad's death, (id. 18:25—26); (3) the

12  County's production of medical records is "wholly consistent" with its failure to transmit this

13  information to Rideout, (id. 19:2-6); and (4) generally, the County impermissibly "attempts to controvert

14  the SAC's allegations that 'widespread deficiencies in training, staffing, and maintenance of current

15  policies and procedures for the provision of health care to inmates' in Sutter County 'have been

16  known . . . for years, have not been addressed or corrected, and directly and substantially contributed to

17  [Mr. Prasad's] death.'" (Id. 19:7—11 (quoting SAC ¶ 7).)

18         In its reply brief, the County responds that Plaintiffs' characterizations of its policies are

19  unsupported by the complaint, which states only that there was "'an established *practice* in effect at

20  Sutter County Jail such that medical staff were responsible for determining who goes to the hospital or

21  calling for an ambulance in an emergency situation'" and that "individuals failed [to] maintain records"

22  or followed a *practice* of not doing so, "not that there was an express *policy*" to that effect. (Sutter Defs.'

23  Reply to Pls.' Opp'n to Mot. to Dismiss ("Sutter Defs.' Reply"), ECF No. 70, 5:25-6:8 (quoting SAC ¶

24  74) (emphases added).)

25         To subject the County to liability, Plaintiffs must allege that the County "had a deliberate

26  policy, custom, or practice that was the moving force behind the constitutional violation." AE ex rel.

27  Herndandez v. Cnty. of Tulare, 666 F.3d 631, 636 (9th Cir. 2012) (quoting Whitaker v. Garcetti, 486

28  F.3d 572, 581 (9th Cir. 2007)). For purposes of County liability, a "policy" includes a policy of inaction

1   due to failure to train County employees. Waggy v. Spokane Cnty. Wash., 594 F.3d 707, 713 (9th Cir.

2   2010) (citing City of Canton v. Harris, 489 U.S. 378, 392 (1989)). A "practice" or "custom" involves an

3   act that is so "longstanding" that it "constitutes the standard operating procedure of the local government

4   entity." Villegas v. Gilroy Garlic Festival Ass'n, 541 F.3d 950, 964 (9th Cir. 2008) (quoting Ulrich v.

5   City & Cnty. of S.F., 308 F.3d 968, 984 (9th Cir. 2002)); see also Trevino v. Gates, 99 F.3d 911, 918

6   (9th Cir. 1996) (defining a "custom" or "practice" in the same way).  Here, Plaintiffs assert their Monell

7   claim based on the County's alleged policy of inaction and based on its affirmative customs and

8   practices. (See Pls.' Opp'n 17:12—25.) Specifically, Plaintiffs allege that the County maintained

9   customs or practices "whereby no medical staff whatsoever were on site for one-sixth of every day,"

10  "custody staff lacked authority to respond to emergent and critical inmate needs," and "the medical

11  records system withheld crucial information about inmates from affiliated health care providers like

12  Rideout." (Id. 17:15-23.) Plaintiffs also allege a policy of inaction by the County involving "a complete

13  failure to train that rendered [J]ail staff incompetent and unequipped to identify or respond to medical

14  emergencies." (Id.; SAC ¶ 98.)

15          Under either theory of liability, the County's customs, practices, or inaction must be the

16  cause-in-fact and proximate cause of the alleged constitutional violations. E.g., Harper v. City of L.A.,

17  533 F.3d 1010, 1026 (9th Cir. 2008); Van Ort v. Estate of Stanewich, 92 F.3d 831, 837 (9th Cir. 1996).

18  Here, Plaintiffs' complaint amply alleges that the County's customs, practices, and policy of inaction

19  caused Prasad's preventable early death. (E.g., SAC ¶¶ 1, 7 (alleging that Prasad's MRSA "infection

20  [was] wholly treatable through basic and timely medical attention," but that Prasad died an "unnecessary

21  and avoidable death" because of "widespread deficiencies in training, staffing, and maintenance of

22  current policies and procedures for the provision of health care to inmates at Sutter County Jail").) Thus

23  in this case, the allegedly "unconstitutional policy at issue and the particular injury alleged are not only

24  'closely related,' they are cause and effect." Harper, 533 F.3d at 1027 (quoting City of Canton, 489 U.S.

25  at 391).

26          Nor are the County's specific arguments availing. The absence of a policy may supply a

27  basis for Monell liability if the absence leads to a failure to protect constitutional rights. E.g., Cabrales v.

28  Cnty. of L.A., 864 F.2d 1454, 1461 (9th Cir. 1988) (explicitly rebutting the argument "that only

1  *affirmative* acts constitute a policy or custom for section 1983 purposes"), <u>vacated on other grounds</u>, 490

2  U.S. 1087 (1989). Likewise, a practice may give rise to <u>Monell</u> liability just as a policy may do the same.

3  <u>E.g.</u>, <u>Villegas</u>, 541 F.3d at 964. Nor are the complaint's allegations—the County created medical

4  records, but failed to transmit them to Rideout—contradictory or reason to discredit the complaint's

5  causal allegations. Further, the County had not identified any unforeseeable intervening causes that

6  negate an inference of proximate causation. Accordingly, this portion of the dismissal motion is denied.

7         **(5) Substantive Due Process Right to Family Integrity**

8            The Sutter Defendants seek dismissal of Plaintiffs' substantive due process claim against

9  them, arguing that "Plaintiffs fail to allege sufficient facts showing each of the Defendants 'shocked the

10 conscience,'" as required to state a claim for interference with their family integrity, "particularly in light

11 of . . . allegations that Prasad was seen and treated, placed under observation by medical staff, and finally

12 transported to the hospital." (Sutter Defs.' Mot. 12:2—5.)[3] The Sutter Defendants do not advance other

13 arguments for dismissal of Plaintiffs' claim. Plaintiffs respond that the complaint's "allegations against

14 each of the Sutter Defendants easily states a claim that their conduct rose to the conscience-shocking

15 level," and they recite many of these "additional specific allegations." (Pls.' Opp'n 16:7—8, 15:25.)

16           A prison official's deliberate indifference to a prisoner's serious medical needs shocks the

17 conscience and states a claim under the substantive due process clause. <u>See</u> <u>supra</u> (outlining the same).

18 Here, since Plaintiffs allege deliberate indifference by the Sutter Defendants, and since the Sutter

19 Defendants advance no other arguments for dismissal, Plaintiffs have stated a substantive due process

20 claim against the Sutter Defendants. Accordingly, this portion of the Sutter Defendants' dismissal

21 motion is denied.

22        **(6) Failure to Summon Medical Care**

23           Deputies Dickson, Rai, Crawford, Diaz, Aguilar, and Tahara; Correctional Officers

24 Stohlman, and Eaton; and Jail Nurse Program Manager Garbett ("these Defendants") seek dismissal of

25

26 ————————————

27      [3] The Sutter Defendants also attack Plaintiffs' substantive due process claim in light of the "allegation" in Attachment B "that an earlier transfer would have 'probably unlikely' made any difference

28 in the outcome." (Sutter Defs.' Mot. 12:4—6 (quoting Attachment B).) Since this argument has already been rejected, it is not addressed again here.

Plaintiffs' Cal. Gov't Code § 845.6 claim for failure to summon medical care.[4] These Defendants argue that liability under § 845.6 is limited "only to situations where [a] public employee 'intentionally or unjustifiably fails to furnish immediate medical care,'" and here, since Prasad was "already" or "concurrently" under observation by medical staff, none of these Defendants intentionally or unjustifiably failed to summon medical care for Prasad. (Sutter Defs.' Mot. 16:7-8, 16:17, 16:21 (quoting Watson v. California, 21 Cal. App. 4th 836, 841 (1993)).) Plaintiffs counter that § 845.6 requires public employees to summon medical care if they have "'actual or constructive knowledge'" of an inmate's need for immediate medical care, and Defendants here failed to summon and "secure necessary emergency care [for Prasad] when they knew none was being provided." (Pls.' Opp'n 20:21, 21:28-29:1 (quoting Lucas v. Cnty. of L.A., 47 Cal. App. 4th 277, 288 (1996)).)

Under Cal Gov't Code § 845.6, "a public employee . . . is liable if the employee knows or has reason to know that [a] prisoner is in need of immediate medical care and he fails to take reasonable action to summon such medical care." Section 845.6 thus "'creates liability'" and "'an obligation of help.'" Lawson v. Superior Court, 180 Cal. App. 4th 1372, 1384 n.11 (2010) (quoting Johnson v. Cnty. of L.A., 143 Cal. App. 3d 298, 317 (1983)). However, this obligation to help does not extend to "furnishing, monitoring, follow-up, or subsequent care for the same condition" for which care was originally summoned. Castaneda v. Dep't of Corr. & Rehab., 212 Cal. App. 4th 1051, 1074 (2013); see id. (rejecting the Ninth Circuit's broader holding in Jett v. Penner that § 845.6 requires public employees to summon "treatment," and not just "diagnosis"); Watson, 21 Cal. App. 4th at 841—42 (emphasizing § 845.6's creation of an obligation to "*summon*" medical care without mention of any concomitant duty to "provide reasonable medical care"); Sanders v. Yuba Cnty., 247 Cal. App. 2d 748, 753 n.3 (1967) (recognizing that whereas the original draft of § 845.6 required a public employee "to 'see' to it" that a prisoner received needed immediate care, the enacted version of § 845.6 merely requires an employee "to 'summon' medical care").

Plaintiffs argue that the court should refrain from "'speculat[ing] on the nature of the medical care, if any, which here should have been summoned for Decedent'" since the question of the

---

[4] Nurse Practitioner Brown and Licensed Vocational Nurses Young, Weiss, and Bhangu do not challenge Plaintiffs' § 845.6 claim against them.

reasonableness of Defendants' conduct is a "'question[] of fact to be determined at trial'" by the jury. (Pls.' Opp'n 21:14-18 (quoting Johnson, 143 Cal. App. 3d at 317).) While Plaintiffs are correct that § 845.6 generally presents a factual question for the jury, even the Johnson court—upon which Plaintiffs rely, and which reversed a grant of demurrer on plaintiffs' § 845.6 claim—noted that under § 845.6 "merely calling a doctor or other trained health care provider to examine a prisoner may be sufficient." Johnson, 143 Cal. App. 3d at 317. Unlike in Johnson, where defendants failed to so much as "call a doctor or other trained health care provider" for the prisoner, id., here, Prasad was "already" or "concurrently" under medical supervision when observed by these Defendants. (Sutter Defs.' Mot. 16:17, 16:21.) Accordingly, since § 845.6 does not extend to "furnishing, monitoring, [or] follow-up" once care has been summoned, Castaneda, 212 Cal. App. 4th at 1074, and since it would be redundant to read § 845.6 as requiring Defendants to summon care when care was already there and further action was not required, Plaintiffs' § 845.6 claim against Defendants Garbett, Stohlman, Eaton, Dickson, Rai, Crawford, Diaz, Aguilar, and Tahara is dismissed.

### (7) Wrongful Death

The Sutter Defendants seek dismissal of Plaintiffs' wrongful death claim against them, arguing that "[a] claim for relief under California's wrongful death statute requires that the Complaint 'contain allegations as to all the elements of actionable negligence' from which the death occurred," (Sutter Defs.' Mot. 17:3—5 (quoting Jacoves v. United Merch. Corp., 9 Cal. App. 4th 88, 105 (1992))). According to the Sutter Defendants, however, Plaintiffs fail to allege the negligence elements of duty and causation since (1) "the decedent was released on his own recognizance before expiring at the hospital," (id. 17:24—26); (2) Prasad spent an "apparently lengthy" period at the hospital and his "earlier arrival 'probably unlikely' would have prevented his death," (id. 18:5—7); and (3) the non-medical professionals "owed no duty of professional medical care to the decedent." (Id. 17:18—22.) Plaintiffs respond that a wrongful death claim may be predicated on "either the 'negligence or other wrongful act' of a tortfeasor," and here Plaintiffs allege that "each defendant engaged in 'wrongful acts and/or omissions,'" namely "deliberate indifference to medical needs and failure to summon needed care," that "directly and proximately caused Mr. Prasad's death." (Pls.' Opp'n 22:23—28.)

///

The elements of a California wrongful death claim are: "(1) a 'wrongful act or neglect' on the part of one or more persons that (2) 'cause[s]' (3) the 'death of [another] person.'" Norgart v. Upjohn Co., 21 Cal. 4th 383, 390 (1999) (quoting Cal. Civ. Proc. Code § 377.60) (alterations in original)). A wrongful death claim may be predicated on negligence or other tortious conduct. See infra (discussing this issue at some length). Here, Plaintiffs allege that each of the Sutter Defendants were deliberately indifferent to Prasad's serious medical needs, and that their deliberate indifference caused Prasad's preventable death. These allegations suffice to state a claim for wrongful death. Nor are the Sutter Defendants' arguments about the lapse of time, lack of duty, or "release" of Prasad on his own recognizance persuasive. See supra. Accordingly, this portion of the Sutter Defendants' dismissal motion is denied.

**(8) Prayer for Punitive Damages**

Defendants Cummings, Garbett, Brown, Young, Weiss, and Bhangu ("Sutter Medical Defendants") seek to dismiss or strike Plaintiffs' prayer for punitive damages concerning Plaintiffs' state law claims. (Sutter Defs.' Reply 8:21—24). The Sutter Medical Defendants argue that dismissal is warranted since "Plaintiffs did not petition the Court for punitive damages against Defendants" under Cal. Civil Proc. Code § 425.13. (Sutter Defs.' Mot. 18:26—27.) Plaintiffs counter that § 425.13 "does not apply in federal courts where punitive damage claims can be addressed 'through case management procedures.'"[5] (Pls.' Opp'n 24:15—16 (quoting Jackson v. E. Bay Hosp., 980 F. Supp. 1341, 1353 (N.D. Cal. 1997), aff'd, 246 F.3d 1248 (9th Cir. 2001)).)

California Civil Procedure Code § 425.13 prescribes that "[i]n any action for damages arising out of the professional negligence of a health care provider, no claim for punitive damages shall

---

[5] In the alternative, Plaintiffs argue that even if § 425.13 does apply in federal court it is inapplicable here since "by its terms" § 425.13 applies "only to state law claims arising out of the professional negligence of a health care provider" and Plaintiffs claims, "which are predicated on deliberate, egregious conduct, do not fall under the ambit of this statute." (Pls.' Opp'n 24:18—25:1 (citing Covenant Care, Inc. v. Superior Court, 32 Cal. 4th 771 (2004)).) The Sutter Medical Defendants counter that § 425.13 applies "to both negligence and [intentional] tort claims against medical providers." (Defs.' Reply 9:8 (citing Cent. Pathology Serv. Med. Clinic, Inc. v. Superior Court, 3 Cal. 4th 181 (1992)).) However, this state law question—concerning whether § 425.13 applies to wrongful death and failure to furnish medical care claims based on the deliberate indifference of medical providers—is not reached since § 425.13 is adjudged inapplicable in federal court.

be included in a complaint or other pleading unless the court enters an order allowing an amended

pleading that includes a claim for punitive damages to be filed." Cal. Civ. Pro. Code § 425.13(a). To

obtain an order authorizing a request for punitive damages under § 425.13, the court must determine on

the plaintiff's motion "that the plaintiff has established that there is a substantial probability that the

plaintiff will prevail on the claim." Id.

Federal district courts have divided on whether § 425.13 applies in federal court.

Decisions from this district generally apply the statute, finding § 425.13 is "intimately bound to the state

substantive causes of action for professional negligence" and therefore "more properly [a] rule[] of

substantive law within the meaning of Erie." Thomas v. Hickman, No. CV F 06-0215 AWI SMS, 2006

WL 2868967, at *40 (E.D. Cal. Oct. 6, 2006); see Allen v. Woodford, No. 1:05-CV-01104-OWW-LJO,

2006 WL 1748587, at *21 (E.D. Cal. June 26, 2006) (finding § 425.13 so 'intimately bound up' with

the substantive" law of professional negligence that it is "part of an integrated scheme for managing

medical malpractice claims and constitutes a central feature of that scheme"). These initial decisions in

Thomas and Allen have since been followed by other decisions from this district. See Rhodes v. Placer

Cnty., No. 2:09-CV-00489 MCE KNJ PS, 2011 WL 1302240, at *21 (E.D. Cal. Mar. 31, 2011)

(following Allen and Thomas and holding "plaintiff must petition the court for punitive

damages . . . pursuant to Section 425.13"), adopted, 2011 WL 1739914 (E.D. Cal. May 4, 2011); see

also Bock, 2012 WL 3778953, at *19 (following Thomas without the benefit of briefing on the inter-

district split); Fraher v. Surydevara, No. 1:06-cv-01120-AWI-GSA PC, 2009 WL 1371829, at *2 (E.D.

Cal. May 15, 2009) (same); Moreno v. The GEO Group, Inc., No. 1:07-CV-01630-CKJ, 2009 WL

841139, at *5 (E.D. Cal. Mar. 26, 2009) (granting unopposed motion to strike prayer for punitive

damages under§ 425.13 without the benefit of briefing on the split).

By contrast, decisions from the Northern and Southern Districts of California generally

decline to apply § 425.13, finding that the statute is "a procedural matter rather than a substantive one."

Jackson, 980 F. Supp. at 1352. In Jackson, an early Northern District of California case addressing the

question, the court adjudged § 425.13 inapplicable since it is "essentially a method of managing or

directing a plaintiff's pleadings, rather than a determination of substantive rights." Id. (concluding that §

425.13 "is not 'a central feature' of the [California] medical malpractice scheme," and relying on

1    intermediate California appellate court rulings that § 425.13 is non-jurisdictional, waivable, and

2    "procedural"). <u>Jackson</u> has since been followed and approved of by courts in the Northern and Southern

3    District of California. <u>See, e.g.</u>, <u>George</u>, 732 F. Supp. 2d at 951 (concluding that "section 425.13 is a

4    procedural rule that does not apply in federal court" and disagreeing with the reasoning of the leading

5    Eastern District of California case holding otherwise); <u>Burrows v. Redbud Cmty. Hosp. Dist.</u>, 188

6    F.R.D. 356, 361 (N.D. Cal. 1997) ("[S]ection 425.13 is a procedural rule for managing and directing

7    pleadings: it does not create substantive limits on the damages a plaintiff may seek."); <u>Ortegoza v. Kho</u>,

8    No. 12-cv-529-L (KSC), 2013 WL 2147799, at *7 (S.D. Cal. May 16, 2013) ("agree[ing] with the

9    <u>Jackson</u> court's determination that § 425.13 is procedural" and inapplicable in federal court); <u>see also</u>,

10    <u>e.g.</u>, <u>Steel v. City of San Diego</u>, 726 F. Supp. 2d 1172, 1182 (S.D. Cal. 2010) (citing <u>Jackson</u> with

11    approval); <u>Franklin v. Allstate Corp.</u>, No. C-06-1901 MMC, 2007 WL 1991518, at *3—4 (N.D. Cal.

12    2007) (same); <u>Shinde v. Nithyananda Found.</u>, No. EDCV 13-0363 JGB (Spx), 2013 WL 1953707, at

13    *16 & n.6 (C.D. Cal. May 10, 2013) (same).

14            Despite the split in the application of § 425.13 in federal court, the issue has generally

15    been considered a question of classification of the statute as substantive or procedural. Thus

16    <u>Jackson</u> framed the question as presenting "an <u>Erie</u> issue: Is the punitive damages requirement

17    substantive, so that state law applies, or is it procedural, so that federal law applies?" <u>Jackson</u>, 980 F.

18    Supp. at 1351; <u>see id.</u> at 1352 (explaining that whether the "statute is procedural or substantive[ is] an

19    inquiry this court finds essential to resolution of the issue"). Likewise, <u>Thomas</u>, in the Eastern District,

20    presented the issue for decision as whether § 425.13 should be deemed procedural or "'substantive' for

21    Erie purposes." <u>Thomas</u>, 2006 WL 2868967, at *40.

22            Instead of following this framing, Plaintiffs urge the court to adopt the reasoning of the

23    Eleventh Circuit and to find that § 425.13's requirement that a plaintiff obtain an order authorizing

24    punitive damages directly conflicts with Rule 8(a)(3) of the Federal Rules of Civil Procedure—thereby

25    obviating the need for the "'typical, relatively unguided <u>Erie</u> choice.'" <u>Metabolife Int'l, Inc. v. Wornick</u>,

26    264 F.3d 832, 845 (9th Cir. 2001) (quoting <u>Hanna v. Plumer</u>, 380 U.S. 460, 471 (1965)). (<u>See generally</u>

27    Pls.' Supplemental Br. in Resp. to Ct.'s Apr. 3, 2013 Minute Order, ECF No. 83, 2:9—4:14.) For the

28    reasons that follow, given the plain meaning of Rule 8(a)(3), and the persuasive reasoning of the

1  Eleventh Circuit in <u>Cohen v. Office Depot, Inc.</u>, this court follows <u>Cohen</u> and holds that Rule 8(a)(3)

2  conflicts with Cal. Civ. Proc. Code § 425.13, making § 425.13 inapplicable in federal court.

3          When resolving whether a state law applies in federal court, a court "must first determine

4  whether [the relevant Federal Rule []] answers the question in dispute." <u>Shady Grove Orthopedic</u>

5  <u>Assocs. v. Allstate Ins. Co.</u>, 130 S. Ct. 1431, 1437 (2010); <u>accord</u> <u>Burlington N. R.R. Co. v. Woods</u>, 480

6  U.S. 1, 4—5 (1987) (describing this as "[t]he initial step" in such determinations); <u>Goldberg v. Pac.</u>

7  <u>Indem. Co.</u>, 627 F.3d 752, 755 (9th Cir. 2010) (noting that the court must "first determine whether the

8  federal rule is 'sufficiently broad to control the issue,'" and only "[i]f there is no direct conflict between

9  the federal rule and the state rule" should the court then turn to the traditional <u>Erie</u> analysis); <u>Hamm v.</u>

10 <u>Am. Home Prods. Corp.</u>, 888 F. Supp. 1037, 1038 (E.D. Cal. 1995) ("[T]he first step of the analysis is to

11 determine whether there is a Federal Rule of Civil Procedure that governs the matter at issue.").

12         As the split concerning § 425.13 amply indicates, the task of classifying a law "as

13 'substantive' or 'procedural' for <u>Erie</u> purposes" is "challenging" when the law is not construed as

14 covered by one of the Federal Rules. <u>Gasperini v. Ctr. for Humanities, Inc.</u>, 518 U.S. 415, 427 & n.7

15 (1996); <u>see also</u> <u>Allstate Ins. Co.</u>, 130 S. Ct. At 1437 (describing the <u>Erie</u> analysis as "murky" when

16 there is no governing Federal Rule); <u>Hamm</u>, 888 F. Supp. at 1038 (acknowledging that "the line between

17 substance and procedure is neither static nor easily drawn"). However, a court need not make a

18 challenging and "relatively unguided <u>Erie</u> choice" when "a situation is covered by one of the Federal

19 Rules." <u>Hanna</u>, 380 U.S. at 471; <u>see</u> <u>Verizon Del., Inc v. Convad Commc'ns Co.</u>, 377 F.3d 1081, 1091

20 (9th Cir. 2004) (finding "no[] need to proceed to the secondary test" under <u>Erie</u> because "a direct

21 collision with a federal procedural rule exists"). Instead, "when a Federal Rule of Civil Procedure is on

22 point, it, not the state law, governs, so long as it does not run afoul of the Rules Enabling Act" or the

23 Constitution. <u>McCalla v. Royal MacCabees Life Ins. Co.</u>, 369 F.3d 1128, 1135 (9th Cir. 2004).[6]

24         Rule 8(a)(3) prescribes that "[a] pleading that states a claim for relief must contain . . . a

25 demand for the relief sought, which may include relief in the alternative or different types of relief."

26

27         [6] The Sutter Medical Defendants do not argue that Rule 8(a)(3) runs afoul of the Rules Enabling Act

28 or the Constitution. <u>See</u> <u>Goldberg</u>, 627 F.3d at 755 n.5 (declining to address whether Rule 68 "transgresses the limits of the Rules Enabling Act or the Constitution" when defendants did not so argue).

Meanwhile, Cal. Civ. Proc. Code § 425.13 prevents a pleading that states a claim for relief from containing a demand for punitive damages without prior court authorization. Cal. Civ. Proc. Code § 425.13(a) (providing that "no claim for punitive damages shall be included in a complaint [arising out of the professional negligence of a health care provider] . . . unless the court enters an order allowing an amended pleading that includes a claim for punitive damages to be filed").

In Cohen v. Office Depot, Inc., the Eleventh Circuit analyzed a similar state law requiring leave of court to include a claim for punitive damages. Cohen, 184 F.3d 1292 (11th Cir. 1999), vacated in part on other grounds, 204 F.3d 1069 (11th Cir. 2000). It determined that the state law directly conflicted with Rule 8(a)(3), making it inapplicable in federal court. Id. at 1299. Cohen held that "because Rule 8(a)(3) allows a plaintiff to request in her initial complaint all the relief she seeks, it says 'implicitly, but with unmistakable clarity' that a plaintiff is not required to wait until a later stage of the litigation to include a prayer for punitive damages, nor is she required to proffer evidence or obtain leave of court before doing so." Cohen, 184 F.3d at 1298—99 (quoting Hanna, 380 U.S. at 470). Given the force of this reasoning, this court follows Cohen and holds that the plain meaning of Rule 8(a)(3) conflicts with Cal. Civ. Proc. Code § 425.13, making § 425.13 inapplicable in federal court.

Accordingly, the Sutter Medical Defendants' motion to dismiss Plaintiffs' prayer for state law punitive damages for failure to comply with § 425.13 is denied.

**B. Rideout's Dismissal Motion**

Plaintiffs allege claims against Rideout for cruel and unusual punishment, (SAC ¶¶ 103—08), substantive due process, (id. ¶¶ 127—30), and wrongful death. (Id. ¶¶ 137—42.) Rideout seeks dismissal of all of Plaintiffs' claims against it.

**(1) Action Under Color of State Law**

Rideout argues that its actions do not "rise to the level of being a State actor" under § 1983 since it was "uninvolved" and "not in contact with the [J]ail" at "the time [when] Prasad's serious medical needs" arose. (Rideout's Mot. to Dismiss ("Rideout's Mot."), ECF No. 56, 9:12, 9:2—4; Rideout's Reply to Pls.' Opp'n to Mot. to Dismiss ("Rideout's Reply"), ECF No. 72, 2:22—24.) Plaintiffs respond that "Rideout assumed a traditionally governmental function when it contracted to provide emergency medical services to Sutter County Jail inmates" and therefore its "conduct

1  [constitutes state action] within the ambit of Section 1983." (Pls.' Opp'n to Rideout's Mot. to Dismiss

2  ("Pls.' Opp'n to Rideout's Mot."), ECF No. 64, 5:18—20, 6:2.)

3          A hospital is a state actor for purposes of § 1983 when it contracts with the state to

4  provide adequate medical care to the state's incarcerated citizens. See Lopez v. Dep't of Health Servs.,

5  939 F.2d 881, 883 (9th Cir. 1991) (per curiam) (finding state action where hospital "contract[ed] with

6  the state . . . to provide medical services to indigent citizens"); George v. Sonoma Cnty. Sheriff's Dep't,

7  732 F. Supp. 2d 922, 934 (N.D. Cal. 2010) ("A private . . . hospital that contracts with a public prison

8  system to provide treatment for inmates performs a public function and acts under color of law for

9  purposes of § 1983."). Here, Rideout assumed a traditional governmental function and acted under color

10  of state law by suppling "the sole facility to which Jail inmates [we]re transported to receive emergency

11  medical care." (SAC ¶ 2.) To the extent that Rideout argues that it was not a state actor because it did

12  not act in this case, (e.g., Rideout's Mot. 9:14—21), Rideout's argument concerns Plaintiffs' allegation

13  that Rideout violated a constitutionally guaranteed right, not Rideout's status as a state actor. See

14  generally Bradley v. Flannery, No. CV F F-11-0942 AWI DLB, 2011 WL 4738313, at *3 (E.D. Cal. Oct.

15  5, 2011) (noting "[d]efendants' argument tends to conflate the [separate] issues of whether [d]efendants

16  were acting under color of law with the issue of whether any constitutionally guaranteed right was

17  violated"). Accordingly, this portion of Rideout's dismissal motion is denied.

18          **(2) Deliberate Indifference to Serious Medical Needs**

19          Rideout argues Plaintiffs have not pled Rideout's deliberate indifference to Prasad's

20  serious medical needs since the complaint alleges neither Prasad's serious medical needs nor Rideout's

21  deliberate indifference to those needs. (Rideout's Mot. 11:2—12:8.) Plaintiffs counter that the complaint

22  alleges Rideout's knowledge of Prasad's "serious and life-threatening condition," (SAC ¶ 104(e)),

23  Prasad's need for "access to emergency medical treatment if his symptoms worsened or new symptoms

24  developed," (id.), and the Jail's inability to provide "observation, supervision, and ongoing [or timely]

25  access to emergency medical treatment." (Id. ¶ 51; Pls.' Opp'n to Rideout's Mot. 7:9—8:2.)

26          In the Ninth Circuit, the test for deliberate indifference to a prisoner's serious medical

27  needs is two-pronged. E.g., Akhtar v. Mesa, 698 F.3d 1202, 1213 (9th Cir. 2012); Wilhelm v. Rotman,

28  680 F.3d 1113, 1122 (9th Cir. 2012). "'First, the plaintiff must show a serious medical need by

25

1  demonstrating that failure to treat a prisoner's condition could result in further significant injury or the

2  unnecessary and wanton infliction of pain.'" Wilhelm, 680 F.3d at 1122 (quoting Jett v. Penner, 439

3  F.3d 1091, 1096 (9th Cir. 2006)). Second, the plaintiff must "'show the defendant's response to the need

4  was deliberately indifferent'" by alleging "'a purposeful act or failure to respond to a prisoner's pain or

5  possible medical need'" and "'harm caused by the indifference.'" Id. (quoting Jett, 439 F.3d at 1096).

6           Plaintiffs have amply alleged that Prasad's condition constituted "a serious medical need"

7  under the first prong of this test. Id. at 1122. Prasad was taken to Rideout because he was exhibiting

8  signs of a serious and life-threatening condition and experiencing extreme pain and swelling in his lower

9  extremities. (SAC ¶¶ 46, 50.) After a "brief" medical evaluation, (id. ¶ 48), Prasad was discharged from

10 Rideout with instructions that if his symptoms worsen or new symptoms develop, he was to be returned

11 to the Emergency Department immediately. (Id. ¶ 50.) Fewer than fifty-five hours later, Prasad died in

12 extreme pain from the same condition for which he was admitted. (Id.) Rideout's argument that "any

13 serious medical need ceased to exist" after Prasad was treated and discharged from Rideout, (Rideout's

14 Mot. 11:11—12), is belied by Plaintiffs' allegations that Prasad died less than fifty-five hours later and

15 that by the evening of his discharge, he was "coughing and/or vomiting up blood," experiencing

16 "shortness of breath" and "severe chills," and "suffering from 'uncontrollable pain.'" (SAC ¶ 56.)

17          Under the second prong of this test, Rideout contends that Plaintiffs cannot allege its

18 deliberate indifference since Prasad's medical needs were merely "'likely,'" but not current or

19 immediate. (Rideout's Reply 4:21—5:3.) However, there is no such limitation on deliberate indifference

20 liability, which extends not just to failure to respond to a current medical need, but also to "failure to

21 respond to a prisoner's . . . *possible* medical need." Jett, 439 F.3d at 1096; see also Doty v. Cnty. of

22 Lassen, 37 F.3d 540, 546 (9th Cir. 1994) (defining a serious medical need as "the failure to treat a

23 prisoner's condition [that] *could* result in further significant injury" or pain) (emphasis added). Plaintiffs

24 allege Rideout knew that Prasad "was exhibiting signs of a serious and life-threatening condition and

25 would need access to emergency medical treatment if his symptoms worsened or new symptoms

26 developed," (SAC ¶ 104(e)), but that Rideout nonetheless discharged Prasad to the Jail—a setting where

27 it knew that Prasad could not receive around-the-clock access to emergency medical treatment. (Id. ¶¶

28

1   51, 52.) This is enough to plead Rideout's "failure to respond to [Prasad's] . . . possible medical need."

2   Jett, 439 F.3d at 1096. Accordingly, this portion of Rideout's dismissal motion is denied.

3   **(3) Substantive Due Process Right to Family Integrity**

4   Rideout argues that Mary Prasad, T.P., and A.P.'s family integrity claim fails since their

5   "constitutional claims alleged on behalf of the Decedent fail." (Rideout's Mot. 13:11—12.) Plaintiffs

6   counter that "[b]ecause the SAC states a claim that Rideout maintained a policy and practice that was

7   deliberately indifferent to Mr. Prasad's need for life-saving emergency medical care, it also states a

8   claim that Rideout was deliberately indifferent to Mary Prasad's right to the companionship and society

9   of her son, and to T.P. and A.P.'s rights to the companionship and society of their father." (Pls.' Opp'n

10  to Rideout's Mot. 9:15—19.) Since Rideout has not in fact shown that Plaintiffs' other constitutional

11  claims fail, see supra, this portion of Rideout's dismissal motion is denied.

12  **(4) Wrongful Death**

13  Rideout seeks dismissal of Plaintiffs' wrongful death claim, alleged under Cal. Civ. Proc.

14  Code § 377.60, arguing that "[a]lthough Plaintiffs do not specifically allege medical malpractice, it may

15  be inferred [from] the complaint" that Plaintiffs' claim is based on medical malpractice, and Plaintiffs

16  have not met the requirements for a medical malpractice claim. (Rideout's Mot. 14:2-3.) Plaintiffs

17  respond that their claim is based on "a wrongful act-namely, deliberate indifference to serious medical

18  needs-by Rideout," and "Rideout cannot secure dismissal by transmuting [Plaintiffs'] claims . . . into

19  claims that it prefers to rebut." (Pls.' Opp'n to Rideout's Mot. 10:10-11, 10:5—6.)

20  Cal. Civ. Proc. Code § 377.60 authorizes "[a] cause of action for the death of a person

21  caused by the wrongful act or neglect of another." The term "'wrongful act' as used in section 377

22  means any kind of tortious act," including not only acts of negligence, but also acts of intentional or

23  willful misconduct. Barrett v. Superior Court, 222 Cal. App. 3d 1176, 1191 (1990); see also Ewig v.

24  Cloverleaf Bowl, 20 Cal. 3d 389, 398 (1978) (considering wrongful death claim based on theories of

25  "both negligence and willful misconduct"). Thus a wrongful death claim against a medical provider need

26  not assert professional negligence as its basis, but may instead be based on a provider's affirmatively

27  wrongful conduct.

28

1    Here, Plaintiffs have pled Rideout's deliberate indifference to Prasad's serious medical

2   needs in violation of the Fourteenth Amendment, which mirrors the Eighth Amendment standard. E.g.,

3   Lolli v. Cnty. of Orange, 351 F.3d 410, 418—19 (9th Cir. 2003); Gibson, 290 F.3d at 1187. An Eighth

4   or Fourteenth Amendment violation is "quite distinct" from, and not "encompass[ed]" by, a claim for

5   malpractice. Castaneda v. United States, 546 F.3d 682, 694 n.12 (9th Cir. 2008) ("stress[ing] the

6   difference between malpractice and an Eighth [or Fourteenth] Amendment violation," and finding a

7   medical provider's deliberate indifference to an inmate's medical needs is "categorically different from

8   anything . . .  term[ed] 'malpractice'"), rev'd on other grounds sub nom. Hui v. Castaneda, 559 U.S. 799

9   (2010). Therefore Plaintiffs' wrongful death claim based on Rideout's deliberate indifference is

10   "categorically different" from a claim based on medical malpractice. Id. Thus Rideout's dismissal

11   motion based on Plaintiffs' failure to state a medical malpractice claim is denied.

12   **(5) Rule 12(e) Motion for a More Definite Statement**

13    Rideout requests an order under Rule 12(e) "requiring [P]laintiffs to provide a more

14   definite statement" of their claims, but provides no further information in support of its request.

15   (Rideout's Mot. 14:25.) Plaintiffs argue that Rideout's motion "must be denied" since it "makes no

16   effort to specify any purportedly vague or ambiguous provisions of the SAC." (Pls.' Opp'n to Rideout's

17   Mot. 11:16—17.) Rideout does not respond to this portion of Plaintiffs' opposition. (Rideout's Reply.)

18    A motion for a more definite statement of a pleading under Rule 12(e) "must point out the

19   defects complained of and the details desired." Fed. R. Civ. P. 12(e); see also Bautista v. L.A. Cnty., 216

20   F.3d 837, 843 n.1 (9th Cir. 2000) (stating that a party may seek a more definite statement by "pointing

21   out" this information). The requirement that a Rule 12(e) motion identify these defects and details

22   enables the court to "test the propriety of the motion . . . in light of the Rule's limited purpose," Charles

23   Alan Wright et al., 5C Federal Practice & Procedure § 1378 (3d ed. 2012), which permits amendment

24   only when a pleading is so "unintelligible" that "the defendant literally cannot frame a responsive

25   pleading." Pub. Lands for the People, Inc. v. U.S. Dep't of Agric., 733 F. Supp. 2d 1172, 1200 (E.D. Cal.

26   2010). A Rule 12(e) motion that does not identify the details desired from the more definite statement is

27   neither "effective" nor "in compliance with Rule 12(e)." Gillibeau v. City of Richmond, 417 F.2d 426,

28

1   431 & n.5 (9th Cir. 1969). Here, since Rideout fails to point out defects in Plaintiffs' complaint or the

2   details desired from the amendment, Rideout's Rule 12(e) motion is denied.

3   **C. Fraters's Dismissal Motion**

4          Fraters moves to dismiss Plaintiffs' claims against him for cruel and unusual punishment

5   (SAC ¶¶ 103—08), substantive due process (id. ¶¶ 127—30), and wrongful death. (Id. ¶¶ 137—42.)

6          **(1) Action Under Color of State Law**

7          Fraters seeks dismissal of Plaintiffs' § 1983 claims, arguing Plaintiffs have not shown

8   that Fraters acted under color of state law, since he neither acted under the direction of the state nor

9   contracted directly with the state. (Fraters's Mot. to Dismiss ("Fraters's Mot."), ECF No. 52,

10  4:22—5:13.) Plaintiffs respond that Fraters acted under color of state law for purposes of § 1983 since

11  the state contractually delegated to Rideout its obligation to provide medical care for inmates, and

12  Fraters acted as Rideout's agent under that contract. (Pls.' Opp'n to Fraters's Mot. to Dismiss ("Pls.'

13  Opp'n to Fraters's Mot."), ECF No. 66, 4:5—6:18.)

14         Since the state bears "an affirmative obligation to provide adequate medical care" to its

15  inmates, a private physician who "is authorized and obliged to treat prison inmates" acts under color of

16  state law for purposes of § 1983. West v. Atkins, 487 U.S. 42, 56, 55 (1988). Here, the state "delegated"

17  to Rideout the provision of medical care for state inmates; Rideout "voluntarily assumed that obligation

18  by contract"; and Fraters acted as Rideout's agent. Id. at 56. Thus for purposes of liability under § 1983,

19  Fraters is "'a person who may fairly be said to be a state actor.'" Id. at 49 (quoting Lugar v. Edmondson

20  Oil Co., 457 U.S. 922, 937 (1982)); see also George, 732 F. Supp. 2d at 935 (finding private physician

21  acted under color of state law by treating inmate even though only the physician's employer contracted

22  directly with the state); Ayala v. Andreasen, No. CIV S-04-0903-RRB-CMK-P, 2007 WL 1395093, at

23  *3 (E.D. Cal. May 10, 2007) (holding private physician acted under color of state law since his hospital-

24  employer "was under a contract with state prison authorities for inmate referrals" and physician acted

25  "[a]s an agent of the hospital"). Accordingly, this portion of Fraters's dismissal motion is denied.

26         **(2) Deliberate Indifference to Serious Medical Needs**

27         Fraters argues Plaintiffs have not pled Fraters's deliberate indifference under § 1983,

28  since physicians do not have a duty "to determine the level of medical care available to a patient upon

discharge," (Fraters's Reply to Pls.' Opp'n to Mot. to Dismiss ("Fraters's Reply"), ECF No. 68, 3:12),
and Plaintiffs' allegations against Fraters are based solely on Fraters's discharge of Prasad to Sutter
County Jail. (Fraters's Mot. 6:18—26.) Plaintiffs counter that "the SAC does not attempt to impose an[]
all-encompassing affirmative duty to investigate" on Fraters; "[r]ather, it alleges that given Dr. Fraters's
existing knowledge, his actions were deliberately indifferent." (Pls.' Opp'n to Fraters's Mot. 7:28—8:3.)

A plaintiff may plead deliberate indifference under § 1983 by alleging that an "official
acted or failed to act despite his knowledge of a substantial risk of serious harm." Farmer v. Brennan,
511 U.S. 825, 842 (1994). Thus a plaintiff may demonstrate a defendant's deliberate indifference by
"present[ing] evidence showing that a substantial risk . . . was longstanding, pervasive,
well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that
the defendant-official being sued had been exposed to information concerning the risk." Id. (internal
quotation marks omitted). Here, Plaintiffs have pled just that. The complaint alleges that the deficiencies
at Sutter County Jail were longstanding, repeatedly documented, and expressly noted by officials in the
past, and that Fraters had knowledge of these circumstances. (SAC ¶¶ 52, 80, 84—89.) Given these
allegations, Plaintiffs have pled that Fraters acted with deliberate indifference to Prasad's serious
medical needs when he discharged Prasad to Sutter County Jail despite knowing that "safe discharge
from the hospital depended on the capacity for emergency medical response that he knew did not exist at
Sutter County Jail." (SAC ¶¶ 35, 52.) See generally Bock v. Cnty. of Sutter, No. 2:11-cv-00536-MCE-
GGH, 2012 WL 3778953, at *7 (E.D. Cal. Aug. 31, 2012) (finding plaintiffs pled deliberate indifference
since psychiatrist discharged inmate from hospital to Sutter County Jail knowing that the jail "could not,
and would not, provide the necessary hospital-level treatment"). Accordingly, this portion of Fraters's
dismissal motion is denied.

**(3) Substantive Due Process Right to Family Integrity**

Fraters argues that Mary Prasad, T.P., and A.P.'s substantive due process family integrity
claim fails since Fraters "had no duty regarding the supervision or training of any individuals at the
Sutter County Jail," and "any alleged conduct by the [J]ail staff . . . cannot be attributed" to Fraters.
(Fraters's Mot. 7:17—20.) Plaintiffs respond that Fraters "misrepresents or simply misapprehends" their
claim, which is predicated on Fraters's deliberately indifferent discharge of "Prasad to a setting utterly

1   unable to address his need for life-saving emergency medical care," not on Fraters's supervision of

2   Prasad's care at the Jail. (Pls.' Opp'n to Fraters's Mot. 9:16, 10:6—8.)

3          "The substantive due process right to family integrity or to familial association is well

4   established." Rosenbaum v. Washoe Cnty., 663 F.3d 1071, 1079 (9th Cir. 2011). "'A parent has a

5   fundamental liberty interest in companionship with his or her child.'" United States v. Wolf Child, 699

6   F.3d 1082, 1091 (9th Cir. 2012) (quoting Rosenbaum, 663 F.3d at 1079). Likewise, a child has a

7   fundamental liberty interest in the companionship and society of his or her parent. Lee v. City of L.A.,

8   250 F.3d 668, 685—86 (9th Cir. 2001); Curnow ex rel. Curnow v. Ridgecrest Police, 952 F.2d 321, 325

9   (9th Cir. 1991). "[V]iolation of the right to family integrity is subject to remedy under § 1983."

10  Rosenbaum, 663 F.3d at 1079.

11         To violate the substantive due process right to family integrity, a defendant's "alleged

12  conduct must 'shock[ ] the conscience.'" Marsh v. Cnty. of San Diego, 680 F.3d 1148, 1154 (9th Cir.

13  2012) (quoting Rochin v. California, 342 U.S. 165, 172—73 (1952) (alteration in original)); accord

14  Rosenbaum, 663 F.3d at 1079; Wilkinson v. Torres, 610 F.3d 546, 554 (9th Cir. 2010); Porter v. Osborn,

15  546 F.3d 1131, 1137 (9th Cir. 2008).[7] In a prison setting, deliberate indifference to an inmate's basic

16  human and medical needs constitutes "constitutionally shocking" action. Cnty. of Sacramento v. Lewis,

17  523 U.S. 833, 851—52 (1998); accord Porter, 546 F.3d at 1139. Prison "incapacitates a prisoner to

18  exercise ordinary responsibility for his own welfare," making "forethought about an inmate's welfare []

19  not only feasible but obligatory." Lewis, 523 U.S. at 851. Under these circumstances, "extended

20  opportunities to do better are teamed with protracted failure even to care," and "indifference is truly

21  shocking." Id. at 853; see Porter, 546 F.3d at 1139 (highlighting prisoner's medical needs as a clear

22  example of when deliberate indifference shocks the conscience); see also Rodriguez v. City of Fresno,

23  819 F. Supp. 2d 937, 948 (E.D. Cal. 2011) (noting "most occasions whereby corrections officials ignore

24  an inmate's serious medical needs . . . will be deemed conscience-shocking if they were taken with

25  deliberate indifference") (quoting Claybrook v. Birchwell, 199 F.3d 350, 359 (6th Cir. 2000)). Since

26

27         [7] But see Crowe v. Cnty. of San Diego, 608 F.3d 406, 441 n.23 (9th Cir. 2010) ("The standard for
28  deprivation of familial companionship is 'unwarranted interference,' not conduct which 'shocks the
    conscience.'").

Plaintiffs have alleged that Fraters was deliberately indifferent to Prasad's urgent medical needs while he was in custody and could not exercise responsibility for his own welfare, see supra, Mary Prasad, T.P., and A.P. have stated a substantive due process claim against Fraters for interference with the right of familial association if Fraters's other arguments are unavailing.

Fraters also contends, however, that Plaintiffs have not adequately asserted his interference with their right to familial association, because Plaintiffs do not allege that Fraters intended to interfere with their family. (See Fraters's Reply 4:4—5; Fraters's Mot. 7:26—27.) In the Ninth Circuit, "plaintiffs can state a section 1983 [substantive due process] claim without further alleging that the official was trying to break up their family." Smith v. City of Fontana, 818 F.2d 1411, 1420 n.12 (9th Cir. 1987), overruled on other grounds by Hodgers-Durgin v. de la Vina, 199 F.3d 1037 (9th Cir. 1999). Thus Plaintiffs need not allege Fraters's specific intent to interfere with their familial relationship. See Ward v. City of San Jose, 967 F.2d 280, 284 (9th Cir. 1991) (rejecting "any such limitation" that would "requir[e familial association plaintiffs] to prove a wrongful intent directed specifically at them"); see also Huffman v. Cnty. of L.A., 147 F.3d 1054, 1057 (9th Cir. 1998) (recognizing right to familial association without conditioning the right on intentional interference with the familial association). Accordingly, this portion of Fraters's dismissal motion is denied.

**(4) Wrongful Death**

Fraters seeks dismissal of Plaintiffs' wrongful death claim against him arguing that Plaintiffs' claim is based on "medical negligence by Dr. Fraters," but Plaintiffs have not pled the elements of a medical malpractice claim. (Fraters's Mot. 8:11—12.) Plaintiffs respond that "the SAC nowhere alleges medical malpractice, and Dr. Fraters cannot secure dismissal by transmuting the claims that are made into claims that he prefers to rebut." (Pls.' Opp'n to Fraters's Mot. 10:4—6.) Rather, "the SAC alleges a wrongful act—namely, deliberate indifference to serious medical needs—by Dr. Fraters." (Id. 11:10—11.) Since Plaintiffs have pled Fraters's deliberate indifference to Prasad's serious medical needs in violation of the Fourteenth Amendment, see supra, and since this is "quite distinct" from a medical malpractice claim, Castaneda, 546 F.3d at 694 n.12, this portion of Fraters's dismissal motion is denied.

///

32

### (5) Motion for a More Definite Statement

Fraters requests "an order requiring . . . a more definite statement" of Plaintiffs' claims, but provides no reasons justifying his request or details sought from the amendment. (Fraters's Mot. 9:4—5.) Plaintiffs argue, as they did with Rideout, that Fraters's request is "defective" since Fraters "makes no effort to specify any purportedly vague or ambiguous provisions of the SAC." (Pls.' Opp'n to Fraters's Mot. 11:18, 11:25—26.) Fraters does not respond to this portion of Plaintiffs' opposition. (Fraters's Reply.) Since Fraters fails to identify any defects in Plaintiffs' complaint or details desired from the amendment, see supra, Fraters's Rule 12(e) motion is denied.

### D. Fraters's Motion to Strike Prayer for Punitive Damages

Fraters seeks to strike Plaintiffs' prayer for punitive damages under Rule 12(f) on the grounds that it is precluded as a matter of law. (Fraters's Mot. to Strike, ECF No. 53.) Plaintiffs argue that this motion should be denied outright since Fraters "improperly seeks to [use Rule 12(f) to] strike a prayer for punitive damages." (Pls.' Opp'n to Fraters's Mot. to Strike, ECF No. 67, 1:20—21.) Fraters does not respond to this portion of Plaintiffs' opposition. (Fraters's Reply to Pls.' Opp'n to Mot. to Strike, ECF No. 69.)

"Rule 12(f) does not authorize district courts to strike claims for damages on the ground that such claims are precluded as a matter of law." Whittlestone, 618 F.3d at 974—75; see also Wells Fargo Bank, N.A. v. Am. Nat'l Ins. Co., Nos. 11-55366, 11-55665, 2012 WL 3245403, at *2 (9th Cir. Aug. 10, 2012) ("revers[ing] the district court order striking [plaintiff's] request" for relief under Rule 12(f)); Ferretti v. Pfizer Inc., 855 F. Supp. 2d 1017, 1029 (N.D. Cal. 2012) (denying defendant's motion to strike plaintiff's claim for damages since Rule 12(f) is not an appropriate vehicle for such relief); Duenez v. City of Manteca, No. CIV. S-11-1820 LKK/KJN, 2011 WL 5118912, at *7 (E.D. Cal. Oct. 27, 2011) (same). Instead, material may be stricken under Rule 12(f) only when it is "redundant, immaterial, impertinent or scandalous matter" or "an insufficient defense." Fed. R. Civ. Pro. 12(f); Whittlestone, 618 F.3d at 973—74. Plaintiffs' prayer for punitive damages satisfies "none of the[se] five categories" of material that may be stricken under Rule 12(f). Whittlestone, 618 F.3d at 974 (delineating how claim for damages "clearly" fails to meet any of the five enumerated grounds for striking material from a pleading). Nor may Fraters's motion to *strike* be read "in a manner that allow[s him] to use it as a

1  means to *dismiss* some or all of a pleading." Id. (emphasis added); see also Harvey v. Bank of Am.,

2  N.A., 906 F. Supp. 2d 982, 996 (N.D. Cal. 2012) ("Rule 12(f) may not be used to make an end-run

3  around Rule 12(b)(6) standards or summary judgment procedures."). Accordingly, since Fraters has not

4  shown that Rule 12(f) is an "authorized" or "proper" vehicle for the relief he seeks, Yamamoto v.

5  Omiya, 564 F.2d 1319, 1327 (9th Cir. 1977), Fraters's motion to strike Plaintiffs' prayer for punitive

6  damages is denied. The substance of Fraters's arguments are not reached.

7  **E. Rideout's Motion to Strike Prayer for Punitive Damages & Attorneys' Fees**

8           Rideout moves under Rule 12(f) to strike Plaintiffs' prayer for punitive damages;

9  paragraphs 108, 130, and 132 of Plaintiffs' complaint relating to punitive damages; and Plaintiffs' prayer

10 for attorneys' fees. (Rideout's Mot. to Strike, ECF No. 57, 3:20—23.) Plaintiffs argue, as they did with

11 Fraters, that this motion should be denied outright since Rideout "improperly seeks to [use Rule 12(f) to]

12 strike a prayer for punitive damages" and attorneys' fees. (Pls.' Opp'n to Rideout's Mot. to Strike, ECF

13 No. 65, 1:18—19.) Rideout does not reply to this portion of Plaintiffs' opposition. (Rideout's Reply to

14 Pls.' Opp'n to Mot. to Strike, ECF No. 71.) Thus Rideout has neither shown that Rule 12(f) is an

15 "authorized" vehicle for the relief it seeks, Yamamoto, 564 F.2d at 1327, nor established that claims for

16 damages or attorneys' fees qualify as material that may be stricken under any of "the five categories" in

17 Rule 12(f). Whittlestone, 618 F.3d at 974. Accordingly, Rideout's motion to strike is denied. The

18 substance of its motion is not reached.

19                                    **IV. CONCLUSION**

20           For the stated reasons, Fraters and Rideout's dismissal motions and motions to strike

21 (ECF Nos. 52, 53, 56, 57) are denied. The Sutter Defendants' dismissal motion (ECF No. 61) is denied

22 in all respects except that Plaintiffs' failure to summon medical care claim against Dickson, Rai,

23 Crawford, Diaz, Aguilar, Tahara, Stohlman, Eaton, and Garbett is dismissed. Plaintiffs are granted

24 fifteen (15) days leave to amend their complaint to address the deficiencies described in their failure to

25 summon medical care claim.

26

27

28

Dated:          July 29, 2013

_____
Troy L. Nunley
United States District Judge