MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
AARON J. FISCHER – 247391
KATHRYN G. MANTOAN – 239649
JENNIFER L. STARK – 267062
ROSEN BIEN GALVAN & GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, California  94104-1823
Telephone:    (415) 433-6830
Facsimile:    (415) 433-7104

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

## SACRAMENTO DIVISION

| | |
|---|---|
| Estate of NATHAN PRASAD, deceased, by and through MARY PRASAD; MARY PRASAD; T.P., a minor; A.P., a minor; and N.S., a minor, <br><br> Plaintiffs, <br><br> v. <br><br> COUNTY OF SUTTER; J. PAUL PARKER, Sutter County Sheriff's Department Sheriff; DAVID SAMSON, Sutter County Jail Division Commander; NORMAN BIDWELL, Sutter County Jail Corrections Lieutenant; LOU ANNE CUMMINGS, Sutter County Health Officer; AMERJIT BHATTAL, Sutter County Assistant Director of Human Services – Health Division; BRENT GARBETT, Sutter County Jail Nurse Program Manager; DORIS BROWN, Sutter County Jail Advanced Registered Nurse Practitioner; MELODY YOUNG, Sutter County Jail Licensed Vocational Nurse; KIMBERLY WEISS, Sutter County Jail Licensed Vocational Nurse; GURKIRAT BHANGU, Sutter County Jail Licensed Vocational Nurse; CHRISTINA STOHLMAN, Sutter County Jail  Correctional Officer; LESTER EATON, Sutter County Jail Correctional Officer; MIGUEL AGUILAR, Sutter County Jail Deputy Officer; OLGA TAHARA, Sutter County Jail Deputy Officer; ROSA DIAZ, Sutter County Jail Deputy Officer; ERIC CRAWFORD, Sutter County Jail Deputy Officer; BALJINDER RAI, Sutter County Jail Deputy Officer; SHANE DICKSON, Sutter County Jail Deputy Officer; FREMONT-RIDEOUT HEALTH GROUP; and MICHAEL FRATERS, D.O., <br><br> Defendants. | Case No. 2:12-CV-00592-TLN-CKD <br><br> **THIRD AMENDED COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

[1071448-2]

**INTRODUCTION**

1. This case involves the unnecessary and avoidable death of NATHAN PRASAD, a young man denied basic emergency life-saving treatment for a serious infection while detained at Sutter County Jail (the "Jail") on minor, non-violent charges. In the course of his approximately one-week detention, NATHAN PRASAD's condition deteriorated from an infection wholly treatable through basic and timely medical attention to an extraordinarily painful death as a result of Sutter County Jail's failure to provide treatment. Sutter County Jail's failure was despite documented observations of his emergent medical problems, including coughing up blood, deteriorating vital signs, and desperate pleas for help by NATHAN PRASAD and other jail inmates.

2. After reporting to jail staff that he was experiencing enormous pain in his lower extremities, he was brought to Rideout Memorial Hospital on January 26, 2011 for further evaluation. Following diagnostic testing on his lower extremities, hospital staff discharged NATHAN PRASAD back to the jail after only two-and-a-half hours. Doctors provided to jail staff Defendants explicit direction that NATHAN PRASAD be returned to the emergency room *immediately* if his symptoms worsen or new symptoms develop. Hospital staff knew, however, that the jail's staffing, policies and procedures made such immediate return extremely unlikely if not impossible. Because Rideout Memorial Hospital is the sole facility to which Jail inmates are transported to receive emergency medical care, hospital staff knew that Jail policies were such that jail medical staff, not custody staff, were responsible for summoning emergency medical attention, but that jail medical staff were not present during lengthy periods each day.

3. Upon his return to Sutter County Jail, NATHAN PRASAD's symptoms worsened dramatically, and new alarming symptoms developed. Jail staff observed and documented that NATHAN PRASAD was experiencing tremendous pain, coughing up blood, and telling them that he was afraid he would die without medical care. Basic medical diagnostic evaluation at the jail showed that his vital signs indicated extreme danger. His pulse rate was abnormally high; he had borderline low blood pressure, and

1   evinced a precipitous drop in blood pressure since his hospital admission; he had a low

2   grade fever; and the bruising that had been localized in his lower extremities had travelled

3   to his midsection.  Fellow inmates desperately sought medical help for NATHAN

4   PRASAD, going so far as to collect the blood he coughed up in a used milk carton which

5   was provided to jail staff.

6       4.     Despite their knowledge, jail staff ignored NATHAN PRASAD's serious

7   medical needs, instead ridiculing him and leaving him to continue to deteriorate in his cell

8   and at the jail.

9       5.     After almost two days of deterioration and suffering at the jail, NATHAN

10   PRASAD's condition became so serious that his blood pressure could no longer be

11   detected at all and he was losing consciousness.  His condition was so deteriorated by the

12   time emergency personnel were summoned that subsequent life-saving measures could not

13   revive him.

14       6.     NATHAN PRASAD fell into a coma and died on January 28, 2011, at the

15   age of 30.  He left behind three young children, T.P., A.P., and N.S., with whom he had a

16   close and loving relationship, and who he helped to support financially and emotionally.

17   He further left behind his mother, MARY PRASAD, with whom he remained

18   exceptionally close throughout his life and in the months prior to his death.  Neither

19   MARY PRASAD, nor T.P., nor A.P, nor N.S. was able to make it to NATHAN

20   PRASAD's bedside to see him before he passed away.

21       7.     Defendants acted with deliberate indifference to NATHAN PRASAD's

22   serious medical needs, and in violation of their duties under federal and state law, causing

23   NATHAN PRASAD's tragic and preventable death.  In both 2010-2011 and 2011-2012,

24   grand juries convened in Sutter County identified widespread deficiencies in training,

25   staffing, and maintenance of current policies and procedures for the provision of health

26   care to inmates at Sutter County Jail.  These systemic problems have been known to

27   Defendants for years, have not been addressed or corrected, and directly and substantially

28   contributed to NATHAN PRASAD's death in custody.

**JURISDICTION AND VENUE**

8.     This case is brought pursuant to 42 U.S.C. § 1983.  Jurisdiction is based on 28 U.S.C. §§ 1331 and 1343.  With respect to those claims brought pursuant to California law, Plaintiffs have complied with the administrative claim requirement.

9.     The court has supplemental jurisdiction over Plaintiffs' state claims pursuant to 28 U.S.C. § 1367.

10.     The claims alleged herein arose in the County of Sutter, California.  Therefore, venue in the Eastern District of California is proper pursuant to 28 U.S.C. § 1391(b)(2).

**PARTIES**

11.     Plaintiffs' decedent is NATHAN PRASAD, who, at the time of his death, was a 30-year-old citizen of the United States.  He was a citizen and resident of County of Sutter in the State of California.

12.     Plaintiff MARY PRASAD, as Administrator of the Estate of NATHAN PRASAD, brings this action pursuant to California Code of Civil Procedure §§ 377.10 *et seq.*  The survival causes of action in this matter are based on violations of NATHAN PRASAD's rights under the First and Fourteenth Amendments, and on violations of California state law.  MARY PRASAD is the mother of NATHAN PRASAD, and is also suing individually for violations of her civil rights under the First and Fourteenth Amendments and for wrongful death.

13.     Plaintiffs T.P., A.P., and N.S. are the children of NATHAN PRASAD.  They are suing for violations of their civil rights under the First and Fourteenth Amendments.  They are further suing for violations of California state law.  As minors, T.P., A.P., and N.S. are suing through MARY PRASAD, their grandmother, as Guardian *Ad Litem*.

14.     Plaintiff MARY PRASAD is a resident of the County of Colusa in the State of California.  Plaintiffs T.P., A.P., and N.S. are residents of the County of Sutter in the State of California.

15.     Defendant COUNTY OF SUTTER is a public entity, duly organized and

[1071448-2]

existing under the laws of the State of California.  Under its authority, Defendant COUNTY OF SUTTER operates and manages Sutter County Jail and is, and was at all relevant times mentioned herein, responsible for the actions and/or inactions and the policies, procedures and practices/customs of the Sutter County Sheriff's Department and its respective employees and/or agents.  Sutter County Sheriff's Department operates Sutter County Jail, and is and was responsible for ensuring the provision of emergency and basic medical care services to all Sutter County Jail inmates.

16.     Defendant J. PAUL PARKER is, and was at all relevant times mentioned herein, the Sheriff of the COUNTY OF SUTTER, the highest position in the Sutter County Sheriff's Department.  As Sheriff, Defendant PARKER is and was responsible for the hiring, screening, training, retention, supervision, discipline, counseling, and control of all Sutter County Sheriff's Department custodial employees and/or agents.  Defendant PARKER is and was charged by law with the administration of the Sutter County Jail, with the assistance of a small group of executive officers.  Defendant PARKER is and was also responsible for the promulgation of the policies and procedures and allowance of the practices/customs pursuant to which the acts of the Sutter County Sheriff's Department alleged herein were committed.  Defendant PARKER is being sued in his individual capacity.

17.     Defendant DAVID SAMSON is, and was at all relevant times mentioned herein, the Sutter County Jail Division Commander.  Defendant SAMSON is and was responsible for the hiring, screening, training, retention, supervision, discipline, counseling, and control of all Sutter County Sheriff's Department custodial employees and/or agents.  Defendant SAMSON is and was responsible for the administration of the Sutter County Jail.  Defendant SAMSON is and was also responsible for the promulgation of the policies and procedures and allowance of the practices/customs pursuant to which the acts of the Sutter County Sheriff's Department alleged herein were committed.  Defendant SAMSON is being sued in his individual capacity.

18.     Defendant NORMAN BIDWELL, is, and was at all relevant times

1  mentioned herein, the Sutter County Jail Corrections Lieutenant.  Defendant BIDWELL is

2  and was second-in-command at Sutter County Jail.  Defendant BIDWELL is and was the

3  first-level manager responsible for the day-to-day operations and support of the Jail.

4  Defendant BIDWELL is and was responsible for the hiring, screening, training, retention,

5  supervision, discipline, counseling, and control of all Sutter County Sheriff's Department

6  custodial employees and/or agents.  Defendant BIDWELL is and was responsible for the

7  administration of the Sutter County Jail.  Defendant BIDWELL is and was also responsible

8  for the promulgation of the policies and procedures and allowance of the practices/customs

9  pursuant to which the acts of the Sutter County Sheriff's Department alleged herein were

10 committed.  Defendant BIDWELL is being sued in his individual capacity.

11      19.     Defendant LOU ANNE CUMMINGS is, and was at all relevant times

12 mentioned herein, the Sutter County Health Officer.  Defendant CUMMINGS' job

13 description provides that she "[a]cts as medical director of the county jail medical facility,"

14 and that pursuant to this responsibility she "reviews and approves all examination and

15 treatment records initiated by practitioners."  Defendant CUMMINGS' job description

16 further provides that she "[s]upervises, directs and evaluates assigned staff, to include

17 assigning work, handling employee concerns and problems, and counseling."  Defendant

18 CUMMINGS is and was responsible for the hiring, screening, training, retention,

19 supervision, discipline, counseling, and control of jail medical and mental health

20 employees and/or agents involved in the conduct alleged herein.  Defendant CUMMINGS

21 is and was also responsible for the promulgation of the policies and procedures and

22 allowance of the practices/customs pursuant to which the acts of the jail medical and

23 mental health staff alleged herein were committed.  Defendant CUMMINGS was also

24 consulted regarding, and thus personally participated in, the care of NATHAN PRASAD.

25 Defendant CUMMINGS is being sued in her individual capacity.

26      20.     Defendant AMERJIT BHATTAL is, and was at all relevant times mentioned

27 herein, the Sutter County Assistant Director of Human Services – Health Division.

28 Defendant BHATTAL's job description provides that she has "primary authority and

1   responsibility for directing … jail health services," and pursuant to that responsibility

2   "[d]evelops and implements policies and procedures" and "[s]upervises, directs and

3   evaluates assigned staff" (including by "disciplining and completing employee

4   performance appraisals").  Defendant BHATTAL is and was responsible for the hiring,

5   screening, training, retention, supervision, discipline, counseling, and control of jail

6   medical and mental health employees and/or agents involved in the conduct alleged herein.

7   Defendant BHATTAL is and was also responsible for the promulgation of the policies and

8   procedures and allowance of the practices/customs pursuant to which the acts of the jail

9   medical and mental health staff alleged herein were committed.  Defendant BHATTAL is

10  being sued in her individual capacity.

11        21.    Defendant BRENT GARBETT is, and was at all relevant times mentioned

12  herein, the Sutter County Jail Nurse Program Manager.  Defendant GARBETT's job

13  description provides that he has "management responsibility for the jail nursing program

14  and staff," and "report[s] to and receiv[es] direction from the Assistant Director of Human

15  Services – Health Division [Defendant BHATTAL] with medical direction from the

16  County Health Officer [Defendant CUMMINGS]."  Defendant GARBETT's job

17  description further provides that he "directs operations and staff in the delivery of health

18  services to inmates in the County jail facility[;] … [d]evelops, implements and interprets

19  goals, objectives, policies, procedures and standards[;] … [p]rovides professional nursing

20  care as needed; responds and coordinates inmate emergency and urgent care[;] …

21  [s]upervises, directs and evaluates assigned staff … [and] reviews nursing protocols,

22  procedures and standards to ensure effective patient care and compliance with applicable

23  policies and regulations."  Defendant GARBETT is and was responsible for the hiring,

24  screening, training, retention, supervision, discipline, counseling, and control of jail

25  medical and mental health employees and/or agents involved in the conduct alleged herein.

26  Defendant GARBETT is and was also responsible for the promulgation of the policies and

27  procedures and allowance of the practices/customs pursuant to which the acts of the jail

28  medical and mental health staff alleged herein were committed.  Defendant GARBETT

1   was told of NATHAN PRASAD's dire condition on the morning of January 28, 2011 but

2   acted with deliberate indifference by failing to take necessary steps to provide life-saving

3   treatment.  Defendant GARBETT is being sued in his individual capacity.

4        22.    Defendant DORIS BROWN was at all relevant times mentioned herein a

5   Registered Nurse Practitioner at Sutter County Jail.  Defendant BROWN had direct contact

6   with NATHAN PRASAD in the hours and/or days leading up to his death, had actual

7   notice of NATHAN PRASAD's serious and life-threatening condition and need for

8   emergency medical treatment, and acted with deliberate indifference by failing to take

9   necessary steps to provide such treatment.  Defendant BROWN is being sued in her

10   individual capacity.

11        23.    Defendant MELODY YOUNG was at all relevant times mentioned herein a

12   Licensed Vocational Nurse at Sutter County Jail.  Defendant YOUNG had direct contact

13   with NATHAN PRASAD in the hours and/or days leading up to his death, had actual

14   notice of NATHAN PRASAD's serious and life-threatening condition and need for

15   emergency medical treatment, and acted with deliberate indifference by failing to take

16   necessary steps to provide such treatment.  Defendant YOUNG is being sued in her

17   individual capacity.

18        24.    Defendant KIMBERLY WEISS was at all relevant times mentioned herein a

19   Licensed Vocational Nurse at Sutter County Jail.  Defendant WEISS had direct contact

20   with NATHAN PRASAD in the hours and/or days leading up to his death, had actual

21   notice of NATHAN PRASAD's serious and life-threatening condition and need for

22   emergency medical treatment, and acted with deliberate indifference by failing to take

23   necessary steps to provide such treatment.  Defendant WEISS is being sued in her

24   individual capacity.

25        25.    Defendant GURKIRAT BHANGU was at all relevant times mentioned

26   herein a Licensed Vocational Nurse at Sutter County Jail.  Defendant BHANGU had direct

27   contact with NATHAN PRASAD in the hours and/or days leading up to his death, had

28   actual notice of NATHAN PRASAD's serious and life-threatening condition and need for

1  emergency medical treatment, and acted with deliberate indifference by failing to take

2  necessary steps to provide such treatment.  Defendant BHANGU is being sued in her

3  individual capacity.

4          26.     Defendant CHRISTINA STOHLMAN was at all relevant times mentioned

5  herein a Correctional Officer at Sutter County Jail, and the Officer in Charge at Sutter

6  County Jail during relevant days and times as described herein.  Defendant STOHLMAN

7  had actual notice of NATHAN PRASAD's serious and life-threatening condition and need

8  for emergency medical treatment in the hours and/or days leading up to his death, and

9  acted with deliberate indifference by failing to take necessary steps to provide such

10  treatment.  Defendant STOHLMAN is being sued in her individual capacity.

11         27.     Defendant LESTER EATON was at all relevant times mentioned herein a

12  Correctional Officer at Sutter County Jail, and the Officer in Charge at Sutter County Jail

13  during relevant days and times as described herein.  Defendant EATON had actual notice

14  of NATHAN PRASAD's serious and life-threatening condition and need for emergency

15  medical treatment in the hours and/or days leading up to his death, and acted with

16  deliberate indifference by failing to take necessary steps to provide such treatment.

17  Defendant EATON is being sued in his individual capacity.

18         28.     Defendant MIGUEL AGUILAR was at all relevant times mentioned herein a

19  Deputy Officer at Sutter County Jail.  Defendant AGUILAR had direct contact with

20  NATHAN PRASAD in the hours and/or days leading up to his death, had actual notice of

21  NATHAN PRASAD's serious and life-threatening condition and need for emergency

22  medical treatment, and acted with deliberate indifference by failing to take necessary steps

23  to provide such treatment.  Defendant AGUILAR is being sued in his individual capacity.

24         29.     Defendant OLGA TAHARA was at all relevant times mentioned herein a

25  Deputy Officer at Sutter County Jail.  Defendant TAHARA had direct contact with

26  NATHAN PRASAD in the hours and/or days leading up to his death, had actual notice of

27  NATHAN PRASAD's serious and life-threatening condition and need for emergency

28  medical treatment, and acted with deliberate indifference by failing to take necessary steps

1  to provide such treatment.  Defendant TAHARA is being sued in her individual capacity.

2      30.     Defendant ROSA DIAZ was at all relevant times mentioned herein a Deputy

3  Officer at Sutter County Jail.  Defendant DIAZ had direct contact with NATHAN

4  PRASAD in the hours and/or days leading up to his death, had actual notice of NATHAN

5  PRASAD's serious and life-threatening condition and need for emergency medical

6  treatment, and acted with deliberate indifference by failing to take necessary steps to

7  provide such treatment.  Defendant DIAZ is being sued in her individual capacity.

8      31.     Defendant ERIC CRAWFORD was at all relevant times mentioned herein a

9  Deputy Officer at Sutter County Jail.  Defendant CRAWFORD had direct contact with

10  NATHAN PRASAD in the hours and/or days leading up to his death, had actual notice of

11  NATHAN PRASAD's serious and life-threatening condition and need for emergency

12  medical treatment, and acted with deliberate indifference by failing to take necessary steps

13  to provide such treatment.  Defendant CRAWFORD is being sued in his individual

14  capacity.

15      32.     Defendant BALJINDER RAI was at all relevant times mentioned herein a

16  Deputy Officer at Sutter County Jail.  Defendant RAI had direct contact with NATHAN

17  PRASAD in the hours and/or days leading up to his death, had actual notice of NATHAN

18  PRASAD's serious and life-threatening condition and need for emergency medical

19  treatment, and acted with deliberate indifference by failing to take necessary steps to

20  provide such treatment.  Defendant RAI is being sued in his individual capacity.

21      33.     Defendant SHANE DICKSON was at all relevant times mentioned herein a

22  Deputy Officer at Sutter County Jail.  Defendant DICKSON had direct contact with

23  NATHAN PRASAD in the hours and/or days leading up to his death, had actual notice of

24  NATHAN PRASAD's serious and life-threatening condition and need for emergency

25  medical treatment, and acted with deliberate indifference by failing to take necessary steps

26  to provide such treatment.  Defendant DICKSON is being sued in his individual capacity.

27      34.     Defendant FREMONT-RIDEOUT HEALTH GROUP was at all times

28  mentioned herein responsible for the operation of Rideout Memorial Hospital.  Defendant

1  FREMONT-RIDEOUT HEALTH GROUP had and maintained a contractual agreement

2  with COUNTY OF SUTTER to provide medical treatment to Sutter County Jail inmates,

3  including ambulance and emergency services.  The process by which Rideout Memorial

4  Hospital provided treatment to Sutter County Jail inmates involved significant, ongoing

5  coordination and cooperation between COUNTY OF SUTTER, the Sutter County

6  Sheriff's Department, and Defendant FREMONT-RIDEOUT HEALTH GROUP.  On

7  information and belief, Defendant FREMONT-RIDEOUT HEALTH GROUP's Rideout

8  Memorial Hospital is the only facility made available to Jail inmates for the delivery of

9  emergency medical services.  Defendant FREMONT-RIDEOUT HEALTH GROUP

10  established and follows a policy, procedure and practice of receiving jail inmates from

11  Sutter County Jail, and discharging them to Sutter County Jail in a manner that is

12  deliberately indifferent to the known risk of serious or lethal injury in the event, as in the

13  case of NATHAN PRASAD, where the discharge instructions depend on a capacity for

14  emergency medical response that FREMONT-RIDEOUT HEALTH GROUP knew did not

15  exist at Sutter County Jail.

16      35.     Defendant MICHAEL FRATERS was at all relevant times mentioned herein

17  a physician at Rideout Memorial Hospital and employee, contractor and/or agent of

18  FREMONT-RIDEOUT HEALTH GROUP.  Defendant FRATERS treated NATHAN

19  PRASAD pursuant to the COUNTY OF SUTTER-FREMONT-RIDEOUT HEALTH

20  GROUP agreement to treat Sutter County Jail inmates in need of medical care.  Defendant

21  FRATERS signed the note discharging NATHAN PRASAD on January 26, 2011, knew of

22  NATHAN PRASAD's serious and life-threatening condition and need for access to

23  emergency medical treatment, and acted with deliberate indifference to the known risk of

24  serious or lethal injury to NATHAN PRASAD given that a safe discharge from the

25  hospital depended on the capacity for emergency medical response that he knew did not

26  exist at Sutter County Jail.  Defendant FRATERS is being sued in his individual capacity.

27      36.     Defendant COUNTY OF SUTTER is a political subdivision of the State of

28  California, created and existing by virtue of the laws of the State of California.  At all

1  times relevant to this complaint, Defendant COUNTY OF SUTTER employed Defendants
2  J. PAUL PARKER, DAVID SAMSON, NORMAN BIDWELL, LOU ANNE
3  CUMMINGS, AMERJIT BHATTAL, BRENT GARBETT, DORIS BROWN, MELODY
4  YOUNG, KIMBERLY WEISS, GURKIRAT BHANGU, CHRISTINA STOHLMAN,
5  LESTER EATON, MIGUEL AGUILAR, OLGA TAHARA, ROSA DIAZ, ERIC
6  CRAWFORD, BALJINDER RAI, and SHANE DICKSON.

7          37.     Defendants J. PAUL PARKER, DAVID SAMSON, NORMAN BIDWELL,
8  LOU ANNE CUMMINGS, AMERJIT BHATTAL, BRENT GARBETT, DORIS
9  BROWN, MELODY YOUNG, KIMBERLY WEISS, GURKIRAT BHANGU,
10  CHRISTINA STOHLMAN, LESTER EATON, MIGUEL AGUILAR, OLGA TAHARA,
11  ROSA DIAZ, ERIC CRAWFORD, BALJINDER RAI, SHANE DICKSON, ,
12  FREMONT-RIDEOUT HEALTH GROUP, and MICHAEL FRATERS, and each of them,
13  to the extent they engaged in any acts or omissions alleged herein, engaged in such acts or
14  omissions under color of state law.

15          38.     Plaintiffs are informed and believe and thereon allege that at all times
16  mentioned in this complaint, Defendants, and each of them, were the agents, employees,
17  servants, joint venturers, partners and/or co-conspirators of the other Defendants named in
18  this complaint and that at all times, each of the Defendants was acting within the course
19  and scope of said relationship with Defendants.

20                    **EXHAUSTION OF PRE-LAWSUIT PROCEDURES**

21          39.     Plaintiffs MARY PRASAD, T.P., and A.P. filed state governmental tort
22  claims with the State and Defendant COUNTY OF SUTTER, including on behalf of the
23  ESTATE of NATHAN PRASAD, on July 21, 2011.  By correspondence dated
24  September 7, 2011, their governmental tort claims were rejected.  By way of stipulation,
25  Plaintiff N.S. was excused by Defendant COUNTY OF SUTTER from compliance with
26  the governmental tort claims requirement.

27

28

**FACTUAL ALLEGATIONS**

**Nathan Prasad's Life and the Circumstances of His Detention in Sutter County Jail**

40.     NATHAN PRASAD was born on April 10, 1980 in Cedarville, California.

41.     NATHAN PRASAD had a close relationship with his family, helping to raise his young children and assisting his mother and grandmother with various daily and household tasks.  Despite a history of mental illness, NATHAN PRASAD had made great strides in the time before his death towards becoming independent and self-sufficient. After several years struggling with mental illness, he had moved into his own apartment for the first time in his life and was working towards gainful employment.  He spent most days with his family, including his elderly grandmother, his mother and step-father, and his children.

42.     COUNTY OF SUTTER officials and employees – including individual Defendants, county mental health staff, county law enforcement, and county jail staff – had extensive contact with NATHAN PRASAD.  NATHAN PRASAD had been involuntarily hospitalized to receive emergency mental health treatment pursuant to Cal. Welf. & Inst. Code § 5150, and had been placed in the custody of the Sutter County Sheriff's Department multiple times, generally during periods in which he was manifesting serious mental illness and in light of alleged non-violent parole and probation violations. COUNTY OF SUTTER produced and maintained significant documentation of his mental health and medical needs.  This documentation was included in his Sutter County Jail inmate records, and, upon information and belief, reviewed by Defendants CUMMINGS, BROWN, YOUNG, WEISS, BHANGU, STOHLMAN, EATON, AGUILAR, TAHARA, DIAZ, CRAWFORD, RAI, and DICKSON.

43.     COUNTY OF SUTTER officials and employees were further aware of a long-standing and trenchant problem with contagious bacterial infections at Sutter County Jail.  Said officials and employees were further aware that NATHAN PRASAD had suffered from an antibiotic-resistant bacterial infection (*Staphylococcus aureus*, or staph) during a prior period of custody at the Jail in January 2010, and been treated for that

1   infection by jail medical staff.  Jail medical staff further documented at that time that

2   NATHAN PRASAD had experienced "*[r]ecurrent* MRSA [Methicillin-resistant

3   *Staphylococcus aureus*] infections" (emphasis added).  Documentation regarding

4   NATHAN PRASAD's prior treatment was included in his Sutter County Jail inmate

5   records, and, upon information and belief, reviewed by Defendants CUMMINGS,

6   BROWN, YOUNG, WEISS, BHANGU, STOHLMAN, EATON, AGUILAR, TAHARA,

7   DIAZ, CRAWFORD, RAI, and DICKSON.

8       44.     NATHAN PRASAD was arrested on or about January 21, 2011, based on

9   non-violent misdemeanor and parole-related charges.  He was taken to Sutter County Jail,

10  where he was detained for the next week.  During that time period, NATHAN PRASAD

11  developed a medical condition which, as a result of the denial of plainly necessary

12  treatment to address a developing infection, led to great suffering and his painful death on

13  January 28, 2011.

14      45.     At the time of NATHAN PRASAD's death, T.P. was seven (7) years old,

15  A.P. was six (6) years old, and N.S was three (3) years old.  NATHAN PRASAD died just

16  two (2) days before A.P.'s seventh birthday.

17      **Medical Problems, Pain, and Suffering While Detained in Sutter County Jail**

18      46.     Soon after NATHAN PRASAD was booked into Sutter County Jail on

19  January 21, 2011, NATHAN PRASAD reported to jail staff that he was experiencing

20  significant pain in his lower extremities.  He was further manifesting symptoms of mental

21  illness.  Jail staff, including Defendants BROWN, YOUNG, WEISS, BHANGU,

22  STOHLMAN, EATON, AGUILAR, TAHARA, DIAZ, CRAWFORD, RAI, and

23  DICKSON observed NATHAN PRASAD on multiple occasions experiencing pain,

24  swelling, and other serious medical symptoms, and jail staff including Defendants

25  BROWN, WEISS, and YOUNG documented these symptoms.

26      47.     While detained at Sutter County Jail in January 2011, NATHAN PRASAD

27  completed and submitted to jail staff at least one written request to receive medical

28  treatment.  He reported that he was suffering "extreme pain" and stated that he required

1    "emergency" medical attention.

2         48.    After several days of reported and documented medical concerns, Defendant

3    BROWN evaluated NATHAN PRASAD and, following consultation with Defendant

4    CUMMINGS, referred NATHAN PRASAD to Rideout Memorial Hospital for what was a

5    brief medical evaluation.

6         49.    Upon information and belief, Defendants COUNTY OF SUTTER,

7    CUMMINGS, BHATTAL and GARBETT fail to maintain a medical records system that

8    appropriately documents and transmits critical medical information about Jail inmates to

9    affiliated health care providers – a defect which renders a prison health care system

10   constitutionally inadequate.  *See Coleman v. Wilson*, 912 F. Supp. 1282, 1314 (E.D. Cal.

11   1995) (holding that correctional facilities "have a constitutional obligation to provide

12   inmates with adequate medical care" and that "[a] necessary component of minimally

13   adequate medical care is maintenance of complete and accurate medical records"); *Adams*

14   *v. Tilton*, Case No. 1:07-cv-00791-GSA PC, 2009 U.S. Dist. LEXIS 88009, at *29 (E.D.

15   Cal. Sept. 9, 2009) (citations omitted) (holding that "[a]dequate and accurate medical

16   records are essential to a prison's providing inmates with continuity of medical care," and

17   that the Constitution "is violated when incomplete and inaccurate medical records create a

18   'the possibility for disaster' arising from a lack of necessary information about an inmate's

19   medical history").  As a result, and upon information and belief, information regarding

20   NATHAN PRASAD's clinically significant history of recurrent MRSA (Methicillin-

21   resistant *Staphylococcus aureus*) infections was not provided or made available to

22   Defendant FREMONT-RIDEOUT HEALTH GROUP or Defendant FRATERS.  Had this

23   information been provided to Defendant FREMONT-RIDEOUT HEALTH GROUP and/or

24   Defendant FRATERS on January 26, it could have signaled the need for a simple blood

25   test that would have identified NATHAN PRASAD's advancing infection and enabled

26   prompt, life-saving antibiotic treatment.

27         50.    NATHAN PRASAD was evaluated and treated at Rideout Memorial

28   Hospital on January 26, 2011, as pursuant with the Hospital's agreement to treat Sutter

[1071448-2]

County Jail inmates.  A short time after his arrival at the Emergency Department, emergency room physician Defendant FRATERS discharged NATHAN PRASAD with specific discharge instructions that if his symptoms worsen or new symptoms develop, he was to be returned to the Emergency Department ***immediately***.  At the time, Defendant FRATERS knew, based on the information available to him, that NATHAN PRASAD was exhibiting signs of a serious and life-threatening condition – a condition which would result in his death less than 55 hours later.  Defendant FRATERS further knew that NATHAN PRASAD would need access to emergency medical treatment if his symptoms worsened or new symptoms developed.  NATHAN PRASAD was discharged on the afternoon of January 26, and returned to Sutter County Jail.

51.     Defendant FREMONT-RIDEOUT HEALTH GROUP's Rideout Memorial Hospital staff, acting pursuant to a contract with COUNTY OF SUTTER to provide medical treatment to Sutter County Jail inmates, acted with deliberate indifference by discharging NATHAN PRASAD to a notoriously dangerous setting at Sutter County Jail. Hospital staff knew that NATHAN PRASAD would not possibly receive the observation, supervision, and ongoing access to emergency medical treatment he would likely need given his serious medical complaints and condition.

52.     Defendant FRATERS acted with deliberate indifference to the known risk of serious or lethal injury to NATHAN PRASAD given that his safe discharge from the hospital depended on timely access to emergency medical response, which he knew did not exist at Sutter County Jail, a setting that is notoriously dangerous for individuals with serious medical needs and that does not provide sufficient around-the-clock access to medical care.  Neither Defendant FRATERS nor any other employee or agent of FREMONT-RIDEOUT HEALTH GROUP conducted any follow-up regarding NATHAN PRASAD after he was discharged, including any follow-up to ensure that discharge instructions directing that NATHAN PRASAD be returned to the emergency department immediately if any new symptoms developed were understood by recipients.

53.     On information and belief, Defendant BIDWELL, as the officer charged with

1  managing day-to-day operations at the Jail, was informed and aware of NATHAN

2  PRASAD's evaluation at Rideout Memorial Hospital and the discharge instructions

3  providing that if his symptoms worsened or new symptoms developed, he must be taken to

4  the emergency room immediately.

5        54.    On information and belief, Defendants CUMMINGS, BROWN, YOUNG,

6  WEISS, BHANGU, STOHLMAN, EATON, AGUILAR, TAHARA, DIAZ,

7  CRAWFORD, RAI, and DICKSON each reviewed and/or were aware of NATHAN

8  PRASAD's custody file and/or medical file, including the medical documentation

9  indicating his medical status and need to be taken to the emergency room immediately if

10  his symptoms worsened or new symptoms developed.  Defendants BROWN, YOUNG,

11  WEISS, BHANGU, STOHLMAN, EATON, AGUILAR, TAHARA, DIAZ,

12  CRAWFORD, RAI, and DICKSON reviewed and/or were aware of NATHAN PRASAD's

13  custody file and/or medical file because each of them was on duty at the Jail during

14  NATHAN PRASAD's January 2011 detention and had significant contact with NATHAN

15  PRASAD after his return from the hospital (as documented in paragraphs 56-74, *infra*).

16  Defendant CUMMINGS reviewed and/or was aware of NATHAN PRASAD's custody

17  and/or medical file because she is required, as medical director of the county jail medical

18  facility, to review and approve all examination and treatment records initiated by

19  practitioners.  Moreover, Defendant BROWN consulted with Defendant CUMMINGS

20  regarding NATHAN PRASAD's symptomology and treatment plan.

21        55.    Throughout NATHAN PRASAD's detention at Sutter County Jail,

22  Defendants CUMMINGS, GARBETT, BROWN, YOUNG, WEISS, BHANGU,

23  STOHLMAN, EATON, AGUILAR, TAHARA, DIAZ, CRAWFORD, RAI, and

24  DICKSON failed to provide sufficient medical screening, evaluation, and observation of

25  his medical condition and emergent treatment needs.

26  **Defendants' Failure to Provide Clearly Necessary Life-Saving Emergency Treatment**

27        56.    Shortly upon his return from the brief hospital admission, it became readily

28  apparent that NATHAN PRASAD's condition and symptoms were in fact getting

1   significantly worse.  His symptoms included shortness of breath, severe chills, and extreme

2   pain.  NATHAN PRASAD began coughing and/or vomiting up blood.  On the evening of

3   January 26, 2011, Defendant WEISS documented that NATHAN PRASAD was suffering

4   from "uncontrollable pain" and spoke with Defendant BROWN.  Yet no follow-up

5   evaluation was provided that night, nor was NATHAN PRASAD returned to the

6   Emergency Department for treatment as his discharge note required.

7         57.     From January 26 to January 28, NATHAN PRASAD stated aloud repeatedly

8   that he was in extreme pain and having trouble breathing.  He reported to staff that he

9   thought he was going to die unless he received immediate medical attention.  He was

10  manifesting numerous symptoms indicating a serious and life-threatening condition and an

11  immediate need for emergency medical treatment.

12        58.     Several fellow inmates observed NATHAN PRASAD's worsening condition

13  and notified staff at the jail, including Defendants YOUNG, WEISS, BHANGU,

14  AGUILAR, RAI, and DICKSON.  One or more jail staff members responded that

15  NATHAN PRASAD was faking his pain and other symptoms and that he and the other

16  inmates needed to "get over it."

17        59.     Fellow inmates collected the blood that NATHAN PRASAD was coughing

18  up in an empty milk carton, and, upon information and belief, showed it to Defendants

19  YOUNG and RAI in an effort to obtain emergency medical help for NATHAN PRASAD.

20        60.     Jail staff, including Defendants BROWN, YOUNG, WEISS, BHANGU,

21  STOHLMAN, EATON, AGUILAR, TAHARA, DIAZ, CRAWFORD, RAI, and

22  DICKSON observed NATHAN PRASAD's suffering and heard his and his fellow

23  inmates' pleas for immediate medical help.  Defendants BROWN, YOUNG, and WEISS

24  documented NATHAN PRASAD's complaints and worsening symptoms.  In spite of the

25  alarming reports and the observations of Defendants, they failed to provide adequate

26  evaluation or timely emergency treatment for a period of 36 hours or more.

27        61.     Defendant BROWN observed NATHAN PRASAD's condition and

28  reviewed the Emergency Department records and discharge instructions to return him to

1  the hospital *immediately* if his symptoms worsened or new symptoms developed.  She

2  observed and documented that he was continuing to experience pain and other serious, and

3  worsening, symptoms, but took no steps to obtain the emergency medical care he

4  obviously needed.  Specifically, Defendant BROWN observed NATHAN PRASAD at

5  9:00 a.m. on January 27, 2011 and documented alarming symptoms including an

6  abnormally high pulse rate, precipitous drop in blood pressure, low grade fever, marked

7  dehydration, and increased bruising across NATHAN PRASAD's midsection.  His vital

8  signs had changed dramatically and dangerously from the readings taken during his

9  January 26 hospitalization and those taken during Defendant BROWN's own evaluation

10  immediately prior to that hospitalization.  NATHAN PRASAD's presentation on the

11  morning of January 27, 2011 clearly and obviously alerted Defendant BROWN to

12  NATHAN PRASAD's rapidly worsening condition and need for immediate emergency

13  treatment.  Nonetheless, Defendant BROWN did nothing other than prescribe an additional

14  pain reliever.  Defendant BROWN took no steps to ensure that NATHAN PRASAD

15  received any type of medical monitoring in light of his rapidly worsening vital signs,

16  notwithstanding that such monitoring was immediately called for and essential to saving

17  NATHAN PRASAD's life.  No follow-up medical observation or evaluation of any kind

18  was documented at any future time on January 27, 2011.  Indeed, none was documented

19  until nearly *twenty (20) hours* later.

20      62.     Defendant BHANGU conducted the evening medication pass on January 27,

21  2011.  At that time NATHAN PRASAD's serious illness, intense distress and need for

22  immediate emergency medical care were obvious.  Defendant BHANGU did not document

23  or provide any treatment or evaluation of his dire condition, nor did she make any effort to

24  secure the emergency care that NATHAN PRASAD obviously required.

25      63.     While conducting a safety check of the cell where NATHAN PRASAD was

26  detained, Defendant AGUILAR witnessed NATHAN PRASAD's dire condition and was

27  told by NATHAN PRASAD and other inmates that NATHAN PRASAD required

28  immediate medical attention.  Defendant AGUILAR did not make any effort to summon

1  medical care or otherwise address NATHAN PRASAD's urgent medical needs.

2       64.    Defendant DICKSON, after observing NATHAN PRASAD screaming in

3  pain and begging to be taken to the hospital for treatment, ridiculed NATHAN PRASAD.

4  Defendant DICKSON stated that NATHAN PRASAD was the type of person who comes

5  to jail because he wants to get free medical care.  Defendant DICKSON ignored NATHAN

6  PRASAD's serious medical condition, and took no steps to address his medical needs.

7       65.    In the pre-dawn hours of January 28, 2011, Defendants RAI and YOUNG

8  observed, and Defendant YOUNG documented, that NATHAN PRASAD's blood pressure

9  and blood-oxygen saturation were dangerously low, that he was coughing and/or vomiting

10  up blood, dizzy, sweating, cold, and clammy.  On information and belief, he reported to

11  Defendants RAI and YOUNG that he felt like he was "going to die."

12       66.    After the many hours and days during which NATHAN PRASAD was

13  exhibiting worsening symptoms and significant suffering and was pleading with jail staff

14  for help, Defendants RAI and YOUNG placed NATHAN PRASAD in a Sutter County Jail

15  office early on January 28.  However, they ***provided him no medical treatment***, and failed

16  to properly monitor his deteriorating condition, for a period of nearly four (4) hours.

17  Defendants RAI and YOUNG did not call an ambulance or make other arrangements for

18  NATHAN PRASAD to be taken to the hospital emergency room for emergency and life-

19  saving medical care.

20       67.    Instead, NATHAN PRASAD was made to sit in a jail office room, without

21  medical attention of any kind, even as his condition got worse, including further coughing

22  up of blood and deteriorating vital signs.  Defendant GARBETT was informed of

23  NATHAN PRASAD's critical condition but did nothing to summon desperately needed

24  emergency care.

25       68.    Defendants DIAZ and TAHARA observed NATHAN PRASAD during the

26  hours he was locked in the jail office on the morning of January 28, 2011.  Defendants

27  DIAZ and TAHARA heard NATHAN PRASAD plead for help and tell Defendant

28  YOUNG repeatedly that he felt like he was "going to die."  Defendants DIAZ and

[1071448-2]

1  TAHARA heard Defendant YOUNG tell NATHAN PRASAD that she would do nothing

2  for him.  Defendants DIAZ, TAHARA and YOUNG then locked NATHAN PRASAD

3  back in the jail office without providing or summoning any medical care.

4       69.    Defendant CRAWFORD heard NATHAN PRASAD kicking the locked door

5  to the jail office, repeatedly and desperately yelling "I can't breathe!  I can't breathe!"

6  Defendant CRAWFORD ordered NATHAN PRASAD to stop yelling and to lie down.

7  Defendant CRAWFORD did not report these observations to anyone, or make any effort to

8  summon medical care or attention of any kind.

9       70.    Defendant EATON was the officer in charge from the evening of January 27,

10  2011 until 6:00 a.m. on January 28, 2011.  During this time period, Defendant EATON

11  became aware that NATHAN PRASAD had been complaining about difficulty breathing –

12  a serious and life-threatening condition – for *at least several hours*, extending back to the

13  pre-dawn hours when no nursing or medical staff were on site.

14       71.    Defendant STOHLMAN assumed duties as officer in charge at or about 6:00

15  a.m. on January 28, 2011.  At or around the time of this shift change, Defendant EATON

16  informed Defendant STOHLMAN that NATHAN PRASAD had been complaining about

17  difficulty breathing – a serious and life-threatening condition – for *at least several hours*.

18  Defendant EATON further informed Defendant STOHLMAN that NATHAN PRASAD

19  had been placed in a jail office, and that Defendant YOUNG had told NATHAN PRASAD

20  that she could not do anything for him and thus was not providing any treatment or care to

21  NATHAN PRASAD.

22       72.    Despite this knowledge, neither Defendant EATON nor Defendant

23  STOHLMAN at any time made any efforts to summon critically needed emergency

24  medical care, and they each tacitly endorsed the inaction and indifference of the officers

25  under their supervision.

26       73.    Not until *nearly four hours later* on January 28 was an ambulance

27  summoned.  By that time, NATHAN PRASAD's condition had deteriorated dramatically

28  and his skin had turned blue due to severe oxygen deficiency and cyanosis.  His blood

1 pressure could no longer be detected.  NATHAN PRASAD was at this point suffering

2 from severe sepsis.

3      74.    The failure of correctional officer Defendants STOHLMAN, EATON,

4 AGUILAR, TAHARA, DIAZ, CRAWFORD, RAI, and DICKSON to contact emergency

5 medical services was consistent with an established practice in effect at Sutter County Jail

6 such that medical staff were responsible for determining who goes to the hospital or calling

7 for an ambulance in an emergency situation, despite the lack of 24-hour medical staff

8 availability at the jail.  Defendants PARKER, SAMSON, and BIDWELL created, were

9 aware of, and enforced this policy, knowing that it would endanger inmates like NATHAN

10 PRASAD who require emergency medical attention.

11 **NATHAN PRASAD's Painful and Preventable Death**

12      75.    NATHAN PRASAD suffered severe bronchopneumonia and multiple organ

13 failure as a result of Defendants' failure to provide timely medical treatment.  This

14 excruciating condition resulted from a bacterial infection that had spread systemically – an

15 infection which could have been treated with a course of antibiotics, had Defendants

16 GARBETT, BROWN, YOUNG, WEISS, BHANGU, STOHLMAN, EATON, AGUILAR,

17 TAHARA, DIAZ, CRAWFORD, RAI, and DICKSON timely responded to NATHAN

18 PRASAD's obvious suffering.  By the time NATHAN PRASAD reached the hospital on

19 January 28, however, he was deemed to be in critical condition and was unconscious,

20 leading to his placement in the Intensive Care Unit (ICU) at Rideout Memorial Hospital.

21      76.    None of the Defendants timely contacted NATHAN PRASAD's family.  As

22 a result, his mother MARY PRASAD, his children T.P., A.P., and N.S., and other family

23 members were unable to make it to the hospital in time to see NATHAN PRASAD while

24 he was still alive.

25      77.    Meanwhile, Defendants PARKER, SAMSON, BIDWELL and STOHLMAN

26 took steps to drop all pending charges and to release NATHAN PRASAD "on his own

27 recognizance" after he was placed in the ICU and was in critical condition.  Defendant

28 STOHLMAN personally signed paperwork effecting NATHAN PRASAD's "own

1  recognizance" release, collected NATHAN PRASAD's belongings from the Jail and

2  transported them to Rideout Memorial Hospital as NATHAN PRASAD lay dying, in an

3  effort to distance the Jail from its responsibility for NATHAN PRASAD and his dire

4  condition.

5        78.     At approximately 4:19 pm on January 28, NATHAN PRASAD was

6  pronounced dead by hospital staff.

7        79.     Had NATHAN PRASAD not been placed in a jail setting known to be

8  dangerous and ill-equipped to ensure timely emergency medical treatment, and had such

9  emergency treatment been summoned and provided to NATHAN PRASAD, his condition

10  could have been effectively treated.  He would not have experienced severe pain and

11  suffering, and his life would have been saved.

12  **Longstanding and Systemic Deficiencies in Sutter County Jail's Provision of**
   **Emergency Treatment to Inmates, Medical Staffing, and Policies and Procedures in**
13  **Violation of Existing Court Order**

14        80.     Defendant COUNTY OF SUTTER has knowingly maintained and tolerated

15  longstanding and systemic deficiencies in Sutter County Jail's provision of emergency

16  treatment to seriously ill inmates.  It has also knowingly had inadequate medical staffing as

17  well as policies and procedures that were likely in violation of an existing court order

18  directing minimum standards of medical treatment at the jail.  Defendants PARKER,

19  SAMSON, BIDWELL, CUMMINGS, BHATTAL and GARBETT were aware of and

20  tolerated these serious deficiencies in Sutter County Jail's medical care system, policies,

21  and procedures.

22        81.     Upon information and belief, Defendants COUNTY OF SUTTER,

23  CUMMINGS, BHATTAL and GARBETT fail to maintain a medical records system that

24  appropriately documents and transmits critical medical information about Jail inmates to

25  affiliated health care providers, including emergency care provider FREMONT-RIDEOUT

26  HEALTH GROUP and the physicians who work there.  This defect renders the health care

27  system at Sutter County Jail constitutionally infirm.

28        82.     Upon information and belief, Defendants CUMMINGS, BHATTAL and

1   GARBETT authorized and implemented a policy pursuant to which medical staff was only

2   available at the Jail from 4:00 a.m. to midnight.  This policy meant that, for crucial hours

3   each day, there was no medical staff whatsoever available to respond to, triage or treat

4   emergency situations.  Defendants CUMMINGS, BHATTAL and GARBETT have

5   persisted in this policy notwithstanding that the 2007-2008 Sutter County Grand Jury made

6   a specific recommendation that a nurse be on duty twenty-four hours a day, seven days a

7   week at Sutter County Jail.

8        83.    Upon information and belief, Defendants PARKER, SAMSON and

9   BIDWELL authorized and implemented a policy such that jail medical staff, not custody

10  staff, were responsible for summoning emergency medical attention when Jail inmates

11  required such attention.  Defendants PARKER, SAMSON and BIDWELL persisted in this

12  policy notwithstanding that they knew that there were hours each day in which there was

13  no medical staff whatsoever available to respond to, triage or treat emergency situations.

14       84.    As identified by a Sutter County Grand Jury in its 2010-2011 Final Report,

15  Sutter County Jail has had several further known deficiencies in its system of providing

16  treatment to inmates.  (The Final Report of the 2010-2011 Sutter County Grand Jury is

17  appended as **Attachment A**.)

18       85.    Identified deficiencies included inadequate medical staffing, non-compliant

19  medical policies and procedures, and a medical program that was long out-of-compliance.

20  The 2010-2011 Grand Jury noted that such deficiencies were "unacceptable," and may

21  have caused Sutter County to be in violation of an existing court order in *Haller v. Sutter*

22  *County*, Case No. CIV-S-93-1256, which mandates certain jail conditions, policies, and

23  procedures for providing medical treatment to Sutter County Jail inmates.

24       86.    The 2010-2011 Grand Jury found that medical staffing at Sutter County Jail

25  has been inadequate, and that the hiring of additional staff is required.

26       87.    The 2010-2011 Grand Jury noted a report that training of staff had not

27  occurred in more than five (5) years as of 2011, and that such training was "*necessary* to

28  maintain proficiency in emergency response procedures" (emphasis added).  The Grand

1  Jury found that Sutter County Jail had failed to offer staff required training pursuant to

2  court order and the jail's own Medical Policies and Procedures.

3      88.    The 2010-2011 Grand Jury found that Sutter County Jail's health care

4  policies and procedures were significantly out of date, and that conditions at the jail had

5  been allowed to "deteriorate."

6      89.    The 2010-2011 Grand Jury found that Sutter County Jail's nursing program

7  was "completely out of compliance with annual nurse training updates and standard

8  nursing procedures," and found "unacceptable that the program is out of compliance, [the]

9  lack of training for the nursing staff, [and] not having the [policies and procedures] up-to-

10  date," among other problems.

11     90.    The 2010-2011 Grand Jury, pursuant to its statutory authority, identified

12  Defendants CUMMINGS, BHATTAL and GARBETT as responsible for responding to

13  these findings and recommendations regarding the Jail's dangerous and deficient medical

14  care system.  On information and belief, Defendants CUMMINGS, BHATTAL and

15  GARBETT have not responded.

16     91.    In 2011-2012, a second Sutter County Grand Jury investigated improper

17  denial of medical care at Sutter County Jail, in particular the denial of care to an inmate

18  who was arrested on January 21, 2011 and whose health while in custody severely and

19  rapidly deteriorated leading to his January 28, 2011 death.  On information and belief, the

20  inmate whose death was the focus of this investigation was NATHAN PRASAD. (The

21  Final Report of the 2011-2012 Sutter County Grand Jury Pursuant to Penal Code 933(a) on

22  subject – Sutter County Jail Death is appended as **Attachment B**.)

23     92.    The 2011-2012 Grand Jury noted that at 8:00 a.m. on January 28, 2011 "[t]he

24  JNM [Jail Nurse Manager] arrived and was briefed by the LVN [Licensed Vocational

25  Nurse] on the inmates' [*sic*] condition and he did not review the medical chart or examine

26  the inmate."  As noted in the report, this JNM is Defendant GARBETT.

27     93.    The 2011-2012 Grand Jury further noted that "[t]here was never any formal

28  discussion or meeting held for jail nursing staff to review the inmate's case," and that "in

1  fact the HO [Health Officer] did not allow any discussion among medical staff about the

2  inmate's case."  As noted in the report, the HO is Defendant CUMMINGS.

3      94.    At the outset of its report, the 2011-2012 Grand Jury noted its "concern[ ]"

4  that "past inadequate staff training and incomplete JMS [Jail Medical Services] policies

5  and procedures could have been contributing factors in the inmate's death."  The 2011-

6  2012 Grand Jury further noted that the "Sutter County Sick Bay Policy #56" in place as of

7  January 28, 2011 was nearly ten years old, "was one page and stated in general terms that

8  only medical staff could place inmates with medical problems in Sick Bay," and "did not

9  offer any [further] guidance."

10     95.    In its formal statement of findings, the 2011-2012 Grand Jury found that

11  (*inter alia*): "[t]he JNM did not take any interest or immediate action responding to the

12  inmate's medical emergency which is inconsistent with RN training and not in compliance

13  with the job description to provide professional nursing care"; "the AD violated the

14  conditions of the job description by enabling the JNM to be negligent of duties and

15  responsibilities throughout the JNM's entire tenure," including "continuous

16  noncompliance by not reviewing and updating [policies and procedures] annually (Title 15

17  sec. 1206 CA code), no in-clinic training program to assure standardized treatment

18  procedures, and reluctance to act in the capacity of an RN"; "[t]here is no in-house training

19  provided to JMS staff that is specific to their job"; and "[a]ll JMS Management (JNM, AD,

20  and HO) abrogated their responsibility by not conducting a [morbidity and mortality]

21  conference following the death of the inmate."  As noted in the report, the JNM is

22  Defendant GARBETT, the AD is Defendant BHATTAL, and the HO is Defendant

23  CUMMINGS.

24     96.    The 2011-2012 Grand Jury further found that, even in light of the preceding

25  year's Grand Jury Report recommending prompt revision of policies and procedures for

26  medical care at Sutter County Jail, as of April 9, 2012 "only about half of the [policies and

27  procedures] [had] been finalized and made available on the intranet," and that "[t]here was

28  no priority after the inmate death to immediately implement a policy that included vital

1    sign parameters indicating when to call for an ambulance."

2        97.     The systemic deficiencies regarding the provision of emergency and other

3    medical treatment at Sutter County Jail, as well as the inadequate staffing, policies, and

4    procedures, as identified in the 2010-2011 and 2011-2012 Grand Jury Reports and in

5    violation of the existing *Haller v. Sutter County* court order, directly caused the woefully

6    inadequate emergency medical attention and treatment that NATHAN PRASAD received

7    between January 26 and January 28, 2011, leading to his untimely and preventable death

8    on January 28, 2011.

9        98.     Defendants COUNTY OF SUTTER, PARKER, SAMSON, BIDWELL,

10   CUMMINGS, BHATTAL, and GARBETT maintained inadequate medical staffing and

11   insufficient policies and procedures.  These deficiencies include, but are not limited to,

12   insufficient direction as to what circumstances require emergency medical care and the

13   procedure for summoning emergency medical care.  Moreover, Defendants COUNTY OF

14   SUTTER, GARBETT, BHATTAL, and CUMMINGS provided *no in-house training at all*

15   to jail medical staff, including no training whatsoever on the provision of emergency

16   medical care to Sutter County Jail inmates with serious and/or life-threatening medical

17   conditions, even though this training was necessary to maintain minimally adequate

18   emergency response procedures.  Defendants COUNTY OF SUTTER, GARBETT,

19   BHATTAL, and CUMMINGS, by their acts and omissions, tolerated known dangers and

20   risks of serious harm to inmates, like NATHAN PRASAD, who required emergency care

21   while in the Jail.  These failures directly caused the denial of emergency medical attention

22   and treatment that NATHAN PRASAD required between January 26 and January 28,

23   2011, leading to his untimely and preventable death on January 28, 2011.

24       99.     Sutter County Jail has recently experienced several likely preventable inmate

25   deaths in custody, indicating a culture of deliberate indifference to inmates' serious

26   treatment needs at the Jail.  In addition to NATHAN PRASAD's death, there have been

27   disturbing reports of inmate deaths in April 2010 and September 2011.

28

**NATHAN PRASAD's Mother and Young Children Have Been Profoundly Harmed by Defendants' Misconduct Leading to NATHAN PRASAD's Death**

100.    Plaintiffs MARY PRASAD, T.P., A.P., and N.S., have been profoundly harmed by Defendants' conduct leading to NATHAN PRASAD's untimely and avoidable death.

101.    As NATHAN PRASAD's mother, MARY PRASAD has experienced the painful loss of her eldest son.  She has been denied the regular contact that she and NATHAN PRASAD had.  She has lost the loving mother-son relationship that she and NATHAN PRASAD maintained, including regular contact, a warm relationship, and the assistance that NATHAN PRASAD regularly provided her, including home maintenance and improvement projects.

102.    As NATHAN PRASAD's young children, T.P., A.P., and N.S. have experienced the traumatic loss of their father, who remained close to them throughout their lives until his tragic death.  They have taken the loss of their father extremely hard, asking when they will be able to see him again.  They have had and will continue to have great difficulty coping with his death during their most formative years.  T.P., A.P., and N.S. have further suffered the loss of NATHAN PRASAD's financial support, his care and supervision of them, and his paternal guidance.

**FIRST CLAIM FOR RELIEF**
**Cruel and Unusual Punishment in Violation of the Fourteenth Amendment to the Constitution of the United States – Deliberate Indifference to Serious Medical Needs, Health and Safety**
**(Survival Action – 42 U.S.C. § 1983)**
**(Against Defendants J. PAUL PARKER, DAVID SAMSON, NORMAN BIDWELL, LOU ANNE CUMMINGS, AMERJIT BHATTAL, BRENT GARBETT, DORIS BROWN, MELODY YOUNG, KIMBERLY WEISS, GURKIRAT BHANGU, CHRISTINA STOHLMAN, LESTER EATON, MIGUEL AGUILAR, OLGA TAHARA, ROSA DIAZ, ERIC CRAWFORD, BALJINDER RAI, SHANE DICKSON, FREMONT-RIDEOUT HEALTH GROUP, and MICHAEL FRATERS)**

103.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 102 of this complaint as though fully set forth herein.

104.    Defendants PARKER, SAMSON, BIDWELL, CUMMINGS, BHATTAL, GARBETT, BROWN, YOUNG, WEISS, BHANGU, STOHLMAN, EATON, AGUILAR,

1  TAHARA, DIAZ, CRAWFORD, RAI, DICKSON, FREMONT-RIDEOUT HEALTH

2  GROUP, and FRATERS knew that NATHAN PRASAD was in danger of serious personal

3  harm because:

4          a.     Based on NATHAN PRASAD's previous contact with COUNTY OF

5  SUTTER and Sutter County Jail officers and employees, including all individual

6  Defendants, Defendants had substantial documentation of his medical needs, and his need

7  for consistent supervision and prompt medical attention when warranted.

8          b.     NATHAN PRASAD's Sutter County Jail inmate records documented

9  that he had a history of MRSA (Methicillin-resistant *Staphylococcus aureus*) infections,

10  and had required treatment for such an infection during a prior period of custody at Sutter

11  County Jail.  Documentation regarding this prior history was included in his Sutter County

12  Jail inmate records, and, upon information and belief, reviewed by Defendants

13  CUMMINGS, BROWN, YOUNG, WEISS, BHANGU, STOHLMAN, EATON,

14  AGUILAR, TAHARA, DIAZ, CRAWFORD, RAI, and DICKSON.

15          c.     NATHAN PRASAD completed and submitted at least one written

16  request to receive medical treatment, reporting "extreme pain" and the need for

17  "emergency" medical attention.

18          d.     Emergency room physicians documented clear instructions that were

19  placed in NATHAN PRASAD's jail custody file and/or medical file, that if his symptoms

20  worsened or new symptoms developed, he needed to be returned to the hospital for

21  emergency treatment *immediately*.  Upon information and belief, Defendant BIDWELL,

22  as the officer charged with managing day-to-day operations at the Jail, was informed and

23  aware of NATHAN PRASAD's evaluation at Rideout Memorial Hospital and the

24  discharge instructions providing that if his symptoms worsened or new symptoms

25  developed, he must be taken to the Emergency Department immediately.  Upon

26  information and belief, Defendants CUMMINGS, BROWN, YOUNG, WEISS,

27  BHANGU, STOHLMAN, EATON, AGUILAR, TAHARA, DIAZ, CRAWFORD, RAI,

28  and DICKSON each reviewed and/or were informed of NATHAN PRASAD's jail custody

1  file and/or medical file, including the medical documentation indicating his medical status

2  and need to be taken to the emergency room immediately if his symptoms worsened or

3  new symptoms developed.

4        e.     Defendants FREMONT-RIDEOUT HEALTH GROUP and

5  FRATERS, who treated NATHAN PRASAD pursuant to a COUNTY OF SUTTER

6  contractual agreement to provide medical treatment to Sutter County Jail inmates,

7  discharged NATHAN PRASAD to a notoriously dangerous setting at Sutter County Jail on

8  January 26, 2011.  They knew that NATHAN PRASAD was exhibiting signs of a serious

9  and life-threatening condition and would need access to emergency medical treatment if

10  his symptoms worsened or new symptoms developed.  Defendants further acted with

11  deliberate indifference to the known risk of serious or lethal injury to NATHAN PRASAD

12  given that his safe discharge from the hospital depended on the capacity for timely

13  emergency medical response which they knew did not exist at Sutter County Jail, given the

14  hospital's service agreement and their experience treating Sutter County Jail inmates.

15        f.     From January 26 to January 28, 2011, NATHAN PRASAD reported

16  to each of Defendants BROWN, YOUNG, WEISS, BHANGU, AGUILAR, TAHARA,

17  DIAZ, CRAWFORD, RAI, and DICKSON that he was in extreme pain, having trouble

18  breathing, and afraid that he was going to die.

19        g.     Defendants BROWN, WEISS and YOUNG each observed and

20  documented that NATHAN PRASAD's condition and symptoms were clearly getting

21  worse, including but not limited to vomiting, shortness of breath, severe chills, coughing

22  and/or vomiting up blood, and "uncontrollable pain."

23        h.     On January 27, 2011 – the morning following NATHAN PRASAD's

24  initial trip to Rideout Memorial Hospital – Defendant BROWN documented NATHAN

25  PRASAD's alarming and clearly worsening symptoms including an abnormally high pulse

26  rate, precipitous drop in blood pressure, low grade fever, marked dehydration, and

27  increased bruising;

28        i.     Defendants BHANGU, AGUILAR, DICKSON and RAI and each

[1071448-2]

29

1  observed that NATHAN PRASAD's condition and symptoms were clearly getting worse

2  and heard his and his fellow inmates' pleas for medical help.

3       j.       Inmates housed with NATHAN PRASAD collected the blood that

4  NATHAN PRASAD was coughing up in an empty milk carton, showing it to Defendants

5  BROWN, YOUNG, RAI, and DICKSON, in a desperate effort to obtain medical attention

6  and treatment for him.

7       k.       In the pre-dawn hours of January 28, 2011, Defendants RAI and

8  YOUNG observed, and Defendant YOUNG documented, NATHAN PRASAD's

9  significant suffering and life-threatening symptoms, including dangerously low blood

10 pressure and blood-oxygen saturation, coughing and/or vomiting up blood, dizziness,

11 sweats, and reports that NATHAN PRASAD feared that he was "going to die."  Defendant

12 GARBETT was informed of these alarming symptoms but did nothing whatsoever in

13 response.  Defendants STOHLMAN, EATON, TAHARA, DIAZ and CRAWFORD each

14 witnessed and/or were informed of NATHAN PRASAD's severe distress and need for

15 immediate medical care, yet did nothing to secure that care despite knowing that

16 Defendant YOUNG was providing no treatment whatsoever.

17      l.       Not until *four (4) hours* after these observations and documented

18 reports did Sutter County Jail staff contact emergency medical services and summon an

19 ambulance.  By the time emergency personnel arrived, NATHAN PRASAD's condition

20 had deteriorated so substantially that his condition was dire.  He died soon thereafter at the

21 hospital.

22      m.       Defendants CUMMINGS, BHATTAL and GARBETT fail to

23 maintain a medical records system that appropriately documents and transmits critical

24 medical information about Jail inmates to affiliated health care providers, knowing that

25 such failure will prevent critically ill inmates like NATHAN PRASAD from receiving

26 appropriate treatment.

27      n.       Defendants PARKER, SAMSON, BIDWELL, CUMMINGS,

28 BHATTAL, and GARBETT developed, implemented and endorsed deficient emergency

1   response policies and procedures, and exhibited a persistent failure to train staff regarding

2   the provision of emergency medical care, knowing that these acts and omissions

3   endangered critically ill inmates such as NATHAN PRASAD.

4          105.   Defendants PARKER, SAMSON, BIDWELL, CUMMINGS, BHATTAL,

5   GARBETT, BROWN, YOUNG, WEISS, BHANGU, STOHLMAN, EATON, AGUILAR,

6   TAHARA, DIAZ, CRAWFORD, RAI, DICKSON, FREMONT-RIDEOUT HEALTH

7   GROUP and FRATERS disregarded these known risks by failing to provide necessary

8   evaluation and treatment for NATHAN PRASAD while he was detained at Sutter County

9   Jail.

10          106.   Defendants' acts and/or omissions as alleged herein, including but not

11   limited to their failure to provide NATHAN PRASAD with timely or adequate medical

12   care and/or to take other measures to protect him from serious harm, along with the acts

13   and/or omissions of the Defendants in failing to train, supervise and/or promulgate

14   appropriate policies and procedures at Sutter County Jail in order to prevent NATHAN

15   PRASAD's and other inmate deaths, constituted deliberate indifference to NATHAN

16   PRASAD's serious medical needs, health and safety.

17          107.   As a direct and proximate result of Defendants' conduct, NATHAN

18   PRASAD experienced physical pain, severe emotional distress, mental anguish, loss of his

19   life, and NATHAN PRASAD and Plaintiffs suffered injuries and damages as alleged

20   herein.

21          108.   The aforementioned acts and/or omissions of Defendants PARKER,

22   SAMSON, BIDWELL, CUMMINGS, BHATTAL, GARBETT, BROWN, YOUNG,

23   WEISS, BHANGU, STOHLMAN, EATON, AGUILAR, TAHARA, DIAZ,

24   CRAWFORD, RAI, DICKSON, FREMONT-RIDEOUT HEALTH GROUP, and

25   FRATERS were malicious, reckless and/or accomplished with a conscious disregard of

26   decedent's rights thereby entitling Plaintiffs to an award of exemplary and punitive

27   damages according to proof, to punish the wrongful conduct alleged herein and to deter

28   such conduct in the future.

**SECOND CLAIM FOR RELIEF**
**Municipal Liability for Violation of the Fourteenth Amendment to the Constitution**
**of the United States – Deliberate Indifference to Serious**
**Medical Needs, Health and Safety**
**(Survival Action - 42 U.S.C. § 1983)**
**(Against Defendant COUNTY OF SUTTER)**

109.   Plaintiffs re-allege and incorporate by reference paragraphs 1 through 108 of this complaint as though fully set forth herein.

110.   Defendants PARKER, SAMSON and BIDWELL are charged with developing and implementing policies and procedures for the Corrections Unit of the Sutter County Sheriff's Department.  The policies, customs and practices that they ratify and implement pursuant to this authority are thus imputable to COUNTY OF SUTTER.

111.   Defendants CUMMINGS, BHATTAL and GARBETT are charged with developing and implementing policies and procedures for the provision of medical services at Sutter County Jail.  The policies, customs and practices that they ratify and implement pursuant to this authority are thus imputable to COUNTY OF SUTTER.

112.   The aforementioned acts and/or omissions of Defendants in being deliberately indifferent to NATHAN PRASAD's serious medical needs, health and safety and violating NATHAN PRASAD's civil rights were the direct and proximate result of customs, practices and policies of Defendants COUNTY OF SUTTER, by and through their agencies, employees and/or agents, including Defendants PARKER, SAMSON, BIDWELL, CUMMINGS, BHATTAL and GARBETT, as alleged herein.

113.   Such policies, customs and/or practices include but are not limited to an ongoing pattern of deliberate indifference, including the following: the failure to maintain a medical records system that appropriately documents and transmits critical medical information about Jail inmates to affiliated health care providers; the failure to ensure implementation of appropriate medical and emergency treatment plans; the failure to act upon clearly life-threatening symptoms and reports; the failure to provide appropriate staffing and training at Sutter County Jail to provide minimally adequate medical treatment for seriously ill inmates; and the failure to implement a policy to ensure that staff would

[1071448-2]

1    contact and summon emergency medical treatment in a timely manner.

2        114.    Such policies, customs and/or practices have persisted even in the face of a

3    grand jury report finding "unacceptable that the program is out of compliance, [the] lack of

4    training for the nursing staff, [and] not having the [policies and procedures] up-to-date."

5    Even NATHAN PRASAD's horrific death in custody did not yield any prompt revision of

6    policies and procedures to ensure that basic emergency care was provided to Jail inmates.

7    The continuation of such policies, customs and/or practices in the face of repeated findings

8    that they are dangerous evinces deliberate indifference of the part of COUNTY OF

9    SUTTER and its policymakers PARKER, SAMSON, BIDWELL, CUMMINGS,

10   BHATTAL and GARBETT to the woefully inadequate and unconstitutional level of

11   medical care at the Jail.

12       115.    Defendant COUNTY OF SUTTER and its policymakers PARKER,

13   SAMSON, BIDWELL, CUMMINGS, BHATTAL and GARBETT tacitly encouraged,

14   ratified and/or approved of the acts and/or omissions alleged herein, and knew that such

15   conduct was unjustified and would result in violations of constitutional rights.

16       116.    The customs, policies and/or practices of Defendants COUNTY OF

17   SUTTER were a direct and proximate cause of Plaintiffs' injuries and the death of the

18   NATHAN PRASAD in that Defendant COUNTY OF SUTTER failed to adequately train

19   and supervise its employees and/or agents to prevent the occurrence of the constitutional

20   violations suffered by Plaintiffs and NATHAN PRASAD, and by other inmates at Sutter

21   County Jail.  Defendant COUNTY OF SUTTER also failed to promulgate appropriate

22   policies or procedures or take other measures to prevent the constitutional violations

23   suffered by Plaintiffs and NATHAN PRASAD, and by other inmates at Sutter County Jail.

24       117.    As a direct and proximate result of the aforementioned customs, policies

25   and/or practices of Defendant COUNTY OF SUTTER, NATHAN PRASAD and Plaintiffs

26   suffered injuries and damages as alleged herein.

27

28

**THIRD CLAIM FOR RELIEF**
**Supervisory Liability for Violation of the Fourteenth Amendment to the Constitution**
**of the United States – Deliberate Indifference to Serious**
**Medical Needs, Health and Safety**
**(Survival Action - 42 U.S.C. § 1983)**
**(Against Defendants J. PAUL PARKER, DAVID SAMSON, NORMAN BIDWELL,**
**CHRISTINA STOHLMAN, LESTER EATON, LOU ANNE CUMMINGS,**
**AMERJIT BHATTAL, and BRENT GARBETT)**

118.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 117, as though fully set forth herein.

119.    Defendants PARKER, SAMSON, BIDWELL, STOHLMAN and EATON were responsible for supervising all Sutter County Sheriff's Department custodial employees and/or agents.  Defendants PARKER, SAMSON, BIDWELL acted in their supervisory capacity in committing the acts alleged herein.

120.    Defendants CUMMINGS, BHATTAL, and GARBETT were responsible for supervising all medical and mental health employees and/or agents responsible for providing care to inmates at the Jail.  Defendants CUMMINGS, BHATTAL, and GARBETT acted in their supervisory capacity in committing the acts alleged herein.

121.    The aforementioned acts and/or omissions of Defendants GARBETT, BROWN, YOUNG, WEISS, BHANGU, STOHLMAN, EATON, TAHARA, DIAZ, CRAWFORD, RAI, and DICKSON in being deliberately indifferent to NATHAN PRASAD's serious medical needs, health and safety and violating decedent's civil rights were the direct and proximate result of customs, practices and policies of Defendants PARKER, SAMSON, BIDWELL, CUMMINGS, BHATTAL, and GARBETT as alleged herein.

122.    Such policies, customs and/or practices include but are not limited to an ongoing pattern of deliberate indifference, including the following: the failure to maintain a medical records system that appropriately documents and transmits critical medical information about Jail inmates to affiliated health care providers; the failure to ensure implementation of appropriate medical and emergency treatment plans; the failure to act upon clearly life-threatening symptoms and reports; the failure to provide appropriate

[1071448-2]

staffing and training at Sutter County Jail to provide minimally adequate medical treatment for seriously ill inmates; and the failure to implement a policy to ensure that staff would contact and summon emergency medical treatment in a timely manner.

123.   Defendants PARKER, SAMSON, BIDWELL, STOHLMAN, EATON, CUMMINGS, BHATTAL and GARBETT tacitly encouraged, ratified and/or approved of the acts and/or omissions alleged herein, and knew that such conduct was unjustified and would result in violations of constitutional rights.

124.   The customs, policies and/or practices of said Defendants were a direct and proximate cause of Plaintiffs' injuries and the death of the NATHAN PRASAD in that Defendants failed to adequately train and supervise their employees and/or agents to prevent the occurrence of the constitutional violations suffered by Plaintiffs and NATHAN PRASAD, and by other inmates at Sutter County Jail.  Defendants also failed to promulgate appropriate policies or procedures or take other measures to prevent the constitutional violations suffered by Plaintiffs and NATHAN PRASAD, and by other inmates at Sutter County Jail.

125.   As a direct and proximate result of the aforementioned customs, policies and/or practices of Defendants, NATHAN PRASAD and Plaintiffs suffered injuries and damages as alleged herein.

126.   The aforementioned acts of Defendants PARKER, SAMSON, BIDWELL, STOHLMAN, EATON, CUMMINGS, BHATTAL and GARBETT were willful, wanton, malicious, and oppressive, thereby justifying an award of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

**FOURTH CLAIM FOR RELIEF**
**Substantive Due Process in Violation of First and Fourteenth Amendments**
**to the Constitution of the United States – Loss of Parent/Child Relationship**
**(42 U.S.C. § 1983)**
**(Against All Defendants)**

127.   Plaintiffs re-allege and incorporate by reference paragraphs 1 through 126, as though fully set forth herein.

128.   The aforementioned acts and/or omissions of Defendants in being

1  deliberately indifferent to NATHAN PRASAD's serious medical needs, health and safety

2  and violating NATHAN PRASAD's civil rights, and their failure to train, supervise and/or

3  take other measures at Sutter County Jail to prevent the conduct that caused the untimely

4  and wrongful death of NATHAN PRASAD, deprived Plaintiffs MARY PRASAD, T.P.,

5  A.P., and N.S. of their liberty interest in the parent-child relationship in violation of their

6  substantive due process rights as defined by the First and Fourteenth Amendments to the

7  United States Constitution.

8       129.  As a direct and proximate result of the aforementioned acts and/or omissions

9  of Defendants, Plaintiffs suffered injuries and damages as alleged herein.

10       130.  The aforementioned acts and/or omissions of the individually named

11  Defendants were willful, wanton, malicious, and oppressive, thereby justifying an award of

12  exemplary and punitive damages to punish the wrongful conduct alleged herein and to

13  deter such conduct in the future.

**FIFTH CLAIM FOR RELIEF**
**Failure to Furnish/Summon Medical Care**
**(Survival Action – Cal. State Law)**
**(Against Defendants BRENT GARBETT, DORIS BROWN, MELODY YOUNG,**
**KIMBERLY WEISS, GURKIRAT BHANGU, CHRISTINA STOHLMAN, LESTER**
**EATON, MIGUEL AGUILAR, OLGA TAHARA, ROSA DIAZ, ERIC**
**CRAWFORD, BALJINDER RAI, and SHANE DICKSON)**

18       131.  Plaintiffs re-allege and incorporate by reference paragraphs 1 through 130, as

19  though fully set forth herein.

20       132.  All Defendants owed NATHAN PRASAD a duty of care to provide him

21  immediate medical care.

22       133.  The conduct of Defendants GARBETT, BROWN, YOUNG, WEISS,

23  BHANGU, STOHLMAN, EATON, AGUILAR, TAHARA, DIAZ, CRAWFORD, RAI,

24  and DICKSON alleged herein, including but not limited to the facts that these Defendants

25  knew or had reason to know that NATHAN PRASAD was in need of immediate medical

26  care, and that Defendants failed to take reasonable action to summon such care or to

27  provide that care, resulting in NATHAN PRASAD's death as alleged herein, breached that

28  duty and violated California state law, including Cal. Govt. Code Sections 844.6 and

1    845.6.

2        134.    The alleged conduct of each of Defendants GARBETT, BROWN, YOUNG,

3    WEISS, BHANGU, STOHLMAN, EATON, AGUILAR, TAHARA, DIAZ,

4    CRAWFORD, RAI and DICKSON was committed within the course and scope of his or

5    her employment.

6        135.    As a direct and proximate result of the breach(es) committed by Defendants

7    GARBETT, BROWN, YOUNG, WEISS, BHANGU, STOHLMAN, EATON, AGUILAR,

8    TAHARA, DIAZ, CRAWFORD, RAI and DICKSON, NATHAN PRASAD and Plaintiffs

9    suffered injuries and damages as alleged herein, including NATHAN PRASAD's great

10   pain and ultimately his death.

11       136.    The aforementioned acts of Defendants GARBETT, BROWN, YOUNG,

12   WEISS, BHANGU, STOHLMAN, EATON, TAHARA, DIAZ, CRAWFORD, RAI and

13   DICKSON were willful, wanton, malicious, and oppressive, thereby justifying an award of

14   exemplary and punitive damages to punish the wrongful conduct alleged herein and to

15   deter such conduct in the future.

16                            **SIXTH CLAIM FOR RELIEF**
                    **Wrongful Death, Cal. Code Civ. Proc. § 377.60**
17                            **(Against All Defendants)**

18       137.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 136, as

19   though fully set forth herein.

20       138.    NATHAN PRASAD's death was a direct and proximate result of the

21   aforementioned wrongful acts and/or omissions of Defendants COUNTY OF SUTTER,

22   PARKER, SAMSON, BIDWELL, CUMMINGS, BHATTAL, GARBETT, BROWN,

23   YOUNG, WEISS, BHANGU, STOHLMAN, EATON, AGUILAR, TAHARA, DIAZ,

24   CRAWFORD, RAI, DICKSON, FREMONT-RIDEOUT HEALTH GROUP, and

25   FRATERS.  These Defendants' acts and/or omissions thus were also a direct and

26   proximate cause of Plaintiffs' injuries and damages, as alleged herein.

27       139.    NATHAN PRASAD's death was a direct and proximate result of the

28   aforementioned negligent acts and/or omissions of Defendants COUNTY OF SUTTER,

[1071448-2]

37

1   PARKER, SAMSON, BIDWELL, STOHLMAN, EATON, AGUILAR, TAHARA, DIAZ,

2   CRAWFORD, RAI and DICKSON.  These Defendants' acts and/or omissions thus were

3   also a direct and proximate cause of Plaintiffs' injuries and damages, as alleged herein.

4        140.   As a direct and proximate result of these acts and/or omissions of

5   Defendants, Plaintiffs incurred expenses for funeral and burial expenses in an amount to be

6   proved.

7        141.   As a direct and proximate result of these acts and/or omissions of

8   Defendants, Plaintiffs MARY PRASAD, T.P., A.P., and N.S. suffered injuries and

9   damages as alleged herein, including the loss of the services, society, care and protection

10  of the decedent, as well as the loss of the present value of his future services to his family.

11  Plaintiffs are further entitled to recover prejudgment interest.

12       142.   The aforementioned acts of the individually named Defendants were willful,

13  wanton, malicious, and oppressive, thereby justifying an award to Plaintiffs of exemplary

14  and punitive damages to punish the wrongful conduct alleged herein and to deter such

15  conduct in the future.

16                          **PRAYER FOR RELIEF**

17       WHEREFORE Plaintiffs pray for judgment against Defendants as follows:

18       1.     For compensatory, general and special damages against each Defendant,

19  jointly and severally, in the amount proven at trial;

20       2.     For damages related to loss of familial relations as to Plaintiffs MARY

21  PRASAD, T.P., A.P., and N.S.;

22       3.     Funeral and burial expenses, and incidental expenses not yet fully

23  ascertained;

24       4.     General damages, including damages for physical and emotional pain,

25  emotional distress, hardship, suffering, shock, worry, anxiety, sleeplessness, illness and

26  trauma and suffering, the loss of the services, society, care and protection of the decedent,

27  as well as the loss of financial support and contributions, loss of the present value of future

28  services and contributions, and loss of economic security;

5.      Prejudgment interest;

6.      For punitive and exemplary damages against each individually named Defendant in an amount appropriate to punish Defendants and deter others from engaging in similar misconduct, in amounts according to proof;

7.      For lost wages, employment opportunities, and other losses in an amount according to proof;

8.      For costs of suit and reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and as otherwise authorized by statute or law;

9.      For restitution as the court deems just and proper;

10.     For such other and further relief as the court deems just and proper.


DATED:  February 28, 2014          Respectfully submitted,

                                   ROSEN BIEN GALVAN & GRUNFELD LLP

                                   By:  */s/ Ernest Galvan*
                                        Ernest Galvan

                                   Attorneys for Plaintiffs


## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial.


DATED:  February 28, 2014          Respectfully submitted,

                                   ROSEN BIEN GALVAN & GRUNFELD LLP

                                   By:  */s/ Ernest Galvan*
                                        Ernest Galvan

                                   Attorneys for Plaintiffs

# ATTACHMENT A

# 2010-2011
# Sutter County Grand Jury Final Report





Cover photo by Larry Burton

ENDORSED FILED

JUL 13 2011

SUPERIOR COURT OF CALIFORNIA
COUNTY OF SUTTER
CLERK OF THE COURT
By   JACKIE LASWELL   Deputy

# Final Report

# of the

# 2010-2011

# Sutter County

# Grand Jury

Rebecca Jennings
Foreperson

Honorable Judge Chris Chandler
Presiding Judge

# Report
## Of the
## 2010-2011
## Sutter County Grand Jury

**Rebecca Jennings-Foreperson, Bob Benton, Carol Guidera, Dale Palmer, Don Pope, Glen Davis, Hal Beeso, Harjeet Singh, Jimi Hans, Karen LaRose, Linda Peterson, Megan Saavedra, Nancy Romero, Sue Countryman, Tammie Putman, Theresa McFall, Tom Bethards, Vera Crabtree**

**Final Report [pursuant to Penal Code 933 (a)**

_____
Rebecca Jennings,
2010-2011 Foreperson

_____
May 4, 2011
**Date**

• • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • •

**Pursuant to Penal Code Section 933(a), the Presiding Judge makes the finding that the foregoing report is in compliance with the Title 4, Chapter 3 of the Penal Code ("Powers and Duties of the Grand Jury").**

_____
**Honorable Christopher Chandler, Presiding Judge**
**Superior Court of California, County of Sutter County**

_____
5-6-11
**Date**

# SUTTER COUNTY GRAND JURY

Honorable Judge Chris Chandler
Sutter County Superior Court
446 2nd Street
Yuba City, CA 95991

Dear: Judge Chandler

In accordance with the California Penal Code Section 933, the 2010-2011 Sutter County Grand Jury has completed its duties with the release of the Final Report to the Court and to the citizens of Sutter County. We were privileged to be selected a year ago to serve on the Sutter County Grand Jury as "a voice of the people and conscience of the community." We took our work seriously and did our best to approach our reviews and investigations objectively and thoroughly.

It has been a year of learning and hard work in gaining new insights; some were frustrations, and some were fun. We have all had personal growth in this Grand Jury experience. As is with any new Grand Jury, eighteen independent individuals with distinctive talents and skills successfully formed cohesive efforts to make their contribution to the citizens of this county. Members of this Jury have dedicated countless hours of work investigating, compiling, debating, and writing these reports. Each member of this Grand Jury contributed greatly to this report. I am proud of my fellow jurors and all they have accomplished.

This year was Judge Brian Aronson second year as the supervising judge for the Grand Jury. We would like to thank Judge Aronson, together we have learned a lot. To complete our work, we had the assistance of the county's court staff, particularly Christine Dagnino and Jackie Laswell. Each staff member we encountered was friendly and helpful. Our thanks to District Attorney Carl Adams and his staff who assisted us along the way taking our phone calls and providing us with the information we needed to perform our duties as members of the Grand Jury. We commend District Attorney Carl Adams dedication of time as the legal advisor for the Grand Jury for the past twenty-eight years. The Court Security Staff was very helpful as we navigated unfamiliar territory around the courthouse. Many individuals from the various agencies we visited were also helpful in countless ways.

In Conclusion I would like to thank this year's Grand Jurors for their conscientious effort and commitment. I would also like to thank Tammie Putman for her dedication and service as the Pro-tem and Secretary of the 2010-2011 Sutter County Grand Jury. Her dedication has made our job much easier. In closing, I would also like to express my

gratitude to the families of my fellow jurors in their unwavering support of their family members as they dedicated many hours away from home in performance of their Grand Jury duties. I believe that each member of this year's Sutter county Grand Jury will echo my sentiments, that this has been a priceless learning experience and opportunity to serve our County. I consider it a privilege to have served with the many individuals who demonstrate concern about the welfare of their county and the citizens who reside in it.

Respectfully,

Rebecca Jennings, Foreperson
Sutter County Grand Jury 2010-2011

**PO Box A, Yuba City, CA  95992**

## 2010-2011 Signature Page

Harold Beeso

Robert Benton

Tom Bethards

Susan Countryman

Vera D. Crabtree

Glen Davis

Carol Guidera

Jimi Hans

Rebecca L. Jennings

Karen LaRose

Theresa McFall

Dale D. Palmer

Linda Peterson

Donald Pope

Tammie Putman

Nancy Romero

Megan Saavedra

Harjeet Singh

4

# Table of Contents

                                                                          Page

**AD-HOC Committee**                                                        **7**

    Sutter County Jail Nurses Program Citizens Complaint          8
        Attachment A                                            12

**Audit and Finance Committee**                                            **13**

    Misallocation of Bradley-Burns and Transportation Tax Fund Deposits   14
        Attachment A                                            19
        Attachment B                                            20
        Attachment C                                            21

**County Government and Administration Committee**                         **22**

    County Government Release of Public Information               23

**Criminal Justice Committee**                                             **26**

    Leo Chesney Community Correctional Facility                   27

    Sutter County Jail                                            29

    Sutter County Department of Child Support Services            31

    Yuba City Police Department                                   34

    Yuba-Sutter Juvenile Hall Camp Singer Youth Guidance Center   35

**Education Committee**                                                     **38**

    Sutter County Superintendent of Schools                       39

    Sutter Union High School                                      43

**Fire and Emergency Committee**                                           **45**

    Office of Emergency Management                                46

    Twin Cities Rod and Gun Club                                  48

**Health and Mental Health Services Committee**        **50**

    Sutter-Yuba Mental Health Services        51

**Planning and Environment Committee**        **54**

    Sutter County Environmental Health Division        55

    Sutter County Planning Services        57

**Public Buildings and Properties Committee**        **58**

    Sutter County Animal Control Shelter        59

**Social Services Committee**        **78**

    Maternal, Child and Adolescent Health Program        79

    Sutter County Department of Human Services        81

**Continuity Committee**        **84**

    Department of Child Support Services        85

    Leo Chesney Community Correctional Facility        86

    Sutter County Jail        87

    Yuba City Police Department        88

    Yuba-Sutter Juvenile Hall        89

# AD-HOC Committee

**Sutter County Jail Nurses Program**
**Citizens Complaint**

**Introduction**

The 2010-2011 Sutter County Grand Jury (SCGJ) received a citizen's complaint on the Sutter County Jail Nurses Program. The complaint alleged illegal practices, lack of training, out of compliant policies/procedures and poor inmate medical care.

The Grand Jury established an Adhoc Committee to undertake an investigation to determine these allegations on the complaint. Interviews were held with supervisors, managers, and staff of the Sutter County Jail. The Adhoc Committee completed an investigation of this complaint and made a number of recommendations resulting from that investigation.

**Discussion**

The Sutter County Jail Nurses program is to ensure provision of emergency and basic health care services to individuals who are in custody. Nursing Staff provides health care to the incarcerated from booking until the time of release. Along with the Physician and Nurse Practitioner, there is a Jail Nurse Manager, a Supervising Registered Nurse (SRN) , three Licensed Vocational Nurses (LVN)'s  and 7-8 contract LVN's. Since November 2010, the county has an open position for a second SRN.

The Grand Jury felt the allegations in the complaint were serious and needed to be investigated.

The complaint alleges the following:

**Inadequate R.N. Coverage**

According to the complaint, per Legal Decree #CIV-S-93-1256 DFL JFM (P) of Dempsey W. Haller, et al. vs. The County of Sutter, et al. (see attachment, A) states in part:

E. 2. Staffing: "Jail medical staffing is the responsibility of the County's Human Services Department and shall consist of at least one registered nurse on site during either the day shift or the evening shift seven days per week, and either one registered nurse or one LVN on site during the other day shift or evening shift as appropriate, seven days per week…"

Prior to the resignation of a SRN, there was one SRN and LVN on the day shift or one SRN and LVN on the night shift. There was an incident when the SRN on the night shift became ill while on duty. The SRN called in a LVN for backup. The SRN was reprimanded by the Jail Nurse Manager in an email that there should have been a Registered Nurse on duty. The SRN was referred to legal decree #CIV-S-93-1256 DFL

8

JFM (P) against Sutter County, which states the requirement. The SRN was not told of this legal decree prior to this incident. According to the staff, there had been 20 days so far that year that this had occurred. During the investigation, it was noted that this was a common occurrence since there were only two SRNs.

## Lack of Training

According to the complaint training of staff nurses has not occurred in more than five (5) years. Annual onsite training is necessary to maintain proficiency in emergency response procedures.

Before the SRN resigned, the SRN requested onsite training. The SRN's request was refused by the Jail Nurse Manager. The SRN put together training on Emergency Response in the jail. The SRN asked for a review of the materials and the Jail Nurse Manager refused to even look at the class outline. The SRN held the class with a few nurses and correctional staff in attendance.

## Out of Compliant Policies and Procedures

The complaint alleged the Jail Nurses Program is out of compliance with California State correctional code – Title 15 sec 1206 Policy and Procedures (P&P) are to be reviewed annually. Standardized Nursing Procedures (SNP) have not been reviewed or updated since 1995. The SNP has been changed with pencil marks.

The nursing staff has inquired as to why these P&P's and the SNP's are outdated. The Jail Nursing Manager's answer is lack of time prevents him from completing the task.

## Finding

### Inadequate R.N. Coverage

The Nurse staffing at the Jail has been directed by a court order in Dempsey W. Haller vs. Sutter County, et al. No. CIV-S-93-1256 DFL JFM (P). Failure to comply with this order Sutter County can be found out-of-compliance and could be liable for additional action by the Court.

## Recommendation

Every effort should be made to hire an additional SRN and ensure one is available for either the AM shift or the PM shift. The Nursing Program Manager needs to take a more active role in managing the Jail Nursing Program. Once the SRN position is filled, the Nursing Program Manager, who is also an RN, must be utilized to ensure the Jail Nursing Program is in compliance with the court order.

The Assistant Director of Health and Human Services should provide oversight to insure the Jail Nursing Program is in full compliance with court order Legal decree #CIV-S-93-1256 DLF JFM (P).

**Finding**

**Lack of Training**

Legal decree #CIV-S-93-1256 DLF JFM (P)
E19. Training: "Jail custody staff shall receive periodic update training in First Aid, CPR, intake screening, blood borne pathogens and suicide prevention…"

Sutter County Jail Medical Policies and Procedures #3 Section 6. "Oversees training of nurses and/or officers in areas where improvement is needed, as identified by QA audits, including regular and continued joint staff development activities. These will be documented as to date given, content, attendees and comments."

Training is necessary to maintain proficiency in on-site activities. The Nursing Program Manager has failed to offer his nursing staff any of the required training. When one of his SRN's put together an emergency response training class he refused to review the course outline before the class was held.

**Recommendation**

The Grand Jury recommends the Nursing Program Manager along with the Medical Officer, develop a training program to ensure adequate on-site training be made available to the nursing staff on a regular basis. The Assistant Director of Health and Human Services should provide oversight to ensure this training program is implemented.

**Finding**

**Out of Compliance Policies and Procedures**

Title 15 Regulations 1206. Health Care Procedure Manual "The health authority shall in cooperation with the facility administrator, set forth in writing, policies and procedures in conformance with applicable State and Federal law, which are reviewed and updated at least annually…"

During the investigation, it was stated unanimously that the P&P's were significantly out-of-date. The County Medical Officer is responsible for making sure the P&P's are current by signing them annually. The Jail Nurse Program Manager has overall responsibility to see that the Nursing Program policies and procedures are operational and functioning in the scope as laid out in the Standard Nursing Procedures. The Jail Nurse Program Manager has not done this. When the Jail Nurse Program Manager was hired, the P&P's were not up to date. By not correcting these problems, his inaction has allowed this

situation to deteriorate further. The Jail Nurse Program Manager indicated it would take over a year to complete. This should be made a priority.

**Recommendation**

The County Medical Officer and the Jail Nurse Program Manager with oversight from the Assistant Director of Health and Human Services should ensure the Jail Nursing Program P&P's are reviewed, rewritten, and made current so they can be used and referred to by the jail staff. The Standard Nursing Procedures has been changed with pencil marks and needs to be corrected.

The Grand Jury recommends that these documents be completed by December 31, 2011. The Jail Nursing Program would also benefit from more active oversight by the Assistant Director of Health and Human Services to see that it is accomplished by the above date.

**Finding**

During this investigation the Grand Jury finds the Jail Nursing Program is completely out of compliance with annual nurse training updates and standard nursing procedures. This exposes Sutter County to numerous potential issues in the future.

**Recommendation**

The Grand Jury recommends that the Assistant Director of Health and Human Services actively take measures to ensure that this program is in full compliance with the law. It is unacceptable that the program is out of compliance, lack of training for the nursing staff, not having the P & P's up-to-date, and the pencil corrections in the SNP. The Grand Jury recommends that the Jail Nursing Program be in full compliance by December 31, 2011.

**Respondents**

Director of Health and Human Services, Tom Sherry
Assistant Director of Health and Human Services, Amerjit Bhattal
County Medical Officer, Dr. Cummings
Jail Nurse Program Manager, Brent Garbett

**Attachment A**

DARRELL W. LARSEN - Bar No. 044272
SUTTER COUNTY COUNSEL
JAMES SCANLON - Bar No. 078914
DEPUTY COUNTY COUNSEL
1160 Civic Center Blvd.
Yuba City, CA  95993
Telephone:  (916) 741-7110

JOHN HAGAR - Bar No. 81039
LAW OFFICE OF JOHN HAGAR
P. O. Box 86935
Los Angeles, CA  90086-0935

Attorneys for Defendants COUNTY OF SUTTER
and SHERIFF ARTHUR R. BRANDWOOD

FILED

SEP 14 1994

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
            DEPUTY CLERK

LODGED

    18 '94

CLERK
EASTERN
D.
DEPUTY CLERK

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| DEMPSEY W. HALLER, et al. | ) | No. CIV-S-93-1256 DFL JFM (P) |
| | ) | |
| Plaintiffs, | ) | AMENDED |
| | ) | SETTLEMENT AGREEMENT |
| vs. | ) | |
| | ) | |
| THE COUNTY OF SUTTER, et al. | ) | |
| | ) | |
| _____ | ) | |



The parties hereby stipulate to settlement of the issues remaining in this case as follows:

A.   Clothing Exchange:   Defendants will provide Jail inmates with clothing upon intake, and periodic clothing exchanges pursuant to Title 15, section 1260, 1261, 1262, 1263, and 1264.  All references to Title 15 in this agreement are to Title 15 as amended in 1994.

B.   Recreation:  Defendants will provide Jail inmates with outdoor recreation pursuant to Title 15, section 1065. Defendants will make best efforts to provide Main Jail inmates with outdoor recreation five times per week.   In addition, defendants will provide, subject to security considerations, the following recreation equipment in the Jail's outdoor recreation yards [both male and female]:   portable basketball hoops, volleyball nets and balls, handballs, and one Santa Clara County Hermo II exercise machine.[1]

C.   Food:   Defendants will complete the Jail's kitchen remodel project by September 1, 1994.   Thereafter, defendants will comply with Title 15 standards, specifically sections 1240, 1241, 1242, 1243, 1245, 1246, 1247, 1248, and 1249 concerning food preparation in the Jail.

D.  Law Library:   Defendants will participate in an experiment to provide CD-Rom law library materials to Jail inmates effective September 1, 1994.   There will be a CD-Rom library for inmates in the Jail.

---

[1] A Hermo II is also provided to inmates housed in the Jail Dormitory housing unit.

2

1.  All inmates will be provided with access to the CD-Rom library and hardbound law library regardless of sentenced or presentenced status, regardless of whether the inmate is represented by counsel.

2.  CD-Rom library and hardbound law library access will be subject to reasonable security, staffing and time restrictions. Inmates facing court deadline and inmates proceeding "in pro per" in local courts will be afforded priority access.

3.  Inmates who request access to the CD-Rom or hardbound law library will be provided direct access without staff present and will be allowed to browse among the available CD disks and law books and to work on their legal cases within the law library.

4.  The Jail CD-Rom West Publishing inventory is attached as Exhibit A. The Jail hardbound book law library is attached as Exhibit B.

5.  Inmates working with the CD-Rom legal system will have access to a computer, CD drive, dot matrix printer and written instructions explaining how to access CD-Rom materials will be provided by plaintiffs' counsel.

6.  The above-referenced experiment will continue for at least a period of twelve [12] months. Counsel for the parties will communicate at least every six months concerning the status of this experiment. At the conclusion of this period the parties shall meet and confer in good faith concerning the long term use of CD-Rom and hardbound law books.

3

E.   Medical Care:  Defendants will modify their delivery of medical services system to provide medical, mental health, and dental care to the plaintiff class as set forth below, the implementation of which service systems will be commenced immediately and will be completed on or about January 1, 1995.

1.   Intake Screening:  Jail medical intake screening shall be performed by a Sheriff's custody staff trained in screening procedures by County medical and mental health personnel.  The intake screening form shall meet the criteria established by Title 15 of the California Code of Regulations and the California Medical Association.  Jail medical staff shall review all intake screening forms as soon as possible, in most cases the same day as booking, but in no event later than the next shift when nursing staff is available.

2.   Staffing:  Jail medical staffing is the responsibility of the County's Human Services Department and shall consist of at least one registered nurse on site during either the day shift or the evening shift seven days per week, and either one registered nurse or one LVN on site during the other day shift or evening shift as appropriate, seven days per week.  Supplementing this nursing coverage shall be on-site visits by a nurse practitioner or physician's assistant two days per week for a total of approximately four hours per week, and on-site visits by a physician twice per week for approximately five hours.  Excluding weekends and county holidays, there will be an on-site visit by either a nurse practitioner, physician's assistant, or a physician not less frequently than every other day.  Further

4

supplementing this coverage shall be on-site visits by a County mental health staff crisis counselor for approximately 18 hours per week, for no less than 3 separate visits each week.  On-site visits for physicians and mental health workers will take place, whenever possible, on established days and hours.  Clerical support will be provided the Jail nurses as appropriate.

3.   <u>Sick Call</u>:   There  shall  be  a  screening  process concerning inmate medical problems and complaints conducted by the Jail nursing staff or a nurse practitioner or a physician's assistant.   To access sick call, inmates shall utilize a Jail Sick Call Request form.  The triage for sick call slips shall take place daily, formal sick call shall be available five days per week.

4.   <u>Pill Call</u>:  Medications shall be distributed to Jail inmates by County medical and/or Jail staff based upon protocols established and approved by the County Department of Human Services.  All medications shall be distributed the appropriate number of times per day deemed medically necessary by County medical/mental health staff.

5.   <u>Inmate  Medical  Records</u>:    Inmate  medical/mental health/dental records shall be maintained in a confidential manner and in a secure setting.  The Jail's medical staff shall maintain records on site at the Jail which document inmate medical problems and which include the information and documents deemed necessary by established protocols based upon Title 15 Minimum Jail Standards.

/////

5

6.   <u>Access to Specialized Clinics</u>:   Inmates shall have access to specialized clinics and care as deemed appropriate by County medical, dental, and mental health providers.

7.   <u>Inmates With Acute Illnesses</u>:   Inmates with acute illnesses shall be transferred to alternative sites for care as deemed appropriate by County medical and/or mental health staff.

8.   <u>Detoxification</u>:   The Jail shall maintain written detoxification procedures which are utilized by both Sheriff's and County medical staff.  These procedures shall comply with the standards set forth in the Title 15 "Minimum Standards" for Local Detention Facilities in the California Code of Regulations.

9.   <u>Communicable Diseases</u>:   The Jail shall maintain its plan to detect, control, and treat inmates with priority communicable diseases.  The program to detect, control and treat inmates with communicable diseases will describe how the identification, treatment, control, and follow-up management of inmates with communicable diseases will occur.   Priority communicable diseases will include TB, HIV/AIDs, STD's, Hepatitis A and B, Rubella, Measles and other diseases identified by Jail staff and the Sutter County Public Health Officer.

10.  <u>Standardized Practices</u>:  The Jail's medical personnel shall follow established written treatment protocols prepared by the County's Department of Human Services.   These treatment protocols, and the medical policies and procedures utilized by Jail medical staff shall be completely revised and approved by all of the involved County agencies.  Jail policies, procedures, and treatment protocols shall follow the format established by the California Medical Association.

6

11.  Suicide Prevention:  The Jail shall maintain a suicide prevention program which includes  instruction by County mental health staff [both classroom and video training] for Sheriff's personnel working with the Jail.

12.  Dental Care:  Inmates requiring dental care shall be referred to a private provider who shall provide the appropriate care necessary to alleviate pain, prevent infections, and treat emergency dental needs.  Dental care shall be timely depending upon the pain and seriousness of the dental problem.  Dental care shall not be limited to extractions, however, the dental care provided to Jail inmates is not intended to deal with years of personal neglect.

13.  Management  of  Pharmaceuticals:   Pharmaceutical practices will comply with section 1216 of the Title 15 Minimum Standards for Local Detention Facilities.

14.  Sick Call Forms:  The Jail's sick call form, including the form necessary to request mental health care, shall be printed in English, Spanish, and Punjabi.  Inmates who request that a staff member act as a translator during the sick call or intake screening process shall be provided with language assistance as deemed appropriate by Jail staff.  Access to forms shall include access to information concerning how to obtain medical, mental health, and dental care within the Jail.

15.  Quality Assurance:  The responsible County physician for the Jail under Title 15, section 1202 shall establish a mechanism to assure that the quality and adequacy of medical, dental, and mental health care is annually assessed.  The plan

7

shall include a means for the correction of identified deficiencies of the medical/dental/mental health and pharmaceutical services provided and shall include the statistical gathering set forth in Title 15. In addition, and as part of this plan, monthly meetings shall be held between the Jail's custody and medical/mental health staff.

16. <u>Informed Consent</u>: The Jail has established procedures which conform to Title 15, section 1214 of the California Code of Regulations.

17. <u>Food Handlers</u>: The responsible physician shall develop procedures for medical screening of food handlers prior to working in the facility kitchen. Additionally, there shall be written procedures for education and ongoing monitoring and cleanliness of food service workers in accordance with section 27605 of the Health and Safety Code, California Uniform Retail Food Facilities Law.

18. <u>Jail Medical Office</u>: The Jail's medical office shall be renovated by March 1, 1995.

19. <u>Training</u>: Jail custody staff shall receive periodic update training in First Aid, CPR, intake screening, blood borne pathogens,and suicide prevention.

20. <u>OSHA</u>: The Jail will implement a program to address the OSHA blood borne pathogen requirements.

21. <u>Women's Rights</u>: The Jail will post as necessary the pregnancy related rights of female inmates as set forth by the California Penal Code.

22.   <u>HIV Testing</u>:  HIV testing will be provided in the Jail upon request.   Pre and post test counselling will be provided.

F.   Either party may seek to change the terms of this SETTLEMENT AGREEMENT pursuant to the standards set forth in <u>Rufo</u> <u>v. Inmates of Suffolk County Jail</u>, 502 U.S. ____, 112 S.Ct. 748 (1992).

G.   In the event that an emergency threatens the Sheriff's ability to comply with these orders, counsel for defendants will notify counsel for plaintiffs no later than the next business day.

H.   Defendants shall pay to plaintiffs' counsel attorney fees in the amount of $17,500 at the time of the filing of the Final Judgment.

I.   The parties have previously stipulated to a permanent injunction filed on September 15, 1993 relating to any and all population issues, a copy of which is attached hereto and incorporated herein by reference as Exhibit C.  This SETTLEMENT AGREEMENT is intended to resolve all matters not covered by the permanent injunction referred to above.

Upon the execution of this SETTLEMENT AGREEMENT, the parties request a dismissal of all matters not covered by the permanent injunction referred to above.

J.   The parties stipulate and agree that the Magistrate Judge and District Court Judge assigned this case will issue any and all orders necessary for the dismissal of this action, including but not by way of limitation any orders deemed

9

necessary regarding posting of this agreement and any Fairness Hearing deemed necessary.

IT IS SO STIPULATED:

DARRELL W. LARSEN
SUTTER COUNTY COUNSEL

DATED: August __16__, 1994

JAMES SCANLON
DEPUTY COUNTY COUNSEL
Attorneys for Defendants

DATED: August __17__, 1994

PAUL COMISKEY
Attorney for Plaintiffs

10

## EXHIBIT A -- CD-ROM LIBRARY

1.   The system will provide access to the following legal authorities:

    (a)   Reported cases of the United States Supreme Court

    (b)   Federal 2d and Federal 3d Reporters

    (c)   All available California reported cases

    (d)   Annotated California Codes

2.   The computer hardware system which will include a single work station terminal shall be selected by the Sutter County Sheriff with the concurrence with plaintiffs' counsel.

## EXHIBIT B -- LAW LIBRARY - BOOKS

In addition to computerized legal research, the law library shall consist of at a minimum the following bound authorities or their substantial equivalents:

1.   West California Rules of Court, State - latest edition

2.   West California Rules of Court, Federal - latest edition

3.   West Federal Rules of Civil and Criminal Procedure and Evidence - latest edition

4.   Black's Law Dictionary - latest edition

5.   Deerings California Penal Code - latest edition

6.   Deerings California Civil Practice Code - latest edition

7.   Federal Habeas Corpus - 2nd edition (Michie Company)

8.   California Criminal Law

     Book No. 1
             a.   Introduction to Crimes
             b.   Elements of Crime
             c.   Defenses
             d.   Crimes Against the Person

     Book No. 2
             a.   Crimes Against Property
             b.   Crimes Against Decency and Morals
             c.   Crimes Against Public Peace and Morals
             d.   Crimes Against Governmental Authority

     Book No. 3
             a.   Punishment for Crimes

1  DARRELL W. LARSEN [State Bar #44272]
   SUTTER COUNTY COUNSEL
2  JAMES SCANLON [State Bar #78914]
   DEPUTY COUNTY COUNSEL
3  1160 Civic Center Blvd.
   Yuba City, CA 95993
4  (916) 741-7110

5  JOHN HAGAR [State Bar #81039]
   LAW OFFICE OF JOHN HAGAR
6  P.O. Box 86935
   Los Angeles, CA  90086-0935
7  (213) 626-2089

8  Attorneys for Defendants COUNTY OF SUTTER
   and SHERIFF ARTHUR R. BRANDWOOD
9
                    **FILED**
                    SEP 15 1993
                    DEPUTY CLERK

                    EXHIBIT C

10              **UNITED STATES DISTRICT COURT**

11          **FOR THE EASTERN DISTRICT OF CALIFORNIA**

12  DEMPSEY W. HALLER, et al.        )    NO. CIV-S-93-1256 DFL PAN (P)
                                     )
13              Plaintiffs,          )    **STIPULATION RE POPULATION**
                                     )    **LIMITS, ORDER**
14          vs.                      )
                                     )
15  THE COUNTY OF SUTTER, et al.     )
                                     )
16              Defendants.          )
    _____)

17

18

19

20

21

22

23

24

25

26

27

28

1    The parties hereby agree and stipulate to the following

2    injunctive orders:

3        1.   This action shall proceed as a class action pursuant to

4    Federal Rules of Civil Procedure, Rule 23b.

5        2.   Defendants are enjoined from bedding inmates on the floor.

6        3.   The maximum assigned bed capacities for each housing unit

7    of the Sutter County Jail are set forth below:

8    Unit I - 8 beds

9    Unit MPS - 24 beds*

10   Unit MS - 24 beds*

11   Medical Sheltered Living - 3 beds

12   Kitchen Trustee Unit - 8 beds

13   FPC - 4 beds

14   FPS - 6 beds*

15   FS - 10 beds*

16   FJ - 4 beds

17   Jail Dormitory - 62 beds*

18       4.   Defendants may operate, if conditions warrant, housing

19   units MPS, MS, FPS, and FS at two beds above the capacity defined

20   in paragraph 3.  Defendants may operate, if conditions warrant, the

21   Jail Dormitory with as many as six beds above the capacity defined

22   in paragraph 3.  Defendants shall not house inmates in MPS, MS,

23   FPS, FS, and the Jail Dormitory above the capacities agreed to in

24   paragraph 3 unless beds of like classification are not available in

25   other housing units.  In the event units MPS, MS, FPS, FS, and the

26   Jail Dormitory are operated above the capacity set forth in

27   paragraph 3, outdoor recreation will be provided for those units

28

2

operating above the capacity set forth in paragraphs 3 for at least one hour per day, five days per week.  In no event will any housing unit operate above its paragraph 3 capacity for more than 14 consecutive days and, in no event will the total Jail bed capacity exceed by 14 beds the total capacity set forth in paragraph 3, except that except that Defendants may operate the Jail Dormitory at its existing bed capacity of 88 beds until the Minimum Facility presently under construction is operational.[1]

5. The prohibition against floorsleepers is effective immediately.  The population limits set forth in paragraphs 3 and 4 shall be effective forty five [45] days from the date that this Order is approved by the District Court.

6. Defendants are enjoined from adding beds to the Main Jail in each and every housing unit which exists on the date that this stipulation is executed.[2]

7. The Sheriff of Sutter County is authorized by this order to release inmates from the Sutter County Jail whenever the Sutter County Jail, or any specific housing unit therein, is within ten percent [10%] of being filled.  The Sheriff shall release inmates or refuse to accept newly-committed inmates whenever all beds in the Jail are filled, or whenever any specific housing unit within the Jail is filled.

---

1. "Operational" is defined, for the purposes of this stipulation, as being 50% occupied under the rated capacity assigned by the California Board of Corrections.

2. This stipulation does not encompass any additional jail structures to be built in the future, whether contiguous or attached, that are not presently within the physical confines of the presently constructed Jail.  This stipulation does not limit the capacity of the Minimum Facility presently under construction.

3

8.   Either party may seek to modify or terminate this Stipulation pursuant to the standards set forth in Rufo v. Inmates of Suffolk County Jail, ___ U.S. ___, 112 S.Ct. 748 (1992).

IT IS SO STIPULATED:

DATE: _9/8/43_

John Hagar
Attorney for Defendants

DATE: _9/13/93_

James Scanlon
Attorney for Defendants

DATE: _9/9/93_

Paul Persons
Attorney for Plaintiffs

ORDER

It is so recommended.

DATE: _9-15-93_

Honorable Peter A. Nowinski
United States Magistrate Judge
Eastern District of California

It is so ordered.

DATE: _9-15-93_

Honorable David F. Levi
United States District Judge
Eastern District of California

4

# ATTACHMENT B

APR 09 2012

Report
Of the 2011-2012
Sutter County Grand Jury

SUPERIOR COURT OF CALIFORNIA
COUNTY OF SUTTER
CLERK OF THE COURT
By____JACKIE LASWELL____ Deputy

Donald Pope-Foreperson, Jeffry Barrow, Harold Beeso, Thomas Bethards, Bonnie Briscoe
Christine Duncan, Donald Hanson, Wendy Iverson, April James, Lanier Stenhouse
Karen La Rose, Henry Lamon, Martha McClard, Linda Peterson
Brandy Roberts, Mark Jenny, Terrance Sutton, Harprit Takher

Final Report (pursuant to Penal Code 933 (a)) on subject:

Sutter County Jail Death

*Don Pope*

Donald Pope
2011-2012 Foreperson

*APRIL 3, 2012*
Date

*****************************************************************************

Pursuant to Penal Code Section 933 (a), the Presiding Judge makes the findings that the
foregoing report is in compliance with the Title 4, Chapter 3 of the Penal Code
("Powers and Duties of the Grand Jury")

*W2 Chandler*

Honorable Christopher Chandler, Presiding Judge
Superior Court of California, County of Sutter County

*4-3-12*
Date

## SUTTER COUNTY JAIL DEATH

### SUMMARY

The 2011-2012 Sutter County Grand Jury (SCGJ) received a citizen's complaint on the Sutter County Jail alleging improper and denial of medical care resulting in an inmate's death. The SCGJ conducted an investigation into the inmate's time in custody and specifically the quality of medical treatment he received while at the jail.

The SCGJ conducted interviews of all Jail Medical Services (JMS) personnel in management positions, jail clinic staff members, Rideout Hospital Emergency Room (ER) physicians, the ambulance emergency medical team (EMT) personnel, and family members of the deceased. The SCGJ found the medical treatment of the inmate, just prior to his final transport to Rideout Hospital ER, to have been below the standard of care. This can indirectly be traced to a myriad of problems with the jail clinic program.

Recommendations from the SCGJ are to make changes at the jail medical clinic to improve oversight and supervision. Responsibility should be taken by those in management positions to complete and maintain policies and procedures, provide training to nurses, and conduct Morbidity and Mortality (M&M) discussions in order to prevent recurrence of adverse outcomes.

### BACKGROUND

The Sutter County JMS provides necessary emergency and basic health care services to individuals who are in custody from booking until time of release. Medical Staff is comprised of the Health Officer (HO), Jail Nurse Manager (JNM), Nurse Practitioner (NP), two (2) Supervising Registered Nurses (RN), four (4) Licensed Vocational Nurses (LVN), and on-call LVN's as needed.

A sick call request form must be filled out if an inmate wants to be seen at the jail medical clinic. These forms are collected by a JMS staff member during medication pass, then reviewed and triaged by an RN for follow-up. In a medical emergency, the nurse on duty, either using his/her own judgment or by consulting with a physician, NP or RN, can determine if an inmate needs to be seen at Rideout Hospital ER.

#### *Management*

As part of the investigation, the SCGJ reviewed job descriptions of those in authority at the jail clinic to ascertain their respective roles and responsibilities (see Appendix A). This included the JNM, the HO, and Assistant Director of Human Services-Health Division (AD).

### Health Officer

The HO is a physician who acts as medical director of the Sutter County jail and is responsible for oversight of the quality of health care provided to inmates and making final decisions on all clinical matters. The HO is responsible for the development and annual review of medical policies and procedures, including nursing assessment protocols. Even though the HO reports directly to the Board of Supervisors, this position coordinates with the AD in support of the JMS. The current HO has been in the position since 2010.

### Assistant Director of Human Services-Health Division

According to the job description, the AD "...has the primary authority and responsibility for directing for a functional area of services within the Human Services Department..." including jail health services. Having oversight of the jail clinic, the AD is responsible for its efficient operation and delivery of quality medical care in a timely manner. The AD directly supervises the JNM. The current AD has been in this position since 2007.

### Jail Nurse Manager

According to the job description, the JNM has the responsibility "...to plan, organize, coordinate and manage jail medical services; to supervise nursing staff; to oversee quality assurance and legal compliance issues; and to perform related work as required." This includes development of "...policies, procedures and standards to ensure quality of care", directing staff in the delivery of health services to inmates, responding to emergency inmate care, and providing "...professional nursing care as needed." The JNM is also responsible for "...handling employee concerns and problems" and "...directing employee training and development". The current JNM has been in this position since 2009.

### Policies and Procedures

The 2010-2011 SCGJ wrote a report addressing a complaint of the Sutter County Jail Nurses Program which alleged, among other things, out of compliant policies/procedures. The complaint alleged the Jail Nurses Program was out of compliance with the California State correctional code - Title 15 sec 1206, which states that Policy and Procedures (P&P) are to be reviewed and updated annually. Also, Standardized Nursing Procedures had not been reviewed or updated since 1995 and had been changed with pencil marks. The 2010-2011 SCGJ recommended that "The County Medical Officer and the Jail Nurse Program Manager with oversight from the Assistant Director of Health and Human Services should ensure that Jail Nursing Program P&P's are reviewed, rewritten, and made current so they can be used and referred to by the jail staff." This was to be completed by December 31, 2011.

### Nurse Training

The 2010-2011 SCGJ also addressed a complaint of lack of staff training at the Sutter County Jail and recommended the JNM, along with the HO, "...develop a training program to ensure adequate on-site training be made available to the nursing staff on a regular basis". The AD "...should provide oversight to ensure this training program is implemented."

*Complaint*

Based on the serious nature of the complaint, the SCGJ agreed to investigate the allegation of an inmate not receiving proper medical care during his eight days of incarceration. Furthermore, there seemed to be a lack of urgency by JMS management to implement changes in order to avoid a similar adverse outcome. The SCGJ was concerned past inadequate staff training and incomplete JMS policies and procedures could have been contributing factors in the inmate's death.

## APPROACH

Interviews were conducted with the Director of Human Services, Assistant Director of Human Services-Health Division, the Health Officer, the Jail Nurse Manager, several jail nursing staff members, Rideout Hospital ER physicians, the ambulance EMT personnel, several correctional officers, and family members of the deceased.

Medical and jail records and reports associated with the case were obtained and studied. Copies of treatment protocols and the updated Policies and Procedures were requested. Several SCGJ members participated in a tour of the Sutter County Jail, including the jail clinic, the Medical Cell (formerly Sick Bay), and the office of the JNM.

## DISCUSSION

The inmate had been complaining of pain in his leg/foot since sometime after his arrest on January 21, 2011. On January 24, 2011, he requested sick call, and was seen at the jail clinic on January 25, 2011. The inmate was scheduled for sick call again on January 26, 2011, because of increasing leg pain. The jail nurse on duty requested he be transported to Rideout Hospital ER. After evaluation and negative findings by ER physicians, he was returned to the jail. Since the inmate continued to complain of leg pain that night, he was prescribed medication and seen again at the jail clinic on Thursday morning, January 27, 2011. During late evening Thursday/early Friday morning his condition severely and rapidly deteriorated. He was escorted by the Correctional Officer on duty to the nurses' station on January 28, 2011, at 4:39 AM. Abnormal vital signs and appearance, together with reporting of coughing up blood, indicated the inmate to be in serious distress. His vitals were: Blood Pressure (BP) 64/44, Pulse (P) 120, Respirations (R) 24, Temperature (T) 97.6 and Oxygen Saturation 93.

The LVN on duty failed to recognize the urgency of the medical situation to seek immediate help. The LVN did not consult with the on call physician or call for an ambulance. At 5:25 AM, the LVN made the determination to place the inmate in the Medical Cell, located across from the jail clinic, requesting 30 minute visual checks by custody officers.

At 8:00 AM, the inmate was brought back to the clinic and his vital signs were retaken by the LVN: BP unobtainable, P 142, R 40 with significant shortness of breath, and T 94.2. The JNM arrived and was briefed by the LVN on the inmates' condition and he did not review the medical chart or examine the inmate. The NP arrived at 8:05 AM and noted very loud respirations from the inmate. Vital signs were taken, and the NP immediately requested an ambulance to transport him to Rideout Hospital. His condition further deteriorated and the inmate died in the ICU later that afternoon.

According to several Rideout Hospital physicians, it is unknown and probably unlikely that an earlier transport to the hospital would have changed this outcome. However, this does not absolve the actions of the nurse on duty, who failed to recognize the emergency and confined the seriously ill inmate in the Medical Cell for over three hours while she attended to other routine duties.

There was never any formal discussion or meeting held for the jail nursing staff to review the inmate's case. Morbidity and Mortality conferences are considered to be invaluable learning tools with the goal to discuss and gain insight when there is an unexpected death or poor outcome. As the medical director of JMS, the HO is the most likely person to moderate these M&M's. However, it was discovered that M&M-like discussions were not held and in fact the HO did not allow any discussion among medical staff about the inmate's case.

The P&P's were not current at the time the JNM was hired four years ago and no progress was made until the 2010-2011 SCGJ made its recommendations for them to be updated. It has been an ongoing process for both the HO and JNM to write and implement them. Approximately half of the P&P's are completed except for most of the nursing assessment protocols which are pending HO approval.

On the day the inmate was placed in the Medical Cell, the Sutter County Sick Bay Policy #56, dated October 8, 2001, was in place. It was one page and stated in general terms that only jail medical staff could place inmates with medical problems in Sick Bay; it did not offer any guidance. According to the October 12, 2011, revised JMS Policy #16-501, only the JNM, RN Supervisor or NP can determine if an inmate meets the criteria to be placed in the Medical Cell. It is not to be used for an inmate with an unstable condition that requires frequent observation. An LVN must have verbal orders to move an inmate into the Medical Cell.

Almost one year after the inmate's death, a priority still had not been made to write a protocol to help guide nursing staff should an inmate present with similar vital signs and symptoms. There seemed to be no urgency in developing P&P's to ensure inmates receive critical medical attention in a timely manner. Finally, Vital Signs Monitoring JMS Policy #16-506, dated January 9, 2012, includes parameters for normal and abnormal vital signs and required actions. The need to consult with a NP or physician in case of any concerns or questions regarding inmate health is stressed numerous times in the policy.

The JNM has provided the SCGJ with documentation of mandatory training for the JMS completed last year, including CPR, blood borne pathogens, HIPAA, and jail safety. However, he has not provided documentation of any in-house training related to direct patient care or staff meeting minutes showing patient care discussions or training.

Throughout all of the interviews conducted by the SCGJ, not one JMS staff member felt that the JNM provides effective leadership nor are they confident about consulting him regarding patient care. When asked, several of their responses about the JNM's participation in the clinic indicated he's either never there or always in his office, which is located around the corner from the clinic.

Sutter County Health Department requested the National Commission on Correctional Health Care (NCCHC) to assess and propose solutions to improve its health care management and costs. This organization is the leader in setting standards for correctional facilities. A facility can request an assessment by NCCHC for the purpose of reviewing and comparing their health care services against national standards. In November 2011, NCCHC conducted an on-site review of the JMS (see Appendix B).

The chief finding of NCCHC for the JMS was their "...policies, procedures, and guidelines have not been vetted, nor has staff been trained. Although training is planned, the lack of strategic planning, developed policies and procedures and consistent leadership in the application of those policies and procedures have greatly hampered the delivery of health services at the Sutter County Jail." In addition, "...there has been no effective process that studies the quality of health care provided in the jail. A registered nurse reviews charts, but the data from these reviews is limited to documentation issues and does not evaluate the clinical care. The chart reviews include no information regarding the quality of care provided."

Although the NCCHC commended the jail medical staff efforts to provide health care with their limited resources, they made several recommendations to improve the quality of care. The NCCHC recommendations include:

- completing the policies and procedure manual
- implementing "...nursing protocols as soon as possible and ensure that nursing staff is properly trained"
- improvement on the health record format and contents to facilitate monitoring of the quality of health care delivery

**FINDINGS**

**F1.**     The involved LVN, by failing to recognize the medical emergency and by not calling for an ambulance, acted inadequately in the treatment of the inmate.

**F2.**     The JNM did not take any interest or immediate action responding to the inmate's medical emergency which is inconsistent with RN training and not in compliance with the job description to provide professional nursing care.

**F3.**     Although the 2010-2011 SCGJ recommended a December 31, 2011 completion date, only about half of the P&P's have been finalized and made available on the intranet. There was no priority after the inmate death to immediately implement a policy that included vital sign parameters indicating when to call for an ambulance.

**F4.**     According to the job description, the AD has direct involvement with JMS, not only for oversight of the JNM's performance, but for the purpose of recognizing and improving employee problems. With the discontent amongst the JMS staff with the JNM, the AD is not attune to the problems at the jail medical clinic and/or not taking appropriate, decisive steps to resolve them.

**F5.**     The AD violated the conditions of the job description by enabling the JNM to be negligent of duties and responsibilities throughout the JNM's entire tenure. This includes continuous noncompliance by not reviewing and updating P&P's annually (Title 15 sec 1206 CA code), no in-clinic training program to assure standardized treatment procedures, and reluctance to act in the capacity of an RN.

**F6.**     There is no in-house training provided to JMS staff that is specific to their job.

**F7.**     All JMS Management (JNM, AD, and HO) abrogated their responsibility by not conducting an M&M-like conference following the death of the inmate.

**F8.**     M&M-like conferences have not been held after adverse incidents at the JMS clinic. These discussions have been discouraged by the HO. M&M-like conferences are of great value as a teaching tool for patient management. Stifling any discussions of these cases is a detriment to the JMS since it deprives the nursing staff team an outlet to reflect upon and review poor or avoidable outcomes.

**F9.**     Both the NCCHC visit and SCGJ investigation independently came to many of the same conclusions concerning issues with the JNP.

## RECOMMENDATIONS

**R1.** Clinical performance of the involved LVN should be evaluated by RN supervisors on a regular basis and reported to the JNM. The JNM and the AD should then review oversight and performance of the LVN to determine if the LVN meets minimum nursing standards.

**R2.** When present during an emergency situation the JNM should assume full responsibility as the lead RN to ensure professional quality medical care. The JNM should be more accessible when asked for guidance by jail nursing staff regarding inmate care and be more available to assist as needed.

**R3.** The JNM must ensure all JMS staff is thoroughly familiar with the new JMS Policy #16-506, which outlines parameters for abnormal vital signs and required actions.

**R4.** The AD should evaluate and make changes to ensure the person in the position of JNM is capable of fulfilling all job responsibilities. This could entail periodic feedback from the nursing staff, more direct observation, and frequent evaluations of the JNM's leadership abilities.

**R5.** Every effort should be made by the JNM, AD, and HO to finalize and implement all P&P's and make them available on the intranet. Thereafter, all P&P's should be reviewed and updated annually.

**R6.** The JNM should encourage and foster a learning environment for the nursing staff. They should have opportunities to attend continuing education courses and arrangements should be made for in-house training relating to direct patient care, i.e. man down, suicide prevention, etc.

**R7.** After a death or poor outcome at the jail clinic, the HO should conduct M&M-like conferences with the AD and all JMS staff present. The JNM, AD, and HO share the responsibility to schedule these discussions.

**R8.** JMS should implement all NCCHC recommendations.

## RESPONDENTS

Director of Health and Human Services, Tom Sherry
Assistant Director of Health and Human Services, Amerjit Bhattal
County Medical Officer, Dr. Cummings
Jail Nurse Program Manager, Brent Garbett

**APPENDIX A (Job Descriptions)**
**APPENDIX B (NCCHC Report)**

APPENDIX A

*County of Sutter*
*Established: 1/78*
*Revised: 01/31/84; 07/30/96; 10/30/01; 12/06/05; 03/27/07*
<u>*Salary Range: MGT59*</u>
*FLSA: Exempt*

## HEALTH OFFICER

### DEFINITION

Under administrative direction of the Board of Supervisors and the Assistant Director of Human Services - Health, plans, organizes, directs and coordinates the activities of assigned medical programs; enforces local health orders and ordinances pertaining to protection of public health; assesses the community health status; advises the governing body concerning health issues.

### CLASS CHARACTERISTICS

This is a single position classification that has primary responsibility for the enforcement of orders and ordinances pertaining to public health and sanitary matters. The incumbent also provides treatment and care for patients in the Health Department clinics. Positions at this level require highly specialized knowledge, abilities, skills and experience and exercise independent judgment in the performance of duties. Work requires creative ability, resourcefulness and discriminating judgment in the analysis and solution of complex problems, and the ability to make technical decisions on specialized matters. Work is reviewed in terms of fulfillment of goals, program effectiveness and soundness of judgment.

### EXAMPLES OF ESSENTIAL DUTIES

The following duties are normal for this position. These are not to be construed as exclusive or all-inclusive. Other related duties may be required and assigned.

1. Assists the Assistant Director of Human Services - Health in planning, organizing, and directing the activities and programs of the Health Department and the Outpatient Clinic.
2. Enforces all applicable statutes, orders, regulations and rules relating to public health.
3. Provides direction and advice regarding policies and procedures directed by the state immunization board.
4. Assists in making decisions regarding investigation of communicable diseases, their diagnosis and treatment.
5. Directs the detection and control of communicable diseases,

sexually transmitted diseases, and tuberculosis.

6. Directs the operation of adult, child, crippled children, and school health programs.
7. Directs public health education.
8. Promotes the advancement of maternal and child health.
9. Directs the recording of vital statistics.
10. Acts as medical director of the county jail medical facility; reviews and approves all examination and treatment records initiated by practitioners.
11. Approves all prescriptions dispensed by health department.
12. Performs professional care and treatment of patients in various clinics.
13. Conducts clinics to evaluate patients' health status, provide treatment, and provide advise.
14. Conducts immunization programs.
15. Administers a diagnostic and treatment program for individual patients under jurisdiction of the position.
16. May provide medical services at other county institutions.
17. Confers with members of the public and representatives of federal, state and local agencies regarding health department programs; cooperates with federal and state public health groups in the enforcement of health and sanitary matters.
18. Supervises, directs and evaluates assigned staff, to include assigning work, handling employee concerns and problems, and counseling.
19. Reviews technical requirements, reports and procedures generated by the health department.
20. Prepares public health information materials and news releases.
21. Reviews and countersigns various medical charts, reports and documentation; makes recommendations as appropriate.
22. Consults with physicians, nurses, patients, staff members, other county departments, agencies, or other individuals in the diagnosis of, and investigation of, cases of suspected communicable disease and to exchange information or provide recommendations; takes measures to prevent and control epidemics.
23. Answers the telephone, provides information, takes messages and/or directs calls as appropriate.
24. Responds to requests for information or assistance.
25. Provides education to the public; speaks before interested groups.
26. Serves on Emergency Medical Services Preparations

Committee.

### EXAMPLES OF MARGINAL DUTIES

1. Attends professional meetings and conferences.
2. Represents the County on committees, boards, at meetings, or otherwise as assigned.

### MINIMUM QUALIFICATIONS

**Knowledge of:** Medical science and its applications to public health; the pertinent laws, ordinances, rules and regulations governing public health work; principles and practices of public health administration; operating policies and general functions of the State Department of Health Services; principles and practices of management necessary to plan, analyze, develop, evaluate and direct diverse and complex activities of major health programs; current trends, concepts and advances in public health; causes and modes of transmission of communicable disease; basic principles of budgeting; specialized medical equipment and instrumentation; and standard office equipment.

**Ability to:** Plan, organize and direct public health programs within professional standards, legal requirements and financial constraints; direct and supervise professional and technical personnel; analyze situations accurately and take effective action; interpret laws, regulations and standards pertaining to public health; prepare clear and comprehensive records and reports; maintain accurate records; communicate effectively both orally and in writing; speak effectively in public; establish and maintain effective working relationships with patients, staff members, other departments, agencies, and public groups and organizations; operate a variety of standard and specialized medical equipment; and operate standard office equipment.

**Education and Experience:** Graduation from a recognized medical school approved by the Council of Medical Education and Hospitals of the American Medical Association with a degree of M.D., or graduation from a recognized osteopathic medical school approved by the American Osteopathic Association with a degree of D.O. (Master's Degree in Public Health desirable), and progressive supervisory or administrative experience in a health department.

**Special Requirements:** Essential Duties require the following physical skills and work requirements: Employees must be able to support the weight of patients for brief periods of time in positioning/ transporting and lift and hold babies or very young children; ability to operate and use a variety of health care equipment and tools.

### Other Requirements:
Incumbent shall not have an ownership interest in any corporation,

partnership, or other entity engaged in any private practice of medicine, nor engage in any private practice of medical service.

**License or Certificate:** Possession of a valid physician's and surgeon's license issued by the State of California either through the Board of Medical Quality Assurance or the Board of Osteopathic Examiners to practice medicine in the State of California.

The County of Sutter is an Equal Opportunity Employer. In compliance with the Americans with Disabilities Act, the County will provide reasonable accommodation to qualified individuals with disabilities. Sutter County encourages both incumbents and individuals who have been offered employment to discuss potential accommodations with the employer.

*County of Sutter*
*Established: March 1, 1996*
*Revised: 7/30/96, 10/30/01; 3/27/07*
*Salary Range: MGT51*
*FLSA: Exempt*

## ASSISTANT DIRECTOR OF HUMAN SERVICES

### DEFINITION

Under general direction, plans, organizes, and manages the daily operations of a comprehensive social services, bi-county mental health, or community health delivery system within regulatory and fiscal constraints; serves as a member of the department's senior management team; if assigned to the mental health unit, acts as Alcohol and Drug Program Administrator in accordance with Sections 11801 and 11963 of the Health and Safety Code.

### CLASS CHARACTERISTICS

This class has primary authority and responsibility for directing for a functional area of services within the Human Services Department, such as social services, public health, public mental health, primary health, and jail health services. This position is not responsible for technical medical protocols associated with a M.D. Medical protocols and practice are associated with the County Health Officer, a licensed M.D. Work is accomplished within a broad framework of policies. Work requires creative ability, resourcefulness and discriminating judgment in the analysis and solution of complex problems, and the ability to make technical decisions on specialized matters. Work is reviewed in terms of fulfillment of goals, program effectiveness and soundness of judgment.

### EXAMPLES OF ESSENTIAL DUTIES

The following duties are normal for this position. These are not to be construed as exclusive or allinclusive. Other related duties may be required and assigned.

1. Plans, organizes and directs operations of Social Services, the Public Health Department, Mental Health, and/or other human services programs.
2. Develops new programs and expand existing programs to meet community needs and state mandates, in coordination with management staff.
3. Coordinates and integrates program components into a cohesive and effective service delivery system.
4. Develops and implements policies and procedures in compliance with all applicable laws and guidelines.

5. Ensures appropriate expenditure of public funds through the efficient operation of programs.
6. Establishes departmental budget and monitors expenditures.
7. Negotiates and monitors various contracted services.
8. Monitors utilization data, work production, and other information related to service delivery; directs operational changes to increase effectiveness and efficiency of operations.
9. Monitors the quality assurance and utilization review process.
10. Reviews clinical charts for proper documentation.
11. May perform studies, special projects or other managerial or administrative functions as assigned.
12. Supervises, directs and evaluates assigned staff, to include assigning work, handling employee concerns and problems, counseling, disciplining and completing employee performance appraisals.
13. Maintains liaison with representatives of state and regional health and service providers, interested community and other county departments.
14. Promotes public education on health issues; ensures dissemination of information regarding health services and department operations, as well as information published by other agencies or organizations to promote general knowledge of health services; makes public presentations upon request.
15. Prepares comprehensive reports related to program operations and activities.

**EXAMPLES OF MARGINAL DUTIES**

:

1. Responds to complaints and requests for information or assistance.
2. May act on behalf of the Director of Human Services in absence of same.
3. Acts as a representative of the county and the department on committees, at meetings or as otherwise assigned.
4. Attends meetings and conferences.

**MINIMUM QUALIFICATIONS**

**Knowledge of:** Principles and practices of program design, planning and

evaluation; federal, state and local laws and regulations governing program operations; principles and practices of management necessary to administer and direct programs; professional program and service delivery standards; methods and techniques of professional networking and interagency liaison; program integration methods of determining and communicating community needs; public information and public speaking techniques; clinical concepts; public relations, and county programs and services; budgeting principles and practices; principles and practices of supervision and employee development; and basic computer applications and techniques.

**Ability to**: Plan, organize and direct comprehensive human services delivery systems within professional standards, legal requirements and financial constraints; understand, interpret and explain laws, regulations and policies governing program operations; research regulations, procedures and/or technical reference materials; coordinate and integrate various program components into a cohesive and effective service delivery system; formulate, promote and implement a variety of health programs; understand program objectives in relation to departmental goals and procedures; develop goals and objectives; evaluate program effectiveness; collect and analyze data to establish/identify needs; determine the appropriate course of action in emergency or stressful situations; make decisions and exercise independent judgment; supervise the work of others; instruct, persuade, negotiate and motivate individuals with diverse backgrounds and interests; establish and maintain effective interpersonal relations with individuals at all organizational levels; conduct liaison and community relations activities; communicate effectively both orally and in writing.

**Education and Experience**: Four years of progressively responsible management and supervisory experience in a social services or clinical community health or mental health agency which included program planning and evaluation, budget management, personnel management and performance evaluation, and policy development; completion of core course work in Social Work, Health Administration, Business Administration, or closely related field; or any combination of education and experience that provides equivalent knowledge, skills and abilities.

**Special Requirements**: Essential Duties require the following physical skills and work requirements: Requires the ability to exert a small amount of physical effort in sedentary to light work involving prolonged sitting, walking or moving from one area of the office to another, and standing for periods of time. Requires the ability to maintain mental capacity which allows the capability of exercising sound judgment and rational thinking under varied circumstances.

**Other Requirements**:
The Assistant Director of the Mental Health unit is required to possess one of the following:

1. A medical degree and California license in psychiatry with

two years of training in psychiatry, one year of which is administrative.

2. Master's Degree in social work and a Clinical Social Worker license, and five years related experience, two of which are administrative.
3. Ph.D. in clinical psychology with a California Clinical Psychologist license.
4. Marriage, Family, Child Counselor license and a masters degree in behavioral sciences and five years mental health experience, two of which are administrative.
5. Masters degree in psychiatric or public health nursing and license as a Registered Nurse in California and five years mental health experience two of which are administrative.
6. Masters degree in hospital administration, public health administration or public administration and at least three years experience, two of which have been in mental health.

**License or Certificate:** Must possess and maintain an appropriate, valid driver's license. The County of Sutter is an Equal Opportunity Employer. In compliance with the Americans with Disabilities Act, the County will provide reasonable accommodation to qualified individuals with disabilities. Sutter County encourages both incumbents and individuals who have been offered employment to discuss potential accommodations with the employer.

**The County of Sutter is an Equal Opportunity Employer. In compliance with the Americans with Disabilities Act, the County will provide reasonable accommodation to qualified individuals with disabilities. Sutter County encourages both incumbents and individuals who have been offered employment to discuss potential accommodations with the employer.**

**County of Sutter**
**Established: 11/9/04**
**Revised: 03/27/07**
**Salary Range: MNU44**
**FLSA: Exempt**

## JAIL NURSE MANAGER

### DEFINITION

Under general direction, to plan, organize, coordinate and manage jail medical services; to supervise nursing staff; to oversee quality assurance and legal compliance issues; and to perform related work as required.

### CLASS CHARACTERISTICS

This is a single position classification having management responsibility for the jail nursing program and staff, reporting to and receiving direction from the Assistant Director of Human Services - Health Division with medical direction from the County Health Officer. This class is distinguished from the Supervising Nurse, which is a first-level supervisory position, and from the Director of Public Health Nursing, which has broader management authority and responsibility for a variety of public health nursing programs.

### EXAMPLES OF DUTIES

The following duties are normal for this position. These are not to be construed as exclusive or all-inclusive. Other related duties may be required and assigned.

1. Plans, organizes and manages jail nursing services; directs operations and staff in the delivery of health services to inmates in the County jail facility.
2. Develops, implements and interprets goals, objectives, policies, procedures and standards, and interprets and implements laws, rules and regulations, to ensure quality of care and compliance with requirements.
3. Represents the jail nursing program and coordinates operations with other County departments, community agencies, boards, commissions and committees.
4. Provides professional nursing care as needed; responds and coordinates inmate emergency and urgent care.
5. Performs Discharge Planning of inmates and coordinates aftercare with other agencies.
6. Monitors and evaluates operations issues, new developments and requirements; develops, recommends and implements courses of action; evaluates, develops and

oversees implementation of new programs and services.
7. Supervises, directs and evaluates assigned staff; to include assigning work, handling employee concerns and problems, counseling, disciplining, and completing employee performance appraisals.
8. Directs and participates in the interviewing and selection of candidates for employment; directs employee training and development; guides subordinate supervisors in employee performance appraisal and counseling, disciplinary actions, documentation and related personnel actions.
9. Provides clinical and administrative consultation and problem-solving to staff, as needed.
10. Manages quality assurance activities; reviews nursing protocols, procedures and standards to ensure effective patient care and compliance with applicable policies and regulations.
11. Enforces and observes security precautions and requirements.
12. Conducts various staff and committee meetings; disseminates information to staff; confers regularly with superiors regarding policy and operational issues.
13. Participates in the development of the budget.
14. Prepares and maintains a variety of records, reports, studies and statistics related to jail nursing activities.
15. Reassigns and shifts personnel as required.
16. Attends meetings and conferences.

#### MINIMUM QUALIFICATIONS

**Knowledge of**: Principles and practices of management, including goal setting, program development, implementation and evaluation; administration and work planning; principles and practices of personnel management, including hiring, training and supervision; professional nursing principles, practices and techniques, including medical case management, medical/psychological assessment, patient care planning and delivery, patient education and evaluation of outcomes; medical terminology and equipment; principles and techniques of drug administration, uses, effects and adverse reactions to medications and controlled substances; principles, practices and techniques of safety and infectious disease control; laws, rules and regulations governing the practice of nursing in general and within County jail facilities; security issues and challenges of care delivery within a correctional institution; community medical and social agencies and resources; environmental, sociological and psychological problems affecting nursing care within a jail facility; child and elder abuse and neglect and domestic violence reporting laws.

**Ability to**: Plan, organize, direct, schedule, set performance standards and evaluate staff; develop goals, objectives, policies, procedures and protocols; devise and adapt work procedures to meet changing program needs; understand, interpret, explain and apply laws, regulations and policies; perform physical and psycho-social nursing assessments and developing and implementing patient care plans and/or referrals; administer medications and performing skilled nursing treatments and procedures in a high-security setting for dysfunctional, stressed and/or uncooperative patients; assure quality of care and compliance with requirements; establish and maintain a cooperative working relationship with others; prepare and present clear and concise reports, instructions and correspondence; develop and evaluate program policies and procedures and implement as approved; work in an institutional setting and apply institutional rules, policies and procedures; deal effectively with manipulative, hostile and antisocial behaviors; respond effectively in emergency and stressful situations; make effective, reasonable and responsible decisions in emergencies and take appropriate action; deal firmly and fairly with inmates and demonstrate tact and diplomacy; identify alcohol, drug and street drug related symptoms and behaviors; oversee the maintenance of medical records and legally interpret medical records.

**Education and Experience**: Four years of professional nursing experience, including one year of experience in a supervisory capacity; or any combination of education and experience that provides equivalent knowledge, skills and abilities. One year of experience in Discharge Planning or one year experience as a Public Health Nurse is desirable. Core college course work in administration or management is highly desirable. A bachelor's degree in nursing may substitute for one year of the general nursing experience.

**Special Requirements**: Essential Duties require the following physical skills and work requirements: Must be able to apply first aid and CPR which requires stamina and coordination; push heavy objects such as Medical carts, or an occupied wheelchair; rapidly move to an emergency medical situation; distinguish colors of uniforms and armbands to identify inmate access to restricted areas; distinguish verbal and nonverbal sounds in a noisy environment; stand and walk for long periods of time; lift objects weighing up to 16 pounds, such as an emergency bag, portable oxygen tank, and medical card index files; mobility to work in both office and clinical settings, and to travel to various sites; touch in order to conduct physical health assessments; vision to read handwritten and printed materials, computer screens and to examine and observe patients; hearing and speech to converse in person and by telephone; mobility and strength to respond to emergencies.

### Other Requirements:

Must pass a background investigation conducted by the Sheriff's Department. Must be willing and able to accept assignment in a locked jail facility serving clients of various cultural, physical, behavioral and psychological profiles.

**License or Certificate:** Possession of a valid California Registered Nurse license, a current CPR certificate, and a valid California Class C driver license.

The County of Sutter is an Equal Opportunity Employer. In compliance with the Americans with Disabilities Act, the County will provide reasonable accommodation to qualified individuals with disabilities. Sutter County encourages both incumbents and individuals who have been offered employment to discuss potential accommodations with the employer.

APPENDIX  B

**RECEIVED**

FEB 0 9 2012

SUTTER COUNTY HEALTH



TECHNICAL ASSISTANT REPORT OF

THE HEALTH CARE SERVICES AT

SUTTER COUNTY JAIL

Yuba City, CA

**November, 2011**

National Commission on Correctional Health Care
1145 W. Diversey Pkwy.
Chicago, IL 60614-1318
(773) 880-1460



## Introduction

The Sutter County Jail, in Yuba City, California, is a design-rated 352-bed facility. The average daily population ranges from 180 to 230 inmates. The Sutter County Health Department provides health services. As is true across the country, the Sutter County Jail is experiencing a rise in health care costs and the number of inmates with health problems entering from the community. As a result, the county recognized a need to review its health-care delivery system in the jail and requested the National Commission on Correctional Health Care (NCCHC) to assess and propose solutions to improve its health care management and costs. In November 2011, the NCCHC conducted an on-site review of the Sutter County Jail. This report reflects our findings and recommendations that may help to improve access and quality of care at the Sutter County Jail.

## Methodology

NCCHC's main objective in this technical assistance was to review and compare Sutter County Jail's health services delivery system against accepted national standards and practices for jail health care organization. Our goal, through this comparative analysis, is to provide specific recommendations to facilitate jail health services. To assess the efficiency and effectiveness of jail health services NCCHC used a methodological approach that focused on current operational issues. First, we interviewed key personnel, including the medical director, health administrator, jail physician, nurse practitioner, health and mental health staff. We reviewed existing policies and procedures, and a few medical records. We analyzed health care management practices against NCCHC's *Standards for Health Services in Jails (2008)*.

## Chief Finding

The responsible health authority is creating policies, procedures, and clinical guidelines/nursing protocols that will guide staff in the management of jail health services. These

policies, procedures, and guidelines have not been vetted, nor has staff been trained. Although training is planned, the lack of strategic planning, developed policies and procedures, and consistent leadership in the application of those policies and procedures have greatly hampered the delivery of health services at the Sutter County Jail.

## Findings on Operational Issues

### Governance and Administration

**Access to Care.** In our discussions with health staff, we believe that inmates can access health services through written requests that are triaged daily. Inmates are instructed on how to access health services during the intake process. Interviews and health record documentation confirm that inmates have access to needed care.

**Responsible Health Authority.** The responsible health authority (RHA) is the county health department, whose on-site representative is a physician (medical director). A health services administrator (nurse) is responsible for the overall daily operation of the health service program. Mental health services are provided through a county community mental health system and a contracted psychiatrist. This arrangement appears to function well and services are coordinated.

**Medical Autonomy.** Our review of the health records and interviews confirmed that all clinical decisions pertaining to direct health care of patients are the sole responsibility of the medical director and clinical staff.

**Administrative Meetings and Reports.** The medical administration meets with jail administration on a regular basis to strategically plan how to improve health service efficiency and overall clinical operations. Data management could be improved to assess health services. A sample of statistical data that should be collected is provided in Appendix A. The health services manager should be responsible for collecting this information and sharing it with the medical director and jail administration.



**Policies and Procedures.** The medical director is working on the policies and procedures and is using the NCCHC's *Standards for Health Services in Jails (2008)* as the foundational framework. Once completed, the manual will be available to staff. We reviewed a few sample policies and found them to be consistent with national practices.

**Continuous Quality Improvement Program.** The Sutter County Jail's health services quality improvement program needs to be re-assessed. Studies on process or outcome have not been performed to meet the goals for quality of care. The Institute of Medicine's (IOM) 2001 report, *Crossing the Quality Chasm: A New Health System for the 21st Century,* states that health care should be safe, effective, patient-centered, timely, efficient, and equitable. While health staff attempt to meet these objectives, there has been no effective process that studies the quality of health care provided in the jail. A registered nurse reviews charts, but the data from these reviews is limited to documentation issues and does not evaluate the clinical care. The chart reviews include no information regarding the quality of care provided. In the appendix, we provide a sample outcome study on diabetic care. Using this template, jail health managers should begin to monitor the provision of health services.

**Communication on Patient's Health Needs.** Communication occurs between the facility administration and treating clinicians in such a way that patient health needs are appropriately managed and addressed. Health staff, when asked, advises classification and custody staff of an inmate's special health needs that may affect housing, work assignments, program assignments, disciplinary measures, and admissions to and transfers from satellite facilities and other institutions.

**Procedure in the Event of Inmate Death.** There have been three inmate deaths at the Sutter County Jail during the past year and a half. One of these deaths was a suicide. Administrative and clinical reviews were completed. We did not review these documents.

## Managing a Safe and Healthy Environment

**Infection Control Program.** The jail's infection control program is a combined effort of representatives of the facility's administration, the county health department, the medical director, and other health care personnel. Inmates are screened and observed for hepatitis, tuberculosis, sexually transmitted infections, scabies, lice, HIV, and AIDS. Inmates are questioned specifically about current symptoms of tuberculosis. The facility does not have negative air-flow cells and inmates identified through a chest x-ray to be positive for active TB are referred to the county health department and local hospital. Inmates testing positive for reportable sexually transmitted infections (STIs) are prescribed appropriate antibiotic therapy. Health personnel participate in annual infection control in-service training. It appears that the jail has an effective infection control program in place.

**Patient Safety.** The RHA promotes patient safety by instituting systems to prevent adverse and near-miss clinical events. This is accomplished by informing health staff of the incident report process during orientation and daily communications with the medical director. We believe that staff effectively works to monitor patient safety.

## Personnel and Training

**Credentialing.** Health personnel are appropriately credentialed according to the state's licensure, certification, and registration requirements. The health department follows a formalized credentialing process. We did not verify CPR certification for all qualifying health care professionals.

**Clinical Performance Enhancement.** There is no documentation that an annual clinical performance of primary care providers is conducted and shared with the clinician being reviewed.



**Medication Administration Training.** Nurses review, as needed, the appropriate procedures to administer medications.

**Staffing.** Full-time equivalent health staff includes:

| | |
|---|---|
| Medical director | .60 |
| Nurse Practitioner | 1.0 |
| Physician | 0.2 (8 hours a week on Tuesday and Thursday) |
| Jail Nurse Manager | 1.0 |
| Psychiatrist | 0.1 (4 hours on Saturday) |
| RN Shift Supervisors | 2.0 |
| RN | 2.0 |
| LVN | 4.0 |
| Mental health staff | 1.0 |
| Licensed Psychiatric Tech | 0.5 |
| Office Assistant II | 1.0 |

## **Health Care Services And Support**

**Pharmaceutical Operations.** A pharmacist prepares a monthly report on the pharmaceutical services. We did not examine the medications; however, the practitioners noted that pharmaceutical operations are sufficient to meet the needs of inmates.

**Medication Services.** The medical director approves the prescriptive practices at the site and we did not find any irregularities. There is no keep-on-person (KOP) system which allows inhalers, antibiotics, thiazides, cardiac medications, nitroglycerin, Dilantin, Zantac, and prenatal vitamins to be kept by inmates when prescribed by the health care provider. A KOP system includes training for inmates to take care of their health care needs, and helps to reduce the burden of medication distribution in the jail. A sample KOP policy is attached.

**Clinic Space, Equipment, and Supplies.** The clinic area is small but sufficient; it includes one examination room, and a large central nurse's station/clerical office. There is sufficient equipment to provide health services to the inmates. An interview room/office is also across the hall from the clinic area.

### Inmate Care And Treatment

**Information on Health Services.** Inmates are instructed about the availability of, and access to, health care upon their arrival at the facility. We saw no posted signs in the intake area about access to health care services and recommend that such signs be posted (in English and Spanish). Inmates are given written information on how to access health care services. Access to emergency and routine health care services is described in the inmate handbook.

**Receiving Screening.** Admissions arrive directly from the community. Correctional officers complete the receiving screening and nurses review each one. The receiving screening form does not include all the requirements of the standard. Attached is a sample receiving screening form that we recommend be used.

**Health Assessment.** An initial health assessment is offered to each inmate within 14 calendar days of admission. The nurse practitioner completes the initial health assessment. The physician reviews the health assessment forms when there are significant medical findings. Our review of completed health assessments found them to be thorough.

**Mental Health Screening and Evaluation.** Trained correctional officers complete the mental health screening. Patients are referred to the mental health staff when there are positive findings. The mental health worker completes the mental health evaluation.

**Oral Care.** Trained RNs complete the oral screenings during the intake screening. Inmates approaching 12 months of incarceration are not offered an annual oral health examination by the off-site dentist. Oral care is limited to relief of pain and infection. There is a backlog of dental sick call requests.


**Nonemergency Health Care Requests and Services.** Inmates can request medical, dental or mental health services daily. However, the nurse practitioner's daily case load is approximately nine inmates a day. The patient flow is limited and not well organized and inmate requests are not honored on a timely basis: At the time of the survey, the inmate sick call request backlog ranged from one day to four months. The nurse practitioner was working on sick call requests from June. On a daily average, it is expected that 15 patients would be seen in a correctional health care clinic. It was reported that it takes three weeks (21 days) on average to complete the health assessment.

**Nursing Assessment Protocols.** Prior to the on-site audit, nursing protocols had not been used. However, the medical director has drafted a policy for the use of nursing protocols. We reviewed the draft and found that the two main elements for protocols are addressed. First, there are no standing orders for prescription medications, and second, there are requirements that either the physician or nurse practitioner sign off on all nurse-generated protocols. We recommend that nursing assessment protocols be fully implemented at the Sutter County Jail. A sample nursing protocol is attached.

**Continuity of Care During Incarceration.** Referrals to specialist care are carefully monitored. It takes approximately two to three weeks to see a specialist. Individual treatment plans are used and monitored. The medical director reviews charts.

#### Health Promotion

**Healthy Lifestyle Promotion.** The medical director and nurse manager have made health education materials and instruction to patients. Our observation indicates that this is provided to the inmates.

**Medical Diets.** We were informed that medical diets are available for patients with specific dietary needs.

**8** SUTTER COUNTY JAIL, CALIFORNIA

**Use of Tobacco.** Smoking is not permitted anywhere inside the institution

### Special Needs And Services

**Chronic Disease Services.** The nurse practitioner and physician monitor chronic disease. Patients are transported to outside specialty appointments as needed. There are no national clinical guidelines for practitioners to follow. Sample guidelines are provided.

**Basic Mental Health Services.** A mental health counselor provides services 30 hours a week (Monday through Friday). A psychiatrist provides 10 hours of care a week. Custody staff conducts a mental health receiving screening and the nurse will review the form when she arrives. Any inmate with positive findings will be referred to the mental health counselor for evaluation. Crisis intervention is provided by the counselor; however, there is no group counseling (coping skills, medication compliance, or women's group).

**Suicide Prevention Program.** The suicide prevention program addresses each of the 12 aspects of planning as described by the standard. However, when an inmate is placed on suicide watch, 15-minute watches are conducted, instead of on an intermittent schedule, as required by the standard. The mental health staff will release an inmate from suicide watch. The psychiatrist is minimally involved.

**Intoxication and Withdrawal.** Individuals with symptoms of intoxication or withdrawal are managed on site by nursing staff. Individuals with severe withdrawal or intoxication are sent to the hospital. Staff do not use the CIAW-R to monitor intoxication. A copy of the CIAW-R is attached and we recommend that nursing staff be trained to use this patient monitoring tool.

**Care of the Pregnant Inmate.** Health services are available to pregnant inmates through off-site services. Some inmates are allowed to go out to their personal physician.



## Health Records

**Health Record Format and Contents.** Inmate medical and mental health records are integrated in hard copy format. The Master Problem List (MPL) is insufficiently detailed, however. In the appendix we provide a sample MPL and recommend its use.

### Conclusion

Overall, the health staff provide health services with limited resources and are to be commended for their effort. However, several recommendations have been made in this report that, if implemented, can improve the overall quality of care: 1) Jail health administration should improve its metrics to evaluate operational issues. A sample of statistical data that should be collected is provided and we recommend its consistent use. 2) The medical director should complete the policies and procedures manual so that it is consistent with NCCHC's *Standards for Health Services in Jails (2008).* 3) There should be efforts to improve the quality improvement program with one study on process and another on outcome. There has been no effective process that studies the quality of health care provided in the jail. 4) An annual clinical performance of the physician, nurse practitioner, and psychiatrist is to be conducted and shared with the clinician being reviewed. 5) In our experience, full-time equivalent health staff should include 40 hours of psychiatrist's time for 1,000 inmates. More psychiatrist's time is needed at the Sutter County Jail. We recommend that the psychiatrist time be increased to 0.4 from 0.1 hours. 6) Many jails have a keep-on-person (KOP) system that allows inmates to keep inhalers, antibiotics, thiazides, cardiac medications, nitroglycerin, Dilantin, Zantac, and prenatal vitamins when prescribed by the health providers. We recommend that a KOP system be considered. It will help to relieve some of the duties and tasks nurses are required to perform. 7) There should be signs posted in the intake area about the availability of, and access to, health care in the facility. 8) The receiving screening form should be revised so that it conforms to national standards. Nine, an analysis on the oral care provided in the jail should be made. The jail nurse manager should conduct a root cause analysis on the dental sick call request backlog. 10) The jail nurse manager should conduct an analysis of the nurse practitioner's daily caseload. The nurse practitioner is underutilized and because of the limited space, must stop seeing patients and

complete clerical work when the physician is in the office. This is inefficient. The patient flow is limited, not well organized, and should be fully studied. The RHA should consider the problem of inmate requests not being honored on a timely basis as its top priority. When access is limited, quality of care suffers. 11) Implement nursing protocols as soon as possible and ensure that nursing staff is properly trained. The implementation of nursing protocols and the expansion of their duties will improve the sick call process. 12) National clinical guidelines for practitioners to follow should be approved. 13) The implementation of group counseling (coping skills, medication compliance, or women's group) should be considered. This will prevent warehousing of inmates with mental illness. 14) When an inmate is placed on suicide watch for precaution (potential suicide), he or she should be monitored on an infrequent basis, with no two checks more than 15 minutes apart; checks by security officers should be conducted on an intermittent schedule as required by the standard. 15) Health staff should use the CIAW-R to monitor intoxicated inmates. 16) Improvement on the health record format and contents is needed. The Master Problem List (MPL) should be changed and staff instructed on properly completing the form.

We appreciate the opportunity to provide the Sutter County Health Department with this review of its health services. We are certainly willing to provide additional information regarding this report and are available for additional assistance if required.



## About the
## National Commission on Correctional Health Care

With support from the major national organizations representing the fields of health, law and corrections, the National Commission on Correctional Health Care (NCCHC) is committed to improving the quality of health care in jails, prisons, and juvenile confinement facilities. In this we are guided by an exceptionally dedicated Board of Directors comprised of representatives from our supporting organizations.

NCCHC's origins date to the early 1970s, when an American Medical Association study of jails found inadequate, disorganized health services and a lack of national standards. In collaboration with other organizations, the AMA established a program that in the early 1980s became the National Commission on Correctional Health Care, an independent, not-for-profit 501(c)(3) organization whose early mission was to evaluate and develop policy and programs for a field clearly in need of assistance.

Today, NCCHC's leadership in setting standards for health services in correctional facilities is widely recognized. Established by the health, legal and corrections professions, NCCHC's Standards are recommendations for the management of a correctional health services system. Written in separate volumes for prisons, jails and juvenile confinement facilities—and now with a manual specifically for mental health services—the Standards cover the areas of care and treatment, health records, administration, personnel and medical-legal issues. These essential resources have helped correctional and detention facilities improve the health of their inmates and the communities to which they return, increase the efficiency of health services delivery, strengthen organizational effectiveness and reduce the risk of adverse legal judgments.

Building on that foundation, NCCHC offers a broad array of services and resources to help correctional health care systems provide efficient, high-quality care.

The National Commission on Correctional Health Care has no membership or dues. NCCHC does not require any affiliation to be considered for accreditation, certification or employment as a consultant or surveyor, or to serve on committees or the board of directors. NCCHC staff and spouses are not allowed to accept gifts or consulting fees from those we accredit or certify. NCCHC is impartial, unbiased and expert. And dedicated only to recognizing and fostering improvements to the field of correctional health care.

NCCHC GOVERNING BOARD OF DIRECTORS
(Representatives from the following organizations)
American Academy of Child & Adolescent Psychiatry
American Academy of Pediatrics
American Academy of Physician Assistants
American Academy of Psychiatry & the Law
American Association for Correctional Psychology
American Association of Physician Specialists
American Association of Public Health Physicians
American Bar Association
American College of Emergency Physicians
American College of Healthcare Executives
American College of Neuropsychiatrists
American College of Physicians-American
Society of Internal Medicine
American Correctional Health Services Association
American Counseling Association
American Dental Association
American Diabetes Association
American Dietetic Association
American Health Information Management Association
American Jail Association
American Medical Association
American Nurses Association
American Osteopathic Association
American Pharmacists Association
American Psychiatric Association
American Psychological Association
American Public Health Association
American Society of Addiction Medicine
John Howard Association
National Association of Counties
National Association of County and City Health Officials
National District Attorneys Association
National Juvenile Detention Association
National Medical Association
National Sheriffs' Association
Society for Adolescent Medicine
Society of Correctional Physicians

# HEALTH SERVICES DATASHEET

**Health Services Report**

| | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | D[EC] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

### Booking

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Booking refusals (returned) | | | | | | | | | | | | |
| Booking refusals (not returned) | | | | | | | | | | | | |
| Receiving screenings | | | | | | | | | | | | |

### Emergency Services Provided to Patients

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ambulance transports (deputy to ER) | | | | | | | | | | | | |
| Baker Acts (after hours) | | | | | | | | | | | | |
| ER visits (total) | | | | | | | | | | | | |
| Pre-book | | | | | | | | | | | | |
| Post-book | | | | | | | | | | | | |

### H&P's

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| H&P (within 14 days) | | | | | | | | | | | | |
| H&P - Annual (within 1 year) | | | | | | | | | | | | |

### Housing Unit Care

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Patients examined | | | | | | | | | | | | |
| Blood pressures | | | | | | | | | | | | |
| Confinement/Seg Round Visits | | | | | | | | | | | | |
| ETOH / Withdrawal | | | | | | | | | | | | |
| PPD's | | | | | | | | | | | | |
| Sick calls | | | | | | | | | | | | |
| Wound care treatments | | | | | | | | | | | | |

### Infirmary Care

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Physician visits | | | | | | | | | | | | |
| ARNP visits | | | | | | | | | | | | |
| Infirmary days (gym on-site) | | | | | | | | | | | | |
| Infirmary average LOS | | | | | | | | | | | | |
| Admissions (excluding pregnant) | | | | | | | | | | | | |
| Pregnant patients | | | | | | | | | | | | |

### Mental Health Care

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Physician visits | | | | | | | | | | | | |
| ARNP visits | | | | | | | | | | | | |
| RN – Psych visits | | | | | | | | | | | | |
| Mental health days | | | | | | | | | | | | |
| Admissions | | | | | | | | | | | | |
| Close OBS | | | | | | | | | | | | |
| Days in close OBS | | | | | | | | | | | | |
| Signals / Emergencies | | | | | | | | | | | | |
| Suicide Attempts | | | | | | | | | | | | |

### Clinic Care

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Physician visits | | | | | | | | | | | | |

ARNP visits
RN/LPN Visits
Serious inmate injuries
Signals / Emergencies
Wound care treatments

**Chronic Care**

Patients examined
Astma/COPD/Pulmonary
Cardiac/HTN/Lipids
Coumadin
Diabetic/Endocrine
HIV/AIDS
Seizures/Neurology
TB/INH Clinic

**Dental Care**

Patients examined
Completed dental care plans    (annuals)
Dental xrays

**Radiology**

Patients examined
Total xray views taken

**Labs**

Patients with lab tests
number of tests

**Infection Control**

AIDS patients    (last day of the month)
Chlamydia cases
Gonorrhea cases
HEP C chronic cases
HIV's through the system
MRSA cases
New acute hepatitis
New HIV carriers
Syphilis cases
TB cases    (active)

**Pharmacy**

Patients on prescription meds
% of population on meds

Patients on psychotropic meds

% of population on pysch meds

**Office-Site Speciality Visits**

Cardiology

Dental                (surgeon)

Dialysis

ENT

Eye

General surgery

Nephrology

Neurology

Neurosurgery

Obsterics             (includes ob/ radiology)

Oncology

Orthopedic

Other

Radiology

Hospital admissions   (total)

Pre-book

Post-book

Hospital days         (total)

Hospital days         (average)

Outpatient surgeries

Births

**Third Party Reimbursement**

Number of patients

**On-site Speciality Visits**

Dialysis

Gyn                   (amp)

OB/Gyn                (physician)

Physical therapy

Ultrasound

**Deaths**

Deaths

**Discharge Planning**

Patients interviewed

**Grievances**

Requests

Actual grievances

..........
Medical care
Dental care
Mental health care
Non-medical response
Conduct
Medications
PPD's done
PPD's positive
Sick calls
Wound care treatments

**Dorm A**

Patients examined
Blood pressures
ETOH / Withdrawal
PPD's done
PPD's positive
Sick calls
Wound care treatments

**Dorm B**

Patients examined
Blood pressures
ETOH / Withdrawal
PPD's done
PPD's positive
Sick calls
Wound care treatments

**Dorm C**

Patients examined
Blood pressures
ETOH / Withdrawal
PPD's done
PPD's positive
Sick calls
Wound care treatments

# Outcomes Study

INDENTIFIED: Diabetic patients coming into our system have base-line
:vel done by the time of their first official chronic care visit. Approximately
sample had initial elevated values. (N=10)

CTION/ROOT CAUSE: Diabetes is a chronic illness that requires
medical care and patient self management education prevent acute
·ns and reduce the risk of long term complications. At any given time, over 2
ple are incarcerated in prisons and jails in the U.S. It is estimated that nearly
1ese inmates have diabetes – a prevalence of 4.8%. Those with diabetes in
. facilities should receive care that meets national standards.

1C is thought to reflect average glycemic control over several months and has
.ctive value for diabetes complications. It should be performed routinely in all
h diabetes, at initial assessment and then as part of continuing care. The
et value from the American Diabetic Association is <7%.

: for poor initial control is multi-factorial and include: 1) poor self
.t of their disease prior to incarceration; 2) availability of canteen privileges
1e infirmary setting; 3) trading to obtain canteen privileges and consuming
:e dietary items; 4) lack of understanding their disease process and how life-
s play an important role.

Initial and follow-up Hbg A1C values were collected on ten patients enrolled
1ic Care Clinics. Diabetic patients are seen in the Chronic Care Clinic for
·very 90-120 days. Hbg A1C levels are monitored and patients are evaluated
for appropriate insulin or oral hypoglycemics by Health Care Providers
ents are typically placed on a 2400 calorie ADA diet. Unless they are in the

infirmary, they are allowed to put in food orders through the commissary. There are no-sugar choices available. They are educated on the role that diet and exercise play in their disease management and the consequences of poor adherence. Blood sugars are monitored twice per day at a minimum and more often if clinically indicated. Sliding scale coverage of insulin is utilized as needed.

RESULTS: In the sample collected, only 30% of the patients should improvement in their overall glycemic control. Two of the ten essentially remained the same (7.1 and 5.5 to start and 7.2 and 5.6 respectively at follow-up). Three of the ten worsened and two of the patients did not have follow-up values done. All patients were prescribed diabetic diets. The status of any commissary privileges is not known.

DISCUSSION: In this particular study sample, the percent of those patients who improved their glycemic control and of those who worsened were equal at 30%. It is noted that this is overall a small sample. However, given that 2 of the patients remained stable with initially low Hbg A1C's gives that 50% of the sample remained stable or improved. Interestingly, 7/8 of those with follow-up levels done showed values between 5.6 and 7.3. This indicates that their control was still 'pretty good'. Twenty percent of the patients did not have Hbg A1C's ordered by the Providers. This was addressed during subsequent staff meetings in March and April. Our Health Care Providers will need to strengthen their partnership in the management of their diabetes. Follow-up studies will also examine correlations between control and other factors such as type of medication, dietary compliance, level of activity, commissary status, etc.

# Sample Nursing Protocols

DOC-3007 (Rev. 1/03)

| WISCONSIN | EFFECTIVE DATE | NUMBER |
|---|---|---|
| **Department of Corrections** | May 1, 2004 | 300.18 |
| Health Services | UNITS AFFECTED | SUPERCEDES NO. |
| | DAI, DJC, BHS | |
| **POLICY / PROCEDURE** | | DATE REVISED |
| | | 2/11/04 |
| SUBJECT | | PAGE  1  OF  6 |
| Nursing Protocols | | |

### POLICY:

Nursing Protocols are developed and authorized by the Bureau of Health Services to provide Registered Nurses with guidelines for assessment and management of common health conditions in the Wisconsin Department of Corrections patient population.

Registered Nurses utilize nursing protocols approved by a physician as a delegated medical act. In using nursing protocols, RNs must do the following per Chapter N6, N6.02(2)a-d:

a) Accept only those delegated medical acts for which there are protocols or written or verbal orders

b) Accept only those delegated medical acts for which the RN is competent to perform based on his or her nursing education, training or experience.

c) Consult with a physician, dentist, or podiatrist in cases where the RN knows or should know a delegated medical act may harm a patient.

d) Perform delegated medical acts under the general supervision of a physician, dentist, or podiatrist.

This policy/procedure does not include the WCCS facilities.

### REFERENCES:

**Note:** This section lists various standards or resources, which contain subject matter pertinent to the development of the policy and procedure. These standards or resources are intended to be used for guidance only. This does not imply the policy and procedure is intended to be the same in every regard as the standard or resource.

Ch. N6, Wisconsin Administrative Code, Board of Nursing, Department of Regulation and Licensing, Standards of Practice for Registered Nurses and Licensed Practical Nurses

### DEFINITION:

Stat Referral:
A referral that should immediately result in a response or evaluation by an advanced level provider. This applies to any potentially life-threatening condition.

Urgent Referral:
A referral that should result in evaluation the same day. This applies to circumstances which if left untreated, the patient's condition may deteriorate or a painful condition which is uncontrolled with mild analgesics. At a minimum, there must be same day phone consultation with an advanced level provider.

Routine Referral:
A referral should result in a scheduled evaluation usually within ten days. This applies to circumstances in which the patient's condition is non-urgent but requires an initial diagnosis or a diagnosed condition which has not responded to the nursing protocol.

DOC-3007 (Rev. 1/03)

| POLICY / PROCEDURE | EFFECTIVE DATE | NUMBER | |
|---|---|---|---|
| | May 1, 2004 | 300:18 | - 2 - |

| Vital Sign | High | Low | |
|---|---|---|---|
| Temperature | >103F | <96F | |
| Blood Pressure | | | |
| Diastolic | >115mm HG | <90mm HG | |
| Systolic | >170mm HG | <90mm HG | |
| Pulse | >110/minute | <50/minute | |
| Respiration | >30/minute | <10/minute | |

Note: These are guidelines only. The definition of an elevated temperature will vary dependent on the patients' health status. There may be instances when a temperature within the thresholds is significant due to a patients' health condition. There may be instances when a temperature outside the thresholds is normal for a particular patients' health condition.

Ex. Patients on prolonged corticosteroid therapy or other immunosuppressive agents, (e.g. azathioprine/Imuran, mycophenolate/Cellcept, cyclosporine/Sandimmune/Neoral) are especially vulnerable to infection as are persons with underlying cardiac or chronic debilitating diseases, the elderly, and persons with implanted prosthetic devices.

### FORMS/EQUIPMENT:

Nursing Protocol Manual
BHS Approved assessment and flow sheets
DOC-3021 Progress Notes
DOC-3023 Physician's Orders
DOC-3034 Patient Medication Profile

### REQUIREMENTS/NOTES:

Each protocol contains a definition of the problem and its causes, the clinical features most commonly associated with the condition, the nursing assessment process, and nursing interventions, which include patient education and criteria for a stat, urgent and routine referral.

Nurses are expected to practice within their licensure, training and experience when using protocols. When in doubt about the assessment and management of a patient, it should be referred to an advanced level provider for evaluation.

#### Orientation and Training

After having received training in physical assessment and orientation regarding their appropriate use, the protocols will be used by the nurse. Any exceptions or deviations to the protocol should be based on sound reasons and be well documented.

#### Use of Nursing Protocols

Nursing protocols should be made available to nursing personnel in areas where clinical activities are conducted. This includes both the main health services units as well as satellite areas such as isolation/segregation areas. The protocols serve as guidelines for sound nursing practice and should be used during health encounters to assess and treat patients. Professional judgment is used to determine what information should be collected to make an adequate assessment. Regardless of the presenting complaint, abnormal vital signs should always be noted and referred if

| POLICY / PROCEDURE | EFFECTIVE DATE | NUMBER | |
|---|---|---|---|
| | May 1, 2004 | 300:18 | - 3 - |

### Using Nursing Protocols in Isolation/Segregation Housing Units

To maximize the quality of health care, health encounters such as sick call should be conducted, whenever possible, with the health record present, in an adequately equipped room that affords privacy and access to handwashing facilities. A patient declared emergency may, at the nurses' discretion, be briefly assessed through bars for the urgency of the complaint. If urgent, the patient should be taken to an examination room for evaluation and a complete assessment performed, including vital signs. If possible, the patient's complete health record should be in hand, available for review. If non-urgent, the patient should be instructed to submit a health services request form.

### Medical versus Nursing Diagnosis

In using the protocols, it is important to make a distinction between medical and nursing diagnosis. A medical diagnosis is made by physicians or other practitioners who are qualified and licensed to do so. Nursing diagnosis is a deviation from an individual's normal state of health. It is a judgement made by a Registered Nurse following a nursing assessment of a patient's actual or potential health needs for the purpose of establishing a nursing plan of care. For example, a nurse may identify a patient with a blood pressure reading of 160/110 mm/Hg as "elevated blood pressure reading", however, only an advanced level practitioner may make a medical diagnosis of hypertension. Nurses may only provide care to patients within the scope of nursing practice and refer all patients requiring a medical diagnosis to an advanced level practitioner.

Once a medical diagnosis has been made, nurses may refer to the diagnosis if it is relevant to the presenting problem. For example, if the patient with the elevated blood pressure described above has been previously diagnosed as being hypertensive, and the nurse learns through the collection of subjective data that the patient was noncompliant with antihypertensive medication during the previous month, the nurse may appropriately conclude that the patient has an 'elevated blood pressure due to medication noncompliance." An appropriate nursing response includes education regarding the purpose of the medication and effects of uncontrolled hypertension.

The phrase "alteration in comfort or discomfort" as a stand-alone nursing diagnosis provides no useful information regarding the assessment of the patient. In general, it should be avoided and other, more specific nursing diagnoses used, such as fever, chest pain or "discomfort comfort secondary to the problem such as ear pain."

### Multiple Complaint Patients

Patients may present with a number of problems which if taken literally, may require the performance of five or more assessments. While these complaints should never be taken lightly, it is possible to focus the visit in one or two meaningful areas by asking the patient the relative importance of each complaint, in addition to the nurse's assessment of their urgency.

### Vital Signs

Vital sign should generally be taken for all nursing encounters. If an inmate/youth is being seen regularly (e.g. weekly) for follow-up of a stable condition such as an ongoing, non-acute dermatological problem it may not be necessary to take vital signs. All encounters resulting in a referral to a practitioner should have vital signs taken.

Vital signs that fall above or below the thresholds described should be referred on an urgent basis. This requires phone consultation with an advanced level provider. There may be circumstances where vital signs within the identified thresholds is still considered abnormal and should be referred (i.e. patient with a chronic condition such as transplant with a temperature of 101)

The nurse must be cognizant of objective data which requires referral regardless of the presenting complaint of the

| POLICY / PROCEDURE | EFFECTIVE DATE | NUMBER | |
|---|---|---|---|
| | May 1, 2004 | 300:18 | - 4 - |

patient. This is particularly relevant to abnormal vital signs. For example, a patient presenting with athlete's foot who coincidentally has a blood pressure reading of 170/122 mm/Hg should receive an urgent (same day) referral to an advanced level provider.

**Documentation**

Nurses are responsible for recording assessments they have completed and interventions taken, using the protocol as a guideline.

**Patient Teaching**

A number of protocols contain attached instruction sheets that can be used to reinforce patient teaching.

### PROCEDURE:

Warden/Superintendent Responsibilities

- Ensure development of and compliance with policies and procedures.

Bureau of Health Services Director Responsibilities

1. Ensure development of and compliance with policies and procedures.
2. Approve Nursing Protocols
3. Assigns Nursing Coordinator as chairperson of the Nursing Protocol Committee.

Medical Director Responsibilities

1. Approve Nursing Protocols.
2. Identify physician for consultation with the Nursing Protocol Committee

Health Service Nursing Coordinator Responsibilities

1. Chair Nursing Protocol Committee.
2. Approve nursing protocols.
3. Determine when existing nursing protocols need to be reviewed.

Nursing Protocol Committee Responsibilities

1. Develop nursing protocols.
2. Review nursing protocols as needed.

Responsible Physician Responsibilities

1. Review and approve nursing protocols annually.
2. Notify Nursing Protocol Committee if a protocol needs to be revised.

Health Services Manager Responsibilities

DOC-3007 (Rev. 1/03)

| POLICY / PROCEDURE | EFFECTIVE DATE | NUMBER | |
|---|---|---|---|
| | May 1, 2004 | 300:18 | - 5 - |

1. Develop and implement unit policies and procedures.
2. Ensure compliance with policies and procedures.
3. Ensure appropriate use of nursing protocols.
4. Ensure staff are trained:
   - Orientation of new staff
   - All staff for new or revised nursing protocols at staff meetings
5. Provide for staff to attend committee meetings.
6. Maintain document of training of Nurse Clinicians in uses of the nursing protocols.

Nurse Clinician Responsibilities

1. Use Nursing Protocols as appropriate.
2. Document as appropriate on DOC-3021 or checklists.
3. Record over-the-counter medications on DOC-3034.
4. Record prescription medications on DOC-3023 and DOC-3034.

Division of Health Services
DOC-3424 (Rev. 1/2006)

# CHEST PAIN ASSESSMENT ENCOUNTER

OFFENDER NAME ____  DOC NUMBER ____  DATE ____  TIME ____

## Subjective

Onset Pain: ____  Pain Scale (1 – 10): ____

Timing: onset  ☐ Gradual  ☐ Sudden  ☐ Constant  ☐ Intermittent  ☐ With inspiration or ☐ expiration

Describes Pain as:  ☐ Sharp  ☐ Dull  ☐ Crushing/ vice-like  ☐ Throbbing  ☐ Squeezing  ☐ Pressure/heaviness
☐ Ache  ☐ tingling or numbness  ☐ Burning

Location:  ☐ Substernal  ☐Chest  ☐ Epigastrium  ☐ Neck  ☐ Arm  ☐ Jaw  ☐ Radiation ____

Associated Complaints  ☐ SOB  ☐ Nausea/vomiting  ☐ Indigestion  ☐palpitations  ☐ Lightheadedness  ☐ Sweating

What makes it better?  |  What makes it worse?
☐ Exercise  ☐ Rest  ☐ Eating  ☐ Other  |  ☐ Exercise  ☐ Rest  ☐ Eating  ☐ Other

History  ☐ Cardiac Disease (or family history)  ☐ Diabetes  ☐ Hypertension  ☐ Smokes  ☐ High Lipids
☐ Obesity  ☐ > age 40  ☐ Drug user (e.g. cocaine)  ☐ Alcohol user

Present Medications:

RX for nitroglycerin? ☐Yes  ☐ No  If yes, was it taken sublingual every 5 minutes x 3 ☐ Yes ☐ No  Did it relieve pain? ☐ Yes ☐ No

## Objective

General appearance:  ☐ Anxious  ☐ Restless  ☐ Guarded  ☐ Relaxed

Vital Signs:  BP & P: ____ / ____ / ____  Temperature ____  Respirations ____

Heart Sounds  ☐ Regular  ☐ Irregular  ☐ Extra Sounds  ☐ Other ____
Pulses  ☐ Radial  ☐ Right  ☐ Left  ☐ Pedal  ☐ Right  ☐ Left
Breath Sounds  ☐ Clear  ☐ Crackles  ☐ Wheezing  ☐ Rales  ☐ Diminished
Respiratory  ☐ Cough  ☐ Congestion  ☐ Sputum (color ____ )  ☐ Hemoptysis  ☐ Dyspnea
Abdomen  ☐ Distended  ☐ Soft  ☐ Rigid  Bowel Sounds: ☐ Active  ☐ Hyperactive  ☐ Hypoactive  ☐ Absent
Skin  ☐ Pale  ☐ Cyanotic  ☐ Flushed  ☐ Diaphoretic/clammy  ☐ Jaundiced  ☐ Other ____
☐ Leg swelling/ pain  ☐ Other

## Nursing Dx

☐ Chest pain with significant signs and symptoms  ☐ Chest pain unrelieved by nitroglycerin

☐ Chest pain without significant signs and symptoms

☐Other

## Plan / Intervention

☐ Activate EMS (911)  |  ☐ Monitor vital signs as time & conditions permit
☐ CPR/AED  |  ☐ Practitioner notified ____ (time)
☐ Oxygen up to 6 Liters per minute  |  ☐ Advised to submit HSR if ____
☐ Aspirin 325 mg or baby aspirin (4 tablets of 81 mg each) - chewed (if used, obtain Practitioner Order later)  |  ☐ Other
☐ Nitroglycerin sublingual if systolic B/P > 90 mm/hg and heart rate <100 (have patient lay down) (if used, obtain Practitioner Order later)

☐ Follow-up instructions/appointment

STAFF SIGNATURE ____  DATE SIGNED ____

DISTRIBUTION:  Original – Progress Notes Medical Record

DEPARTMENT OF CORRECTIONS
Division of Adult Institutions
DOC-3424C (Rev. 1/2006)

WISCONSIN

# DERMATOLOGICAL ASSESSMENT

| OFFENDER NAME | DOC NUMBER | DATE | TIME |
|---|---|---|---|

## Subjective

Chief Complaint: _____

Allergies: _____

Tetanus (date) _____ _____

Onset: _____

Duration: _____ _____

Prior episodes ☐ Yes ☐ No

Location: _____

Prior treatments: _____

Results? _____

Aggravating/relieving factors _____

Any change on skin care, laundry products, job, etc.: _____

Medical History: _____

Present Medications: _____

Mark affected area(s) on figure



## Objective

Vital Signs:   BP _____ / _____   Pulse _____   Resp. rate _____   Temp. _____

### Description of Lesions:

Type   ☐ Lesion   ☐ Burn   ☐ Laceration   Size/measurement _____

☐ Macules   ☐ Papules   ☐ Pustules   ☐ Comedone   ☐ Wheals   ☐ Plaque   ☐ Vesicles   ☐ Nodule   ☐ Bulla

☐ Dry   ☐ Scaly   ☐ Thickened   ☐ Flaking   ☐ Fissures   ☐ Peeling   Color _____

☐ Excoriation   ☐ Erythematous   Signs/Symptoms of infection   ☐ Yes   ☐ No

☐ Drainage/Bleeding   Color _____   Amount _____   Consistency _____

## Nsg Dx.

| Protocol(s) Utilized: | ☐ Acne | ☐ Blisters | ☐ Burns | ☐ Callus/Corns | ☐ Dry Skin |
|---|---|---|---|---|---|
| | ☐ Eczema | ☐ Frostbite | ☐ Insect Bites/Sting | ☐ Pediculosis | ☐ PFB |
| | ☐ Seborrheic Dermatitis | ☐ Tinea Cruris | ☐ Tinea Pedis | ☐ Tinea Versicolor | ☐ Warts |

Impaired:   ☐ skin integrity ☐ mobility   ☐ Body image disturbance   ☐ Alteration in comfort r/t _____

Potential for:   ☐ Infection   ☐ Altered tissue perfusion   ☐ Other _____

## Plan

☐ Cleansing/Soaks _____

☐ Dressings _____
(steri-strips)

☐ Supplies _____
(corn plaster, pumice stone, basin)

☐ Topical _____ per protocol

☐ Analgesic _____ per protocol

☐ Antihistamine _____ per protocol

☐ Education _____ per protocol

| Referral: ☐ Stat – Anaphylaxis, (Burns 2nd or 3rd degree, ENT, perineum, and > 5-10%, electrical | ☐ Urgent - Abnormal V.S., Overdue td booster; Signs of infection, Wounds: In diabetics & vascular disease; animal or human bites; grossly contaminated; uncontrolled bleeding; deep; penetrating; crushing; functional impairment | ☐ Routine - No response to treatment |
|---|---|---|

| STAFF SIGNATURE | DATE |
|---|---|

DISTRIBUTION:   Original – Medical Chart, Progress Notes Section

DEPARTMENT OF CORRECTIONS
Division of Adult Institutions
DOC-3424B (Rev. 1/2006)

# DIZZINESS - SYNCOPE ASSESSMENT
## ENCOUNTER

WISCONSIN

| OFFENDER NAME | DOC NUMBER | DATE | TIME |
|---|---|---|---|
| | | | |

**Subjective**

Onset ☐ Gradual   ☐ Sudden   ☐ Constant   ☐ Intermittent   ☐ Duration

Previous History   ☐ Yes   ☐ No   If yes, describe

What makes it better? _____   What makes it worse? _____

Associated complaints   ☐ Nausea  ☐ Vomiting ☐ Headache ☐ Sweating  ☐ SOB ☐ palpitations ☐ hearing loss ☐ CP

What happened before and/or after the event?

History   ☐ Cardiac Disease   ☐ HTN   ☐ Seizures   ☐ Arrythmias ☐ Stroke/TIAs ☐ Diabetes Mellitus
☐ Asthma/Emphysema   ☐ GI Bleed   ☐ Drug Use   ☐ Trauma   ☐ Thyroid Disease

Present Medications:                                     Allergies:

**Objective**

General appearance:   ☐ Anxious   ☐ Restless   ☐ Guarded   ☐ Relaxed

Vital Signs: /BP & P:   Lying    /    /    Sitting    /    /    Standing    /    /   T.        R.

☐ Pulse Oximetry _____   ☐ Accucheck _____

Neuro   AAOX3 ☐ yes ☐ No   Steady/symmetrical movements ☐ yes ☐ No   PERL   ☐ yes ☐ No
Hand grasps - equal ☐ yes ☐ No   Balance normal ☐ yes ☐ No   Gait normal ☐ yes ☐ No

CV   Rate/rhythm  regular ☐ yes ☐ No   Pulses equal – radial ☐ yes ☐ No   Pedal ☐ yes ☐ No

Respiratory:   Cough ☐ yes ☐ No   Sputum ☐ yes ☐ No   Lung Sounds Normal ☐ yes ☐ No

GI   Abdomen:  Soft/Rigid/Distended (circle)   ☐ yes ☐ No  If no describe:
Bowel Sounds:  hypoactive/Hyperactive/Absent  (circle)   ☐ yes ☐ No  If no describe:

Bowel Movement:  Normal/Constipation/Diarrhea/Tarry (circle)   ☐ yes ☐ No   If no describe:

EENT   Normal Eyes (vision)/Ears/Nose/Throat/Neck (circle)   ☐ yes ☐ No   If no describe:

Skin   ☐ Normal (WD/P)   ☐ Pale   ☐ Diaphoretic   ☐ Hot   ☐ Dry   ☐ Cyanotic   ☐ Ruddy   ☐ Edema

**Nursing Dx**

☐ Impaired Physical Mobility   ☐ Potential for Injury   ☐ Alteration in Fluid Status   ☐ Loss of consciousness

Nursing Protocol (s) utilized:   ☐ Headache   ☐ Dizziness/Syncope

**Plan / Intervention**

☐ Lay flat & elevate legs

☐ Increase fluid intake

☐ Reassure

☐ Breathe in paper bag if hyperventilating

☐ Restriction from working at heights or with machinery

☐ Acetaminophen  1-2 tablets Q 4-6 hours as needed per protocol

☐ Ibuprofen 1-2 tabs Q 4-6 hours as needed per protocol

☐ Education per _____ protocol

**Practitioner Referral:**
☐ Stat Referral if abnormal vital signs, persistent bradycardia or tachycardia, persistent hypotension or chest pain
☐ Urgent (same day)  if a decrease in level of consciousness, weakness or difficulty speaking, alter mental status, age > 45 years or with a history of arrhythmia and/or CHF
☐ Follow-up – Routine if the findings & examination is normal examination & age is less than 45 years

| STAFF SIGNATURE | DATE SIGNED |
|---|---|
| | |

**DISTRIBUTION:**   Original – Medical Chart, Progress Notes Section

DEPARTMENT OF CORRECTIONS
Division of Adult Institutions
DOC-3501 (Rev. 8/2005)

**GASTROINTESTINAL ASSESSMENT ENCOUNTER**

WISCONSIN

| OFFENDER NAME | DOC NUMBER | DATE | TIME |
|---|---|---|---|
| | | | |

## Subjective

Onset Pain: _____ Pain Scale (1 – 10) _____

Timing: onset  ☐ Gradual  ☐ Sudden  ☐ Constant  ☐ Intermittent  ☐ Location

Describes Pain as:  ☐ Sharp  ☐ Dull  ☐ Crushing  ☐ Throbbing  ☐ Burning  ☐ Squeezing

What makes it better? _____ What makes it worse? _____

Last BM? ___/___/___  ☐ Color  ☐ Constipation  ☐ Diarrhea  ☐ Normal;  # of Stools in 24 hours ____  Duration ____

☐ Nausea  ☐ Vomiting  Duration _____  Amount _____  Color _____

☐ Abdominal trauma  ☐ Ulcer  ☐ Hiatal Hernia  ☐ Irritable Bowel Syndrome  ☐ Genitourinary Complaints

☐ Pregnancy  ☐ Vaginal Discharge  LMP: _____

Present Medications _____

## Objective

General appearance:  ☐ Anxious  ☐ Restless  ☐ Guarded  ☐ Relaxed

Vital Signs:  BP & P:  Lying ___/___  Standing ___/___  Temp. _____  Respirations _____

Abdomen: ☐ Distended  ☐ Soft  ☐ Rigid  Bowel Sounds: ☐ Active  ☐ Hyperactive  ☐ Hypoactive  ☐ Absent

Cardiac: ☐ Heart Sounds  Circulatory:  ☐ Pulses

Respiratory: ☐ Lung Sounds

Skin: ☐ Normal (WD/P)  ☐ Pale  ☐ Flushed  ☐ Cyanotic  ☐ Jaundiced  ☐ Clammy  ☐ Diaphoretic

LAB: ☐ Guiac Stool _____  ☐ Dipstix Urine _____  ☐ pregnancy urine

## Nursing Dx

Nursing Protocol (s) utilized:  ☐ Acute abdomen  ☐ Diarrhea  ☐ Hemorrhoids  ☐ Nausea/Vomiting  ☐ Constipation

☐ Gastrointestinal Bleeding  ☐ Heartburn  ☐ Lactose Intolerance  ☐ Flatulence/Bloating  ☐ Other:

Alteration in:  ☐ Comfort  ☐ Pattern of elimination  ☐ Nutrition  ☐ Circulation  ☐ Other:

## Plan / Intervention

☐ Analgesia_____ (medication) _____ per protocol

☐ Laxative/supp _____ (medication) _____ per protocol

☐ Antacid_____ (medication) _____ per protocol

☐ Hemorrhoid Cream_____ (medication) _____ per protocol

☐ Diet _____

☐ Education per _____ protocol

☐ Advised to submit HSR if Sx get worse

☐ Follow-up appointment _____ (Date)

☐ Stat Referral  ☐ Urgent (same day)  ☐ Follow-up - Routine

| STAFF SIGNATURE | DATE SIGNED |
|---|---|

**DISTRIBUTION:**  Original – Medical Chart, Progress Notes Section

DEPARTMENT OF CORRECTIONS
Division of Adult Institutions
DOC-3515 (Rev. 2/2006)

WISCONSIN

# GENITOURINARY ASSESSMENT ENCOUNTER

| OFFENDER NAME | DOC NUMBER | DATE | TIME |
|---|---|---|---|
| | | | |

<table>
<tr><td rowspan="4"><strong>Subjective</strong></td><td>
Symptoms:  Onset _____           Duration _____        Females – Date last LMP _____<br>
Check if yes   ☐ Hematuria ☐ Dysuria   ☐ Associated symptoms chills/fever/foul odor  ☐ Vaginal or Urethral Discharge<br>
         ☐ Pain  Location & rating _____    ☐ Incontinence/voiding difficulties ☐ Caffeine Intake<br>
         ☐ Other.
</td></tr>
<tr><td>
History  ☐ Previous UTI's  ☐ History of STD ☐Recent Trauma/ Strenuous Activity ☐ Masturbation  ☐ GI Bleed<br>
Date of Last Sexual Intercourse ___ _____  ☐ Constipation/Diarrhea ☐ Diabetes Mellitus ☐ Hypertension<br>
☐ Neurologic Disorder ☐ Penile Disorder ☐ Endocrine Disorder<br>
    ☐ Other:_____
</td></tr>
<tr><td>
Present Medications:                                       Allergies:
</td></tr>
</table>

| | |
|---|---|
| <strong>Objective</strong> | General appearance:  ☐ Anxious ☐ Restless ☐ Guarded ☐ Relaxed ☐ Toxic (pale, listless, ill)<br>Vital Signs:  BP/P   Lying:   ____/____/____   Sitting:  _____/____/_____    R.        T.<br>Of the following check & comment on ONLY those that are ABNORMAL:<br><br>HEENT    ☐ Head/ /Ears/Nose/Throat/Neck (circle)<br>Neuro     ☐ AAOX3 ☐ Movements ☐ PERL ☐ Gait<br>Musculo-skeletal   ☐ ROM ☐ Muscular Strength ☐ Symmetry/ Alignment ☐Motor Weakness ☐ Costovertebral ☐ Tenderness<br>CV        ☐ Rate/rhythm  regular<br>Respiratory:  ☐ Lung Sounds ☐ Rhythm ☐ Quality<br>GI        ☐ Abdomen:  Soft/Rigid/Distended (circle) ☐ Bowel Sounds<br>GU       ☐ Bladder Distention ☐ Genitalia ☐Urine Dipstix<br>Skin      ☐ Rashes ☐ Edema ☐ Hot ☐ Dry ☐ Erythema ☐ Other |

| | |
|---|---|
| <strong>Nursing Dx.</strong> | ☐ Alteration In Elimination      ☐ Potential for Infection<br><br>Nursing Protocol (s)  utilized:  ☐ Genitourinary – Male ☐ Genitourinary – Female |

| | |
|---|---|
| <strong>Plan / Intervention</strong> | ☐ Push Fluids 8 (8 ounce glasses per day)             ☐ Ibuprofen 200 mg 1-2 tabs every 4-6 hours as needed per protocol or<br>☐ Eliminate caffeine/coffee drinks                ☐ Acetaminophen  1-2 tablets Q 4-6 hours as needed per protocol<br>☐ Perineal Hygiene (i.e. loose fitting pants, change underwear daily, wipe front to back)        ☐ Other per _____ protocol<br>☐ Avoid a full bladder                      ☐ Education per _____ protocol<br>☐ Do not postpone urination<br><br><br>Practitioner Referral:<br><br>☐ Stat Referral:  Abnormal vital signs with acute symptoms of chills, fever; Flank pain with fever; Acute onset of testicular pain; Extreme pain (testicular torsion, epididymitis, renal calculi); Signs of systemic infection such as fever, chills, inability or difficulty in voiding.<br><br>☐ Urgent (same day) : Elevated temperature, Positive LET or nitrites on urine dipstix; Pregnant females; Recurring infection after treatment |

| STAFF SIGNATURE | DATE SIGNED |
|---|---|
| | |

**DISTRIBUTION:** Original – Medical Chart, Progress Notes Section

DEPARTMENT OF CORRECTIONS
Division of Adult Institutions
DOC-3424D (Rev. 1/2005)

WISCONSIN

# HEADACHE ASSESSMENT ENCOUNTER

| OFFENDER NAME | DOC NUMBER | DATE | TIME |
|---|---|---|---|

## Subjective

Onset: ☐ Gradual  ☐ Sudden   ☐ Duration _____   ☐ Location _____  ☐ Radiation _____

Previous or Recent Trauma   ☐ Yes  ☐ No   If yes, describe _____   Pain Level: Rate 1-10 _____

Character: ☐ Sharp ☐ Dull ☐ Throbbing ☐ Aching ☐ Stabbing ☐ Tight ☐ Pulling ☐ Cramping ☐ Pressure ☐ Constant ☐ Waves

What makes it better? _____   What makes it worse? _____

Associated complaints   ☐ Nausea/Vomiting ☐ Diaphoresis ☐ Photophobia ☐ Rhinorrhea ☐ Vision Changes ☐ Numbness/Tingling
☐ Congestion ☐ Weakness ☐ Dizziness/Syncope

Therapies Tried:  ☐ OTC  ☐ Sleep  ☐ Relaxation  ☐ Heat/Cold

History   Similar Episodes  ☐ Yes ☐ No   If yes, How often? _____

What Precipitates? _____  Past Treatment _____  Medical Problems _____

Present Medications:   Allergies:

## Objective

General appearance:  ☐ Anxious ☐ Restless  ☐ Guarded  ☐ Relaxed  ☐ Flat Affect  ☐ Distressed

Vital Signs: BP _____   Pulse _____   Respiration _____  Temperature _____

*(circle those that apply & comment on abnormal)*

Neuro — AAOX3–Confused – Obtunded – PERLA - Balance/Gait WNL - MAE Symmetrically - Weakness in Extremity – Ataxic – Numbness _____, Tingling _____

CV — Rate/rhythm regular - Radial & Pedal Pulses   WNL ☐ yes ☐ No

Musculo- — No Evidence of Trauma - Deformity - Neck Stiffness with Flexion   WNL ☐ yes ☐ No

skeletal — Muscle Tone - Limited Movement – No Tenderness to Palpation   WNL ☐ yes ☐ No

EENT — Eyes – vision – Ears – Nose – Throat - Neck   WNL ☐ yes ☐ No

Skin — ☐ Normal (WD/P)  ☐ Pale  ☐ Diaphoretic  ☐ Hot  ☐ Dry  ☐ Cyanotic  ☐ Ruddy  ☐ Edema

## Nursing Dx

☐ Alteration in comfort related to headache pain

Nursing Protocol (s) utilized:  ☐ Headache

## Plan / Intervention

☐ Acetaminophen 1-2 tablets Q 4-6 hours as needed per protocol

☐ Ibuprofen 1-2 tabs Q 4-6 hours as needed per protocol

☐ Relaxation techniques

☐ Warm/cool compresses

☐ Increase Fluids

☐ Headache Diary (length of time)

☐ Education
☐ Discuss lifestyle such as avoiding excessive caffeine, sleep patterns, avoid nicotine, stress management
☐ Discuss overuse of analgesics – rebound headaches
☐ Trigger avoidance
☐ Regular Exercise
☐ Clinical Referral

Practitioner Referral:
☐ Stat - Abnormal vital signs; New-onset, unilateral headache, particularly in patients over age 35, Severe headache or headache different from previous ones; Headaches becoming more continuous and intense; Headaches accompanied by vomiting but not nausea;
☐ Urgent (same day)  - Abnormal Vital Signs
☐ Follow-up – Routine if the findings & examination is normal - Return if unrelieved or Increased severity or duration, new symptoms, fever chills, visual disturbances, numbness, weakness, dizziness, or syncope.

| STAFF SIGNATURE | DATE SIGNED |
|---|---|

DISTRIBUTION:   Original – Medical Chart, Progress Notes Section

DEPARTMENT OF CORRECTIONS
Division of Adult Institutions
DOC-3516 (Rev. 2/2006)

**RESPIRATORY ASSESSMENT ENCOUNTER**

WISCONSIN

OFFENDER NAME | DOC NUMBER | DATE | TIME

**Subjective**

Symptoms    Onset _____    Duration & course _____
Check if yes    ☐ Cough ☐ Sputum  Color _____ ☐ Dyspnea ☐ Numbness/tingling toes/fingers/around mouth
☐ Pain ☐ Location _____ & rating _____ ☐ Palpitations ☐ Respiratory Infection (e.g. clod/flu) ☐ Wheezing
☐ Orthopnea ☐ Exertional dyspnea ☐ Activity Intolerance ☐ Feelings of malaise _____ ☐ Other
☐ Other: _____
Measures tried for relief _____ (e.g. inhaler)
History   ☐ Asthma ☐ COPD/Emphysema ☐ Respiratory Infections ☐ Cardiac Disease ☐ HTN
☐ Arrythmias ☐ Stroke/TIAs ☐ Diabetes Mellitus ☐ Trauma ☐ Smoker ☐ Other
☐ Other: _____
Present Medications: _____                                    Allergies:

**Objective**

Primary Survey   ☐ Conscious ☐ Airway patent ☐ Breathing ☐ Circulation

General Appearance : ☐ Anxious ☐ Restless ☐ Guarded ☐ Relaxed ☐ Lethargic
Vital Signs:    BP        T.        P.       R.      Wt. _____ Pulse Oximetry _____    Peak Flows _____
Of the following check & comment on ONLY those that are ABNORMAL:
HEENT       ☐ Head/ /Ears/Nose/Throat/Neck (circle)
Neuro       ☐ AAOX3 ☐ Movements ☐ PERL ☐ Gait
Musculo-skeletal   ☐ Muscular Strength ☐ Symmetry/ Alignment ☐ Posture/Gait ☐ Accessory Muscles
CV          ☐ Rate/rhythm ☐ Pulses: Radial ☐ Pedal
Respiratory:  ☐ Lung Sounds ☐ Accessory muscles ☐ Respiratory Rate ☐ Wheezing ☐ Sputum Color
            ☐ Other _____
GI          ☐ Abdomen: Soft/Rigid/Distended (circle) ☐ Bowel Sounds ☐ BM
Skin        ☐ Diaphoretic ☐ Hot ☐ Dry ☐ Cyanotic ☐ Erythema ☐ Edema

**Nursing Dx**

☐ Ineffective airway clearance ☐ Alteration in comfort r/t dyspnea ☐ Anxiety r/t situational stress ☐ Ineffective breathing pattern
☐ Impaired gas exchange
**Nursing Protocol (s) utilized:** ☐ Hyperventilation ☐ Respiratory Distress ☐ Upper Respiratory Infection ☐ Asthma

**Plan / Intervention**

For Severe Distress while waiting for EMS:
☐ Place in high fowlers or position of comfort
☐ O2 if available (flow rate per administration device, 6-to 15 liters)
☐ Monitor VS & O2 saturation
For Mild/Moderate Symptoms:
☐ Push fluids Unless contraindicated (e.g. CHF)
☐ Avoid offending agents (smoke, dust, etc.)

☐ Ibuprofen 200 mg 1-2 tabs every 4-6 hours as needed per protocol or
☐ Acetaminophen 1-2 tablets Q 4-6 hours as needed per protocol
☐ Other per _____ protocol
☐ Education per _____ protocol
☐ Nebulizer per _____ protocol

**Practitioner Referral:**
☐ Stat (EMS) Referral: Respiratory Arrest, Severe respiratory distress; Foreign body inhibiting breathing; Distress with cyanosis of the lips, finger nail beds, or earlobes: Pulse Oximeter reading of <90%

☐ Urgent (same day) : Wheezing, dyspnea, difficulty swallowing without severe distress; Abnormal vital signs

STAFF SIGNATURE                                                 DATE SIGNED

DEPARTMENT OF CORRECTIONS
Division of Adult Institutions
DOC-3517 (2/2000)

WISCONSIN

# TRAUMA ASSESSMENT ENCOUNTER

| OFFENDER NAME | DOC NUMBER | DATE | TIME |
|---|---|---|---|

## Subjective

Date & time _____    Mechanism: ☐ Fall  ☐ Fall from height   ☐ Work related   ☐ Altercation  ☐ Sport related  ☐ Self-inflicted

Site(s) affected          ☐ Head & Neck     ☐ Hands & Wrists     ☐ Elbows     ☐ Shoulders & Related Structures

☐ Ankles & Feet    ☐ Knees & Hips    ☐ Spine    ☐ Abdomen   ☐ Chest   ☐ Other

Type of Injury             ☐ Impact   ☐ Blunt Force   ☐ Crushing   ☐ Laceration   ☐ Puncture   ☐ Other

Pain         Rate on a scale of 1-10 _____   Location/Radiation _____    Describe _____

Presenting complaints (patient Statement)

What happened before and/or after the event?

History         ☐ Cardiac Disease   ☐ HTN   ☐ Seizures   ☐ Arrythmias   ☐ Stroke/TIAs  ☐ Diabetes Mellitus  ☐ GI Bleed

☐ Asthma/Emphysema    ☐ Drug Use   ☐ Thyroid Disease  ☐ Previous Trauma         ☐ Psych

☐ Other

| Present Medications: | | Tetanus Status: | Allergies: |
|---|---|---|---|

## Objective

Primary Survey: ☐ Conscious ☐ Airway patent   ☐ Breathing   ☐ Circulation ☐ Neuro (PERRL   EOM - A&O X 3)

General appearance:    ☐ Anxious ☐ Restless   ☐ Guarded       ☐ Relaxed

Vital Signs:       BP         T.          P.          R.                              ☐ Pulse Oximetry _____    (if applicable)

Of the following check & comment on ONLY those that are ABNORMAL:

**HEENT**         Head/ /Ears/Nose/Throat/Neck (circle)  ☐ Teeth  ☐ Eyes:  ☐ Vision  ☐ Foreign Body

**Neuro**         ☐ AAOX3  ☐ Steady/symmetrical movements  ☐ PERLA  ☐ Gait  ☐ Sensory loss R/t Injury

**Musculo-skeletal**   ☐ ROM   ☐ Muscular Strength  ☐ Symmetry/ Alignment  ☐ Crepitus  ☐Motor Weakness

☐ Joint Instability  ☐ Unable to Bear Weight  ☐ Deformity  ☐ Focal or Point Tenderness

**CV**         ☐ Rate/rhythm regular  ☐ Pulses equal – radial  ☐ Pedal

**Respiratory:**   ☐ Lung Sounds  ☐ Rhythm  ☐ Quality

**GI**         ☐ Abdomen: Soft/Rigid/Distended (circle)  ☐ Bowel Sounds  ☐ BM  ☐ Anal Sphincter (spine)

**Skin**         ☐ Diaphoretic  ☐ Hot  ☐ Dry  ☐ Cyanotic  ☐ Erythema  ☐ Edema  ☐ Bruising  ☐ Bleeding

## Nursing Dx

☐ Impaired Physical Mobility             ☐ Potential for Injury

Nursing Protocol (s) utilized:
☐ Ankle-Foot Injury      ☐ Musculoskeletal Pain ☐ Trauma/Injury  ☐ Back Pain  ☐ Eye Pain/Injury  ☐ Dental Trauma

## Plan / Intervention

☐ Protect

☐ Rest Affected Area & Immobilize Part

☐ Ice

☐ Compression (if appropriate)

☐ Elevate Limb

☐ Tetanus per standing order

☐ Activity Restriction

☐ Ibuprofen 200 mg 1-2 tabs every 4-6 hours as needed per protocol or

☐ Acetaminophen  1-2 tablets Q 4-6 hours as needed per protocol

☐ Other per _____ protocol

☐ Education per _____ protocol

Practitioner Referral:

☐ Stat Referral, major trauma; Loss of consciousness;  spine: {saddle anesthesia, neurologic deficits in lower extremities}; abnormal vital signs, Dental: {orofacial swelling & fever, unresolved hemorrhaging}; Eye: {chemical spill, major trauma, sudden visual loss or flashing lights, embedded FB}

☐ Urgent (same day) Potential fractures; Inability to bear weight with severe focal  or point tenderness; Spine:{ over age 50 with acute onset of pain}; Dental {orofacial swelling but normal temperature}; Eye: {corneal abrasion, inability to remove FB, infections}

| STAFF SIGNATURE | DATE SIGNED |
|---|---|

Nursing Protocol

SUBJECT: ABDOMINAL PAIN

EFFECTIVE DATE: OCTOBER 1, 2009

SUPERSEDES: OCTOBER 1, 2008

Note: These are protocols meant to provide very general guidance to PCSO medical staff as to the evaluation, treatment, and disposition of patients. As with any other medical issue, if there is a question or concern for the well-being and care of any patient, do not hesitate to notify a practitioner of these concerns.

Vital signs must be taken as part of the protocol assessment.

SUBJECTIVE FINDINGS
1. When? Onset? How long? Location? Radiation? Type of pain (sharp, dull, cramping)? Duration? Rebound tenderness?
2. Nausea? Vomiting? Diarrhea? - # of times? # of hours? - color consistency?, blood?
3. Has there been a change in color of stool? - constipation? - Date of last BM? Stool color, red or black? Passing flatus? Blood on tissue, streaks of blood, clots?
4. Pain related to food intake?
5. Urinary symptoms?
6. Are they hungry, eating?

OBJECTIVE FINDINGS
1. Temp.___, Pulse___, Resp.___ BP___, Wt.
2. Is there paleness, sweating, weight loss? Dry oral mucosa?
3. Severe pain (cannot stand erect, drawn knees to abdomen when lying down, pain when heels are tapped while lying supine)?
4. Abdomen soft or rigid? Rebound tenderness? Bleeding? Trauma?
5. Is pain produced or elicited or exaggerated by very gentle abdominal palpation?
6. Bowel sounds?
7. Lung sounds?
8. Heart sounds?
9. LMP?
10. Vaginal Discharge or bleeding?
11. Dipstick urine results?
12. Is pain related to food intake?

ASSESSMENT DECISION
1. Abdominal pain. Etiology (?) or as determined above.

FINDINGS REQUIRING REFERRAL (Doctor/ARNP)
1. Temp. 100.4 or > Pulse > 100 Resp. Normal
2. Paleness, sweating, moist skin
3. Pain severe, localized, or generalized – Call Doctor/ARNP for orders
4. Abdomen rigid - firm – Call Doctor/ARNP for orders
5. Intractable Nausea/Vomiting – Call Doctor/ARNP for orders
6. Pregnancy
7. Blood in stool
8. Pain unimproved with conservative care
9. Positive dipstick - place on next available Doctor/ARNP SC.

FINDINGS NOT REQUIRING REFERRAL:
1. Vital signs WNL
2. Minimum to mild pain (According to type of pain and onset)
3. No vomiting or stools with blood

ACTION PLAN: APPROVED O.T.C. MEDS (Check med. allergies)
1. Maalox 10 - 15 cc BID x3 days
2. Symptomatic (I.e. avoidance of offending foods.)
3. Kaopectate as directed for diarrhea
4. MOM 30cc p.o. at h.s. if needed for constipation and abdominal examination is negative. May repeat in 12 hours if no results.

EDUCATION/INSTRUCTION - As appropriate to findings:
1. For constipation, provide instruction to increase water intake.
2. Avoidance of offending foods. Remain NPO until nausea passes.
3. Possibility of mild viral infection, which may persist for 24-48 hours.
4. Return to clinic if symptoms worsen or persist > 48 hours.

SUBJECT:          BACKACHE

EFFECTIVE DATE:   OCTOBER 1, 2008

SUPERSEDES:       SEPTEMBER 21, 2005

Note: These are protocols meant to provide very general guidance to PCSO medical staff as to the evaluation, treatment, and disposition of patients. As with any other medical issue, if there is a question or concern for the well-being and care of any patient, do not hesitate to notify a practitioner of these concerns.

Vital signs must be taken as part of the protocol assessment.

SUBJECTIVE FINDINGS
1.  Cause - lifting, fall, sports, spontaneous?
2.  Onset?
3.  Location, radiation, numbness?
4.  Anything relieves/reduces or increases pain?
5.  Pain on urination, color, increased frequency?
6.  Increased pain with cough?
7.  Past or recent injuries?
8.  R.O.M.?
9.  Difficulty walking?
10. History of kidney Stones, pancreatitis, aortic aneurysm, pregnant?

OBJECTIVE FINDINGS
NOTE PATIENTS GAIT & MOVEMENT BEFORE & AFTER HISTORY & PHYSICAL.
1.  Temp.__, Pulse__, Resp.__, BP__, Weight
2.  Is there swelling, redness, pain to touch, bruised area, limited movement, foot drop, and/or numbness, spasms?
3.  Is urine cloudy, red, dark yellow? Urine dipstick results _____?
4.  Are lower lungs congested, wheezing?
5.  Lung sounds? Abdominal bruit?
6.  What is posture while seated, describe gait
7.  Is there a possibility of drug seeking, malingering? Qualify this with specifics (pain out of proportion to physical findings)
8.  Rash? Possibility of shingles?

ASSESSMENT DECISION
A.  Backache
B.  Etiology (?)

FINDINGS REQUIRING REFERRAL (Doctor/ARNP)
1.  Temp. 100.4 or >
2.  Numbness and/or severe pain
3.  Loss of normal R.O.M.
4.  Swelling, discoloration
5.  Foot drop
6.  Loss of sensation
7.  Positive dipstick findings
8.  Difficulty ambulating

FINDINGS NOT REQUIRING REFERRAL
1.  Temp. < 100.4  Vital signs WNL
2.  Mild Pain
3.  No Local Findings
4.  No Numbness or Radiation
5.  No Recent History of Trauma

ACTION PLAN - As appropriate to findings: (CHECK MED ALLERGIES)

1.  Recommend hot showers if muscle spasm present.
2.  Bed rest for 48-72 hours.
3.  Recreation restriction as appropriate - Do not discontinue recreation privileges unless mandatory for appropriate care.
4.  Tylenol 325mg - 500mg, 1-2 tablets PO BID PRN x3 days, or
5.  Motrin 200mg 2 tablets PO BID or TID x3 days for more severe pain.
6.  Analgesic balm: apply to affected area BID PRN (after hot shower)
7.  RTC PRN if no improvement or increase in symptoms. If bed rest is ordered, provide inmate with note to miss work and document on Nurse's notes.
8.  Extra mattresses are NOT provided.

EDUCATION/INSTRUCTION - As appropriate to findings:
1.  Avoid strenuous activity, especially weight lifting.
2.  Demonstrate proper method of bending and lifting
3.  Suggest simple back exercises (See handout)
4.  Return to clinic if change in symptoms

# CIWA

# FORMS

CLINICAL INSTITUTE WITHDRAWAL ASSESSMENT REVIEW SHEET
ALCOHOL (revised) (CIWA-Ar)



**NAUSEA & VOMITING** - Ask, "Do you feel sick to your stomach? Have you vomited?"
OBSERVATION:
0  No nausea, no vomiting
1  Mild Nausea with no vomiting
2
3
4  Intermittent nausea with dry heaves
5
6
7  Constant nausea, frequent dry heaves & vomiting

**TREMOR** - Arms extended, fingers spread apart.
0  No tremor
1  Not visible but can be felt fingertip to fingertip
2
3
4  Moderate, with patient's arms extended
5
6
7  Severe, even with arms not extended

**PAROXYSMAL SWEATS**
0  No sweat visible
1  Barely perceptible sweating, palms moist
2
3
4  Beads of sweat obvious on forehead
5
6
7  Drenching sweats

**ANXIETY** - Ask, "Do you feel nervous?"
0  No anxiety, at ease
1  Mildly anxious
2
3
4  Moderately anxious, or guarded, so anxiety is inferred
5
6
7  Equivalent to acute panic state, as seen in severe delirium or acute schizophrenic reactions

**AGITATION**
0  Normal activity
1  Somewhat more than normal activity
2
3
4  Moderately fidgety and restless
5
6
7  Paces back and forth during most of the interview, or constantly thrashes about

**TACTILE DISTURBANCES** - Ask, "Have you had any itching, pins & needles sensations, any burning, any numbness, or do you feel bugs crawling on or under your skin?"
0
1  Very mild itching, pins & needles, burning, or numbness
2  Mild itching, pins & needles, burning, or numbness
3  Moderate itching, pins & needles, burning, or numbness
4  Moderately severe hallucinations
5  Severe hallucinations
6  Extremely severe hallucinations
7  Continuous hallucinations

**AUDITORY DISTURBANCES** - Ask, "Are you more aware of sounds around you? Are they harsh? Do they frighten you? Are you hearing anything that is disturbing to you? Are you hearing things you know are not there?"
0  Not present
1  Very mild harshness or ability to frighten
2  Mild harshness or ability to frighten
3  Moderate harshness or ability to frighten
4  Moderately severe hallucinations
5  Severe hallucinations
6  Extremely severe hallucinations
7  Continuous hallucinations

**VISUAL DISTURBANCES** - Ask, "Does the light appear to be too bright? Is the color different? Does it hurt your eyes? Are you seeing anything that is disturbing to you? Are you seeing things you know are not there?"
0  Not present
1  Very mild sensitivity
2  Mild sensitivity
3  Moderate harshness or ability to frighten
4  Moderately severe hallucinations
5  Severe hallucinations
6  Extremely severe hallucinations
7  Continuous hallucinations

**HEADACHE, FULLNESS IN HEAD** - Ask, "Does YOUR HEAD FEEL DIFFERENT? Does it feel like there is a band around your head?" Do Not rate dizziness or lightheadedness. Otherwise rate severity:
0  Not present
1  Very mild
2  Mild
3  Moderate
4  Moderately severe
5  Severe
6  Very severe
7  Extremely severe

**ORIENTATION AND INCLUDING OF SENSORIUM** - Ask, "What day is this? Where are you? Who am I?"
0  Oriented and can do serial additions
1  Cannot do serial additions or is uncertain about the date
2  Disoriented for date by no more than 2 calendar days
3  Disoriented for date by more than 2 calendar days
4  Disoriented for place and/or person

The scores for the 10 items are summed to give a total score.
< 10
10-19
20-25
> 25

**Place Score on CIWA-Ar Score Sheet**

Intake Provider Orders-CIWA Performance
(Only For EtOH (alcohol);
Not for Use for Other Substance Withdrawal)
*(Three Page Pathway)*



CORRECT CARE
S O L U T I O N S

| Patient Name «Name» | Inmate Number «InmateNumber» | Date of Birth «DOB» | Today's Date «ClientDate» |
|---|---|---|---|

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Date: | | | | | | | | | |
| Time: | | | | | | | | | |

| SCORE | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| ausea and Vomiting | | | | | | | | | |
| remor | | | | | | | | | |
| aroxysmal Sweating | | | | | | | | | |
| gitation | | | | | | | | | |
| actile Disturbances | | | | | | | | | |
| uditory Disturbances | | | | | | | | | |
| sual Disturbances | | | | | | | | | |
| nxiety | | | | | | | | | |
| eadaches, Fullness in the Head | | | | | | | | | |
| rientation | | | | | | | | | |
| tal (max score 67) | | | | | | | | | |

| Vitals | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| ɔ | | | | | | | | | |
| mp | | | | | | | | | |
| ilse | | | | | | | | | |

| Mental Health Screen | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| oughts of Self-harm or Suicide? | Y/N | Y/N | Y/N | Y/N | Y/N | Y/N | Y/N | Y/N | Y/N | Y/N |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| urses Initials | | | | | | | | | |

e in conjunction with CIWA-Ar Assessment Review Sheet.
scores for the 10 items are summed to give a total score.

| Stable | 20-25 | Moderate withdrawal |
| 9 | Mild to moderate withdrawal | > 25 | Severe withdrawal |

| ysician: | Allergies: |
|---|---|

Intake Provider Orders-CIWA Performance
(Only For EtOH (alcohol);
Not for Use for Other Substance Withdrawal)
*(Three Page Pathway)*



| Patient Name | Inmate Number | Date of Birth | Today's Date |
|---|---|---|---|
| «Name» | «InmateNumber» | «DOB» | «ClientDate» |

| Date & Time of Initiation: | Patients receiving Librium (Chlordiazepoxide) should be housed in appropriate medical observation area / infirmary as applicable. |
|---|---|

| 1. | House patient in medical observation if possible. |
|---|---|
| 2. | Thiamine 100mg PO q day x 30 days; if vomiting, give first dose IM |
| 3. | If patient is continuously vomiting OR displaying signs and symptoms of dehydration, contact the provider. |
| 4. | Contact the provider IMMEDIATELY for the following BEFORE giving Librium: |

|   | | |
|---|---|---|
| | a. Pregnancy | f. Systolic BP <90 or >180 |
| | b. Unresponsiveness | g. Diastolic BP <60 or >110 |
| | c. Changes in mental status | h. Heart Rate <60 or >120 |
| | d. Seizures | i. Respiratory Rate <10 or >24 |
| | e. CIWA score >19 | j. Temperature >101.1°F |

| 5. | Follow the Pathway below for EtOH assessments and Librium dosing: |
|---|---|
| | *STEP 1: Perform CIWA-Ar and score appropriately* |
| | • Start Librium 50mg po TID x 2 days (0800, 1600, MN), then |
| | • Librium 50mg po BID x 2 days (0900, 2100), then |
| | • Librium 50mg po daily x 1 day (0900) |
| | |
| | *STEP 2: Vital signs and CIWA scoring with each medication dosing* |
| | |
| | *STEP 3: Contact provider for additional dosing orders when CIWA score greater than 19.* |
| 6. | If patient answers "Yes" to mental health screen, immediately place patient on suicide watch then contact mental health provider on-call. |
|   | |

| Date / Time | | ☐ ALCOHOL DETOXIFICATION |
|---|---|---|
| | | 1) Begin "Infirmary Drug/Alcohol Protocol Monitoring Form" and vital signs q 8 hours |
| | | 2) Infirmary Admission, Level 1 |
| | | 3) Low bunk, seizure precautions x14 days |
| | | 4) Begin the following detoxification treatment(s): |
| | | 5) Valium (diazepam) 10mg p.o q 8hrs x 48 hrs; then, <br><br> Valium 10mg p.o q12hrs x 48hrs; then <br> Valium 10mg p.o QHS x 48hrs; then discontinue <br><br> HOLD VALIUM IF ASLEEP OR SEDATED |
| | | 6) Thiamine 100mg p.o daily x3 days |
| | | 7) Laboratory: CBC, CMP, Magnesium |
| | | 8) Notify HCP if unable to tolerate oral medications or remaining symptomatic |

☐ BENZODIAZEPINE OR BARBITURATE DETOXIFICATION

| | | |
|---|---|---|
| | | 1) Low bunk, seizure precautions x 14 days |
| | | 2) Begin the following detoxifications treatment(s): |

| ☐ Ativan 1.0mg p.o q 8hrs x 48hrs; then <br><br> Ativan 0.5mg p.o q8hrs x 72hrs; then <br> Ativan 0.5 mg p.o q12hrs x 72hrs; then <br> Ativan 0.5mg p.o QHS x 48hrs; then discontinue <br> HOLD ATIVAN IF ASLEEP OR SEDATED | -OR- | ☐ Valium (diazepam) 10mg p.o q 8hrs x 48 hrs; then, <br><br> Valium 10mg p.o q12hrs x 48hrs; then <br> Valium 10mg p.o QHS x 48hrs; then discontinue <br><br> HOLD VALIUM IF ASLEEP OR SEDATED |
|---|---|---|

| | | |
|---|---|---|
| 3) Place in Psych RN Clinic (23) in A.M. after meds have started | | Place in Psych RN Clinic (23) in A.M. after meds have started |
| 4) Notify HCP if unable to tolerate oral medications or remaining symptomatic | | |

☐ OPIATE DETOXIFICATION

| | | |
|---|---|---|
| 1) | Low bunk, seizure precaution x 14 days | |
| 2) | Begin the following detoxification treatment(s): | |
| 3) | Clonidine as follows: <br> Clonidine 0.1mg p.o TID x 48 hours; then Clonidine 0.1mg p.o BID x 48 hours; then | |
| | Clonidine 0.1mg p.o QHS x 48 hours; then discontinue | |
| | Hold Clonidine for systolic BP < 100 mmHg or diastolic BP < 70 mmHg | |
| 4) | Ibuprofen 600mg p.o TID x 72 hours prn muscle aches | |
| 5) | Phenergan 25 mg IM or po TID x 72 hours (Hold if patient is too sedated) (give IM if vomiting) | |
| 6) | Bentyl 20mg p.o TID x 72 hours | |
| 7) | Imodium 4mg p.o. TID x 72 hours | |
| 8) | Notify HCP if unable to tolerate oral medications or remaining symptomatic | |
| 9) | Other | |

| ALLERGIES: | | ORDERED BY: _____ <br> Signature: _____ | | | |
|---|---|---|---|---|---|
| Patient Name: | | Booking Number: | D.O.B. | Sex: | Facility: |

5849 (05/08)

# ALCOHOL WITHDRAWAL MED SHEET

**PRO/Date**

THIAMINE 100mg
PO Q D
x 5 DAYS & DC

| USING SCORING PARAMETERS | BP | PULSE | TEMP | TREM | BEHAV | SWEAT | TOTAL SCORE | LIBRIUM GIVEN | TOTAL LIBRIUM Current 24 hr. Per. 0000-2400 | INITIALS |
|---|---|---|---|---|---|---|---|---|---|---|
| DATE / TIME | | | | | | | | | | |
| | | | | | | | | | | |

**Scoring Guide**

| Blood Pressure | 0 | Systolic < 140 and diastolic < 90 |
|---|---|---|
| | 1 | Systolic 140-160 or diastolic 90-96 |
| | 2 | Systolic 161-180 or diastolic 97-104 |
| | 3 | Systolic 181-200 or diastolic 105-112 |
| | 4 | Systolic > 200 or diastolic >112 |
| Pulse | 0 | < 90 |
| | 1 | 91 - 100 |
| | 2 | 100 - 120 |
| | 3 | > 120 |
| Temperature | 0 | <99 (degree F) |
| | 1 | 99 - 100 |
| | 2 | 100.1 - 101 |
| | 3 | > 101 |
| Tremor | 0 | tremor absent or felt but not visible |
| | 1 | mild visible tremor |
| | 2 | moderate visible tremor |
| | 3 | marked tremor (can't drink from a cup) |
| Behavior | 0 | calm |
| | 2 | agitation |
| | 3 | hallucinations |
| Sweating | 0 | none |
| | 1 | mild (barely visible) |
| | 2 | moderate |
| | 3 | marked (clothes or bedding soaked) |
| Total Score | 2 or less | no librium |
| | 3 | librium 25mg (recheck every 4 hrs) |
| | 4-6 | librium 50mg (recheck every 4 hrs) |
| | 7 | librium 75mg (recheck every 4 hrs) |
| | 8-9 | librium 75mg (recheck every 2 hrs) |
| | 10 or more | librium 100mg (if 10 or more, recheck in 1 hour) |

Signature         Init.   Signature         Init.   Signature

ALLERGIC TO:

MODULE:

ID:

PATIENT:

□ Med Fac Restriction Placed

**MULTNOMAH COUNTY HEALTH DEPARTMENT CORRECTIONS HEALTH**

# ALCOHOL WITHDRAWAL MED SHEET

NAME: _____  ID#: _____

| USING SCORING PARAMETERS | BP | PULSE | TEMP | TREM | BEHAV | SW/EAT | TOTAL SCORE | LIBRIUM GIVEN | TOTAL LIBRIUM Current 24 hr. Per. 0000-2400 | INITIALS |
|---|---|---|---|---|---|---|---|---|---|---|
| DATE / TIME | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

| Blood Pressure | | |
|---|---|---|
| | 0 | Systolic < 140 and diastolic < 90 |
| | 1 | Systolic 140-160 or diastolic 90-96 |
| | 2 | Systolic 161-180 or diastolic 97-104 |
| | 3 | Systolic 181-200 or diastolic 105-112 |
| | 4 | Systolic > 200 or diastolic >112 |
| Pulse | 0 | < 80 |
| | 1 | 81 - 100 |
| | 2 | 100 - 120 |
| | 3 | > 120 |
| Temperature | 0 | <99 (degree F) |
| | 1 | 99 - 100 |
| | 2 | 100.1 - 101 |
| | 3 | > 101 |
| Tremor | 0 | tremor absent or felt but not visible |
| | 1 | mild visible tremor |
| | 2 | moderate visible tremor |
| | 3 | marked tremor (can't drink from a cup) |
| Behavior | 0 | calm |
| | 2 | agitation |
| | 3 | hallucinations |
| Sweating | 0 | none |
| | 1 | mild (barely visible) |
| | 2 | moderate |
| | 3 | marked (clothes or bedding soaked) |
| Total Score | 2 or less | no librium |
| | 3 | librium 25mg (recheck every 4 hrs) |
| | 4-6 | librium 50mg (recheck every 4 hrs) |
| | 7 | librium 75mg (recheck every 4 hrs) |
| | 8-9 | librium 75mg (recheck every 2 hrs) |
| | 10 or more | librium 100mg (if 10 or more, recheck in 1 hour) |

**MULTNOMAH COUNTY HEALTH DEPARTMENT CORRECTIONS HEALTH**

NOTE: Not to exceed Librium 300mg/24 hours. Call on-call MD if problem or questions with Librium doses.

# KOP POLICY AND CONTRACT

To facilitate clinically appropriate medication services and to provide prescribed medications in a timely, safe, and sufficient manner within the Detention Health Care Services (DHCS), adult division. This is a revised policy, in compliance with NCCHC J-D-02, and supersedes the policy dated 09/04/07.

## LABORATION:

## NITIONS

**Executive Medical Management Staff** – Term referring to the Medical Director, Administrative Director, Director of Mental Health, and the Director of Nursing

**Controlled Substance Administration Record** – Used to document patient receipt of prescribed medications that are considered to be "controlled medications" according to law. Also used to document patient refusal to report for medication administration when indicated.

**Controlled Substance Record** – Log used to maintain accountability for all controlled medications administered within the Detention Health Care Services (DHCS)

**DOT Medications** – Medications that are prescribed with the instructions that extra caution is needed to insure patient compliance

**Floor Stock System** – System of using stock medication supply, rather than blister packs generated for each individual patient

**KOP MEDS** – "Keep on person medications"; medications that may be issued to the patient for self administration

 **DHCS**

Detention Health Care Services

**Policies and Procedures**

Policy No.:        J-D-02
Page Number:    2 of 22
Effective Date:   02/11/09

- G.  **MAR** – Medication Administration Record, used to document patient administration, or refusal of prescribed medications that are not considered to be "controlled substances" according to law. Also used to document patient's failure to report for medication administration as scheduled

- H.  **No Show** – Occurrences of patient failure to report to the medication cart, medication room, or treatment room for scheduled medication administration. Should be documented on the patient's MARS.

- I.  **Patient Advocacy** – Term used (broadly) here to refer to monitoring and defending the clinical best interests of the patients entrusted to our care, consistent with established community standards.

- J.  **Refusal** – Patient reports to the medication cart, medication room, or treatment room for scheduled medication administration but refuses to take the medication. Refusal form should be signed.

## II.  THE MEDICAL DIRECTOR ESTABLISHES POLICIES REGARDING THE ADMINISTRATION OF ALL PRESCRIPTION MEDICATIONS DELIVERED WITHIN THE FACILITY.

- A.  Administration of prescribed medication to any patient requires an order from a physician, physician's assistant, nurse practitioner, dentist, or other legally authorized individual.

- B.  Prescriptions recommended by non-credentialed medical providers may not be implemented until they are co-signed by the supervising physician.

- C.  Medications are prescribed only when clinically indicated and the clinical indication for the prescribed medication should be documented on the patient's medication label, provided by pharmacy.

- D.  Providers should coordinate their prescribing practices with one another in order to:

 **DHCS**

Detention Health Care Services
**Policies and Procedures**

Policy No.:  J-D-02
Page Number:  3 of 22
Effective Date:  02/11/09

---

1. Reduce the likelihood of an adverse patient outcome
2. Promote consistency in treatment approaches
3. Discourage inappropriate patient drug-seeking behavior
4. Identify and correct duplication of orders
5. Prevent real or potential interactions between prescriptions

E. Prescribed medications will be administered by qualified medical staff unless the medication is approved for issue to the patient, for self administration (Medical Director approval for KOP medication)

## III. MEDICATIONS APPROVED FOR ISSUE TO THE PATIENT, FOR SELF ADMINISTRATION (KOP)

A. Medications on the approved list may be kept in the patient's possession.
   1. Artificial Tears
   2. Metered Dose Inhalers
   3. Nitroglycerin Sublingual
   4. Saline (Ocean Spray)
   5. Dandruff shampoo
   6. "Others" as approved, individually, by the Medical Director, Administrative Director, and Jail Administration

B. These medications should be kept in the patient's assigned cell while the patient is on his/her assigned housing unit (with the exception of Nitroglycerin sublingual and Asthma inhalers which may be kept on the patient's person regardless of location).

C. The Medication Label must include:
   1. Patient Name and SID Number
   2. Start date and expiration date
   3. Clinical Indication
   4. Special instructions if indicated

D. The provider prescribing the medication to be issued to the patient must complete and document the necessary patient education during their contact with the patient during the office visit.

**DHCS**

Detention Health Care Services
**Policies and Procedures**

Policy No.: J-D-02
Page Number: 4 of 22
Effective Date: 02/11/09

E. The patient must be asked to sign the medication sheet, acknowledging receipt of the KOP medication when it is issued to them.

## IV. OVER-THE-COUNTER (OTC) MEDICATIONS ADMINISTERED TO PATIENTS IN THE SCREENING/INTAKE AREA

A. Nurses assigned to the medical screening area may administer a one time dose of regular strength Tylenol (2 tablets of 325mg each) or Aspirin (2 tablets of 325mg each) without a physician's order

1. AFTER the patient's history of allergies is obtained and documented and providing they are not allergic to the medication given.

2. Administration must be documented on the patient's screening sheet or attached progress note

a. Including reason for giving the OTC medication

b. Referrals for follow-up if indicated

B. Repeat doses of Aspirin or Tylenol given to inmates remaining in the booking/intake area require a physician's order and must be documented on the patient's screening sheet or attached progress note

## V. ADMINISTRATION OF OTC MEDICATIONS TO PATIENTS WHO ARE NOT IN THE SCREENING/INTAKE AREA, BY MEDICAL STAFF

A. Nurses may not administer OTC medications to patients outside of the screening/intake area without a credentialed provider's order.

B. The administration of OTC Medications by medical staff must be documented in the patient's medical record.

## VI. OFFICER ADMINISTRATION OF OTC MEDICATIONS ON THE LIVING UNITS

A. Detention Officers assigned to living units (other than the infirmary, 0B, or MHU/SPU areas) are authorized to administer a single, regular strength dose, of Tylenol (2 tablets of 325mg each) or Aspirin (2 tablets of 325mg each) during an eight (8) hour shift.



**DHCS**

Detention Health Care Services
**Policies and Procedures**

Policy No.:        J-D-02
Page Number:    5 of 22
Effective Date:  02/11/09

- B.    The administration of Tylenol or Aspirin by Detention Officers does not need to be documented in the inmate's medical record but the Officer should document the provision of the medication in their unit activity logs.

- C.    Officers should be instructed to refer inmates with frequent requests for OTC medications to sick-call for follow-up if needs persist.

- D.    The housing unit officers are responsible for coordinating a re-supply of approved OTCs directly with pharmacy, as needed

## VII.  ADMINISTRATION OF PRESCRIBED MEDICATIONS TO PATIENTS IN BOOKING

- A.    Patients who remain within the booking areas after being screened should be started on their prescribed medication while still in booking
    1.    Medications should be pulled from stock, per physician's order
    2.    "High priority" medications include, but are not limited to
        a.    Medications ordered for acute alcohol withdrawal
        b.    Medications ordered for pregnant females addicted to opiates
        c.    Medications ordered for documented hypertension
        d.    Medications ordered for documented seizure disorders
        e.    Medications ordered for documented cardiovascular or pulmonary disorders
        f.    Antibiotics for documented or apparent infections (refer suspected infectious patients to the physician for consideration of isolation needs)
    3.    Medications should be given at the same times as those times specified for the rest of the facility (see paragraph XV below)

- B.    Medications prescribed for patients in booking should be administered by the nurses assigned to screening

- C.    MARS for patients receiving medications in booking should be initiated and maintained by the nurses in screening

**⟨⟩ DHCS**

Detention Health Care Services
**Policies and Procedures**

Policy No.: J-D-02
Page Number: 6 of 22
Effective Date: 02/11/09

1. In accordance with guidelines outlined in DHCS Policy J-C-05
2. Must be forwarded to appropriate location once patient is assigned to a housing unit

## VIII. ADMINISTRATION OF PRESCRIBED MEDICATIONS FOR PATIENTS AWAITING A BED ASSIGNMENT IN THE INFIRMARY AREAS (Main Jail and 0B at Annex)

A. Patients who are waiting for a bed assignment will be monitored in the medical department waiting areas (Medical Security in Main Jail or Annex)

B. The nurses assigned to the Main Jail Infirmary and/or Female Infirmary ("0B") will be responsible for ensuring that:
   1. Patient receive their prescribed medications as scheduled
   2. Patients receive their treatments as scheduled
   3. Patients are periodically evaluated for changes in clinical status
   4. The on-duty nursing supervisor is notified of patient changes in status or other unanticipated needs involving these patients
   5. The physician on-call is notified when indicated and in coordination with the on-duty nursing supervisor

## IX. RECEIPT OF PRESCRIPTION MEDICATIONS FOR PATIENTS RETURNING FROM HOSPITALIZATION AT UNIVERSITY HOSPITAL

A. Patients discharged from University Hospital with prescriptions for continued medications should be discharged to the BCADC with a 72 hour supply of each medication ordered
   1. From any inpatient UHS unit
   2. Regardless of classification of drug (exceptions would be drugs requiring special certification for administration, such as chemotherapy drugs)
   3. Regardless of what day of week or time of day

B. Patients returning from University Hospital with prescribed medications should receive these medications as ordered



**DHCS**

Detention Health Care Services
**Policies and Procedures**

Policy No.:  J-D-02
Page Number:  7 of 22
Effective Date:  02/11/09

---

C. The responsible DHCS physician should be notified of the patients' return, condition, and current medication orders
1. On the following morning for patients returning during the night, provided that the patient does not require medical care that is NOT addressed in the discharge orders
2. Immediately upon arrival when:
   a. The patient assessment is inconsistent with the documentation on the discharge paperwork
   b. The patient's clinical needs may exceed the capabilities within the BCADC
   c. The patient requires orders for care that must be completed before morning (other than receipt of the medications or treatment documented on the discharge paperwork arriving with patient, and scheduled for administration before morning)

D. All prescribed medications will be transported from the hospital to DHCS personnel by the transporting Officer and delivered directly to the nurse assigned to screening (see DHCS Policy J-C-05 for specifics on procedure)

E. The Nursing Supervisors must maintain documentation of the failure to receive 72 hours of the prescribed medication when discharged from University Hospital for quality improvement purposes (forward to Medical Administration)
1. Date & time
2. Patient name, SID, date of birth
3. Medication involved
4. Specific discrepancy (i.e. insufficient doses, incorrect doses, etc.)

F. Refer to Paragraph XV for details regarding the receipt and management of controlled medications received from the hospital or approved use of controlled medications from home.

## X. **RECEIPT OF WRITTEN PRESCRIPTIONS FOR PATIENTS RETURNING FROM THE UHS EMERGENCY CENTER (EC),**


**DHCS**

Detention Health Care Services
**Policies and Procedures**

Policy No.: J-D-02
Page Number: 8 of 22
Effective Date: 02/11/09

### EXPRESS MED CLINIC, OR HOSPITALIZATION OUTSIDE OF THE UNIVERSITY HEALTH SYSTEM

A. Prescriptions ordered by University Health System physicians may be honored within the Detention Health Care Services but should be approved by the responsible physician to facilitate medication reconciliation and avoid duplication of medications

B. Approval should be deferred until the next morning if the patient returns during the night and there are no doses scheduled for administration before morning.

C. May be pulled from stock, if available, and
   a. Patient has no known drug allergies
   b. Dose is scheduled for administration *before morning*
   c. The on-call physician authorizes the administration of the initial dose prior to reviewing the medical records in morning (i.e. must call physician)

### XI. ONLY LICENSED NURSES, CERTIFIED MEDICATION AIDES, PHARMACISTS, PHARMACY TECHNICIANS, OR CREDENTIALED PROVIDERS MAY ACCESS THE STOCK MEDICATION CLOSET

### XII. MEDICATION BROUGHT IN TO THE DETENTION CENTER BY INMATE OR INMATE'S FAMILY

A. Acceptance of medications from home should be pre-approved by the Medical Director prior to their being dropped off at the facility, with the following exceptions:
   1. Anti-retroviral medications
   2. Tuberculosis medications
   3. Atypical antipsychotic medications

B. Medications accepted from home may only be received by a licensed nurse (see DHCS Policy J-C-05 "Medication Administration Training for specific procedure)



**DHCS**

Detention Health Care Services
**Policies and Procedures**

Policy No.:       J-D-02
Page Number:   9 of 22
Effective Date:  02/11/09

---

C.   The responsible physician must approve the use of patient medications from home, prior to their administration and will provide the nurse with an order approving the use of medications from home

D.   Once approved by the physician, the medications brought from home must be inspected by pharmacy.
   1.   If cleared by the pharmacist after inspection, a MARS bearing the appropriate label will be generated.
   2.   If the pharmacy is closed, a nurse may generate a handwritten MARS but may NOT administer the medication brought in from home before it is inspected by pharmacy.
   3.   Medications from home may NOT be administered without a physician's order/authorization.

E.   Patient medications received from home, but that are not approved for administration within the BCADC will be placed in the inmate's property. A written receipt will be filed in the patient's medical record.

## XIII.   PATIENTS ON METHADONE: REFERENCE POLICIES

A.   DHCS J-G-06, "Intoxication and Withdrawal"

B.   DHCS J-G-08, "Inmates With Alcohol and Drug Problems"

C.   DHCS J-G-08.1, "Inmates on Methadone"

D.   DHCS J-G-08.2, "Pregnancy Assessment of Women Addicted to Optiates"

E.   DHCS J-C-05, "Medication Administration Training"

### F.   **MEDICATION ERRORS**

1.  Identified medication errors will be documented by:

# DHCS

Detention Health Care Services
**Policies and Procedures**

    a.   The staff member(s) identifying the error

    b.   The staff member committing the error if available

    c.   Using the approved Medication Error report form

2. Completed medication error reports will be provided to the Medical Director, Administrative Director, Clinical Nursing Director, and any other parties relevant to the specific incident

3. Documented medication errors will be investigated for contributing factors and corrective actions will be initiated as indicated.

4. Trends in medication errors, corrective actions taken, and proposed changes in procedure relevant to medication errors will be discussed at the departments Pharmacy and Therapeutics Committee meeting.

**G.** **PATIENTS WILL BE MONITORED FOR ADVERSE DRUG REACTIONS AND ALL IDENTIFIED ADVERSE DRUG REACTIONS TO PRESCRIPTION MEDICATIONS WILL BE INVESTIGATED AND REPORTED ACCORDING TO UNIVERSITY HEALTH SYSTEM POLICY**

**H.** **MANAGEMENT OF CONTROLLED MEDICATIONS/NARCOTICS**

1. A floor stock system of medication, using reverse numbering unit dose packaging, is used for controlled substances in all areas of the DHCS-Adult Division

2. All controlled medications will be maintained/stored in locked carts or medication lockers in accordance with pharmacy policy & recommendations

3. The Controlled Substance Record/inventory sheet (attachment 1) will be used to document the movement of controlled medications in to and out of the stock supply system in each area

The first image is the DHCS logo and is in the header.



**DHCS**

Detention Health Care Services
**Policies and Procedures**

4.  One form will be used for each type and dose of controlled medication, in each area identified

5.  Pharmacy will stock each approved area as directed and annotate the number of doses "added to stock" and update the balance accordingly

6.  Each dose of controlled medication that is removed from the stock system must be logged out on the Controlled Substance Record

7.  Controlled Medications that are wasted or refused must be documented on the Controlled Substance Record (& include the identification of the staff member witnessing the wasting of the medication)

8.  The nurse responsible for a specific area is responsible for notifying pharmacy of the need to restock their area/cart/etc. when the inventory level falls

9.  Inventory levels should not be allowed to drop below the number needed to sustain operations for at least 24 hours (72 hours when approaching a weekend or holiday)

10. The nursing supervisor should also be notified when staff request re-supply of stock narcotics

11. All controlled drugs will be counted by two licensed nurses or certified medication aides, together, when custody of the stock of controlled medications passes from one staff member to another, such as
    a.  Shift change
    b.  When one staff member leaves early and passes control of his/her assigned medications to another staff member
    c.  When a staff member begins a duty day and then is pulled to assume another assignment

12. The counting/verification of the controlled medication count must be

# DHCS

Detention Health Care Services
**Policies and Procedures**

Policy No.: J-D-02
Page Number: 12 of 22
Effective Date: 02/11/09

documented on the Controlled Substance Record
   a.   Must reflect the date/time of the count
   b.   Must reflect the two staff members who completed the count together

13.   A new entry/line on the Controlled Substance Record/inventory sheet will be initiated to document the completion and correctness of the count
   a.   Date
   b.   Time
   c.   Annotation "CC" or "Correct Count"
   d.   Exact quantity ("Balance") on hand
   e.   Signatures of both staff members completing the count
   f.   Example:
      Date   Time            Balance      Shift Change Count
      1/02/07, 0700, ------c/c\------ 64----- signature 1/signature 2

14.   Discrepancies in the narcotics count must be investigated immediately between shifts

15.   The staff member from the off-going shift must remain for the investigation until released by the on-coming nursing supervisor
   a.   Staff must complete their portion of the investigation and provide written reports prior to being released
   b.   Supervisors must review the written report upon receipt, obtain clarification if needed, and release the off-going staff members as soon as possible

16.   A facility incident report must be generated and forwarded to medical administration by the staff members completing the narcotics count when discrepancies are unable to be resolved

17.   The nursing supervisors from both shifts (or their designees covering supervisory responsibilities in their absence) must also document actions they've taken in the course of investigating a discrepancy in the narcotics count.

 **DHCS**

Detention Health Care Services
**Policies and Procedures**

Policy No.:  J-D-02
Page Number:  13 of 22
Effective Date:  02/11/09

- a. Documentation may be on the same facility incident report generated by their staff member, or on a separate report form
- b. Documentation must be forwarded to medical administration

18. Administration of controlled medications to the patient must also be documented on the patients' individual Medication Administration Record (MARS)

19. Refer to DHCS Policy J-C-05, Medication Administration Training for additional specifics regarding documentation on the Controlled Substance Record and MARS

## I. MANAGEMENT OF CONTROLLED MEDICATIONS THAT ARE NOT IN STOCK SUPPLY WHEN APPROVED FOR USE

1. There may be times that the DHCS Medical Director authorizes the use of a controlled medication that is not maintained in the stock narcotic inventory, for individual patient use.

2. Pharmacy will issue a MARS that is labeled for that specific patient

3. The MARS for controlled medications that are not in stock MUST be kept with the Controlled Substances Records and counted at the same time that stock narcotics are counted.

4. Doses of individually issued controlled medications that have not been given must remain secured in the approved in the appropriate narcotics locker/drawer until they are hand carried directly to pharmacy.

5. Discontinued medications that are controlled must NEVER be placed with the "throw backs" or non-controlled medications being returned to pharmacy



6. Discontinued medications that are controlled must NEVER be placed in any cupboards or drawers that are not designated for stock narcotic supplies (i.e. do NOT put in the cupboards formerly used for returning narcotics)

7. Each MARS for each controlled medication being forwarded to pharmacy for destruction must be copied prior to returning the medication (directly) to pharmacy

8. The pharmacist or pharmacist tech must verify that the count for returning medications are correct immediately upon receipt

9. The pharmacist or tech must sign the original and copied MARS, in the presence of the nurse delivering the medication.

10. The copy of the (signed) MARS must be forwarded to Medical Administration

11. The original (signed) MARS must be forwarded to the patient's medical record

**J. APPROVED MEDICATION TIMES**

1. Medication administration times must be standardized throughout the facility (i.e. Annex and Main Jail, Infirmary areas and floors)

2. Medication administration will be documented in military time

3. The following times are approved for medication administration within the BCAC:
   a. Once Daily – administered at 0800 hrs.
   b. Twice Daily – administered at 0800 hrs. and 2000 hrs.
   c. Three Times Daily – administered at 0800 hrs., 1400 hrs., and 2000 hrs.
   d. Four Times Daily – administered at 0800 hrs., 1400 hrs., 2000 hrs., and 0200 hrs.

# DHCS

Detention Health Care Services
**Policies and Procedures**

Policy No.:  J-D-02
Page Number:  15 of 22
Effective Date:  02/11/09

### K.  LOCATION FOR ADMINISTRATION OF MEDICATIONS

1.  In general, medications are administered to the patients on the housing units.

2.  Medications that are not administered on the housing units include, but are not limited to
    a.  Medications Ordered Four Times Daily  medications are administered out of the treatment rooms
    b.  The 1400 dose of prescriptions ordered Three Times Daily will be administered out of the medication rooms
        1.  The nurse prepares patient list and presents to Officer
        2.  Officer makes arrangements to have patient sent to or escorted to the medication room for the required medication

3.  The following types of medications may also be administered in the Treatment rooms:
    a.  Injections
    b.  HIV Medications
    c.  TB Medications
    d.  DOT Medications
    e.  Other approved medications as approved by a member of the Executive Medical Management Staff

4.  Methadone is administered by the nurses assigned to the Mental Health Unit and Female Infirmary and will be administered within the medical waiting areas in Main Jail or Annex

### L.  REFRIGERATED MEDICATIONS

1.  The temperature of refrigerators used for storing medications will be kept at a temperature between 35 – 45 degreed Fahrenheit
2.  Daily documentation of temperature checks, and corrective actions if indicated, will be accomplished by the 7pm-7am shift

 **DHCS**

Detention Health Care Services
**Policies and Procedures**

Policy No.:        J-D-02
Page Number:    16 of 22
Effective Date:   02/11/09

temperature is found to be out of the acceptable range

4. Corrective action taken will be documented on the refrigerator temperature log for the corresponding refrigerator

5. The refrigerator temperature will be re-checked after an appropriate time interval to assess the effectiveness of the corrective action and the findings will also be documented on the refrigerator log

6. Refrigerators that will not maintain an acceptable temperature range will be reported to the Operations Director immediately (or first thing in morning if applicable).

7. The contents of the defective refrigerator must be relocated to another appropriate refrigerator immediately

8. The on-duty nursing supervisor must be notified of the defective refrigerator, corrective actions taken, and re-location of refrigerator contents

9. Mediations discovered to be in a refrigerator that has malfunctioned (i.e. temperature range falls below 35 degrees or above 45 degrees Fahrenheit will be reported to pharmacy immediately

10. The staff member (s) reporting pharmacy of the refrigerator malfunction/inappropriate temperatures will generate an incident report and forward in to Medical Administration through their immediate supervisor

11. Pharmacy will make a determination regarding the need to destroy and replace medications kept at inappropriate temperatures

12. Refrigerators will be defrosted once a week, and as needed, by the 7pm-7am shift

 **DHCS**

Detention Health Care Services
**Policies and Procedures**

Policy No.:       J-D-02
Page Number:   17 of 22
Effective Date:   02/11/09

## XVIII.PROVISION OF MEDICATION TO PATIENT UPON RELEASE FROM CUSTODY

- A.  Prescription medication may be provided to the patient upon release from custody under specific circumstances
    1.  Anti-retroviral medications
    2.  Psychiatric medications involved in the Jail Re-entry Program (REP)
    3.  Patient's medications accepted from home
    4.  Other specific prescriptions, as approved by the Medical Director and Administrative Director

- B.  Successful provision of prescribed medications to the patient upon release from custody requires a coordinated effort between the Medical and Detention departments
    1.  Medical department
        a.  Identification of patients to be release with prescription medication
        b.  Receipt of Medical Director and Administrative Director approval when indicated
        c.  Pharmacy support in filling the prescription
        d.  Centralized location for securing the patient's medication, accessible by staff upon notification of an impending release
        e.  Communication of the need to leave with prescribed medication with the patient when possible
        f.  Provision of the approved medication upon patient release
    2.  Detention staff
        a.  "Daylight release" when applicable
        b.  Timely notification of impending release

## XIV. PROCESSING MEDICATIONS FOR THE RE-ENTRY PROGRAM (REP)

- A.  A physician may order that an inmate be provided with a supply of medications upon his or her release in an effort to ensure that treatment



**DHCS**

Detention Health Care Services
**Policies and Procedures**

Policy No.:       J-D-02
Page Number:   18 of 22
Effective Date:   02/11/09

---

B. The physician will write "REP" (Re-Entry Program) on the physician order form (# 44-5192-01) to indicate this purpose.

C. REP medications and the corresponding medication sheet(s) will be delivered by pharmacy personnel to the nursing supervisor or designee.

D. REP medications will be placed in a double locked cabinet in the designated room in the medical area.

E. Any controlled substances included among the REP medications will be maintained, stored, and inventoried as usual for controlled substances.

F. The responsible nurse will be alerted when the inmate is leaving the facility and his/her REP medications will be given to him/her or the representative of the agency picking him/her up.

G. The inmate or agency representative will sign the corresponding medication sheet when REP medications are given to them.

H. The signed medication sheet will be forwarded to medical records for filing in the medical record.

I. If an inmate is released from the facility without his REP medications the nursing staff should alert the mental health staff and return the medications to pharmacy.

J. The nurse must indicate on the medication sheet that the inmate was released without his medications and that the medications were returned to pharmacy. The medication sheet will be taken to medical to medical records for filing in the medical record.

K. Inmates on Center for Health Care Services (CHCS) funded medications or medications brought from home should be released with these medications.

## XV.  PROCESSING THE REFILL OF PRESCRIPTIONS WITH PROVIDER APPROVAL FOR REFILL WITHOUT A REPEAT VISIT TO PROVIDER



**DHCS**

Detention Health Care Services
**Policies and Procedures**

Policy No.:        J-D-02
Page Number:    19 of 22
Effective Date:   02/11/09

---

A.  The medical provider may approve the refill of prescribed medication
    without a repeat provider appointment based upon their clinical judgment

B.  Pharmacy is dependent upon the nursing department to prompt
    prescription refill in a timely manner
    1.  Pharmacy will print three medication labels when filling the
        original order
    2.  The medication labels will be distributed as follows
        a.  One on patient blister pack
        b.  One on patient MARS
        c.  One forwarded to the Medical Assistant assigned to Medical
            Administration (one document containing all prescriptions
            filled on that business day that have provider approval for
            future refills)

C.  The Medical Assistant assigned to Medical Administration will verify
    that the patient remains in custody approximately 1 week prior to the
    need for prescription refill.
    1.  Patients date and time of release, when applicable, will be
        documented on the label provided by pharmacy
    2.  Patient housing locations for those remaining in custody will be
        revised on the label provided by pharmacy

D.  The document with the updated labels will be forwarded to pharmacy for
    processing of refill.

## XVI. NURSING SERVICES' ROLE IN PATIENT ADVOCACY WITHIN THE MEDICATION DELIVERY SYSTEM

A.  Each member of the Detention Health Care Services are tasked with
    patient advocacy

B.  Nursing's role in patient advocacy, with regards to medication
    administration, is addressed by the Texas Board of Nursing: *Texas*



# DHCS

Detention Health Care Services
**Policies and Procedures**

Policy No.:        J-D-02
Page Number:   20 of 22
Effective Date:  02/11/09

---

*Administrative Code*, Title 22, Part 11, Capter217, Rule 217.11

C.   The Standards for Nursing Practice established by the Texas Board of Nursing, with regards to medication administration, include but are not limited to the following:

1.   Knowing the rationale for and the effects of medications and treatments and correctly administer the same

2.   Accurately and completely reporting and documenting the administration of medications and treatments

3.   Clarifying any order or treatment regimen that the nurse has reason to believe is inaccurate, non-efficacious, or contraindicated by consulting with the appropriate licensed practitioner and notifying the ordering practitioner when the nurse makes the decision not to administer the medication or treatment.

D.   The nurse or medication aide tasked with administering a medication must communicate with their supervisor, ordering provider, and/or Medical Director, when making a decision to not administer a medication until clarification of the order is received.

E.   The nurse/medication aid must make the necessary revisions in their plan of care as indicated by the input received from the ordering practitioner (i.e. resume giving the medications as ordered/scheduled, process revised prescription orders, etc.)

## E.   REFERENCE POLICIES AVAILABLE

A.   DHCS Policy J-C-05, "Medication Administration Training"

B.   DHCS Policy J-C-05.1, "Medication Non-Compliance, Adult Detention Center"

C.   DHCS Policy J-C-05.2 – this policy has been retired and content merged in to DHCS Policy J-C-05

D.   DHCS Policy J-C-05.3, "HIV Medication Administration Protocol"

⁻   DHCS Policies referenced in Paragraph XII above (re Methadone)



| | |
|---|---|
| Detention Health Care Services **Policies and Procedures** | Policy No.:   J-D-02<br>Page Number:   21 of 22<br>Effective Date:   02/11/09 |

F.   DHCS Policy J-D-02.1, Administration of medication to patients on the housing units

**REFERENCES:**

National Commission on Correctional Health Care, (2008)
DHCS Policy Number J-D-01, "Pharmaceutical Operations"
Texas Board of Nursing: *Texas Administrative Code*, Title 22, Part 11, Capter217, Rule 217.11

**OFFICE OF PRIMARY RESPONSIBILITY:**

Medical Director, Detention Health Care Services

**ENDNOTES:**

Written By:                    Shari L. Taylor, RN, MSN, CCHP
                               RN Clinic Supervisor

Reviewed By:                   Katherine McMullen, MSN, FNP
                               DHCS Administrative Director

                               Miguel A. Ramirez, M.D., MPH
                               DHCS Medical Director



**DHCS**

Detention Health Care Services
**Policies and Procedures**

Policy No.:    J-D-02
Page Number:  22 of 22
Effective Date:  02/11/09

Deborah Patton, RN, MSN
DHCS Clinical Nursing Director

Lydia Mesquiti,, LMSW-AP, LCDC, CCHP
DHCS Director of Mental Health

Reviewed & Approved By:    Katherine McMullen, MSN, FNP
Administrative Director (Adult Division)

Miguel A. Ramirez, MD, MPH
DHCS Medical Director

## HILLSBOROUGH COUNTY SHERIFF'S OFFICE
## DEPARTMENT of DETENTION SERVICES
## KEEP ON PERSON (KOP) CONTRACT

If you meet the requirements for the "Keep on Person" medication program, and agree to the requirements below, you will be allowed to keep you medication in your possession:

1.  Only medications that are approved and ordered by the facility clinician will qualify for this program.

2.  Medication may be given to you in a special package that will contain no more than a (30) day supply of medication. The package will contain a label that includes your name, identification number, the medication name, and directions for its use.

3.  You must follow instructions on the medication label. Health care staff can check your medicine at any time to make sure you are taking it correctly.

4.  If you believe you are having a problem with the medication, it is your responsibility to notify the nurse or doctor as soon as possible.

5.  YOU ARE RESPONSIBLE FOR YOUR MEDICATION. If you lose, tamper with, share or trade the medication, you will be terminated from the program and may be subject to disciplinary action.

# PRACTITIONER GUIDELINES AND FORMS

---

roduction

hough clinical guidelines are important decision support for evidence-based practice, to leverage the
ential of guidelines to improve patient outcomes and resource use, NCCHC recommends that health
e delivery systems also have components including primary care teams, other decision support at the
nt of care (such as reminders), disease registries, and patient self-management support. These
nponents have been shown to improve outcomes for patients with chronic conditions. In addition, we
ommend establishment of a strategic quality management program that supports ongoing evaluation
I improvement activities focused on a set of measures that emphasize outcomes as well as process
I practice. For information on the chronic care model, model for improvement, and outcomes
asures, see the resources listed on page 3.

## thma Care in Corrections

e general approach to the management of asthma is organized into four components:

Assessment and monitoring of disease severity and control to reduce impairment and risk
Patient education and self-management about the disease process, appropriate use of medications
and spacers, and use of an action plan, especially for patients with moderate and severe asthma
Attention to environmental triggers and comorbidities such as tobacco smoke, allergens, and
coexistence of (and confusion with) chronic obstructive pulmonary disease
Medications including the daily use of inhaled corticosteroids (ICS) in the vast majority of patients with
persistent asthma, with the goal of reducing the need for and overuse of short-acting beta$_2$-agonists
(SABA)

: diagnosis of asthma is based on information gathered from the clinical history, physical examination,
I spirometry results performed before and after use of albuterol to check for reversibility greater than
%. Assessment of disease severity is most important prior to a patient starting long-term ICS. Because
new inmate-patient usually is already taking medications, the clinician should focus on assessment of
ree of control as well as severity classification to reduce impairment and risk. Impairment is
ermined by the presence of certain symptoms and functional status (see Table 1). Risk of morbidity

Because asthma is a chronic inflammatory disease rather than one characterized solely by "reactive airways," the use of ICS is an important cornerstone of treatment. Historically, in correctional settings as well as other health care settings, the overprescribing and overuse of SABA agents has been a problem both in the stable setting when ICS should be prescribed and in the urgent care setting when a 5- to 10-day course of burst (rather than taper) oral steroids should be prescribed

Currently there is no standard benchmark for the comparison of SABA prescribing to ICS prescribing. However, the ratio between SABA and ICS is recommended as one quality measure to monitor at a population level over time. This ratio typically should not exceed 2 SABA to 1 ICS at an institution and provider or team level.

### Table 1. Severity

The clinician should assess disease severity to initiate treatment for patients who are not currently taking long-term control medications.

| Components of Control | Degree of Severity | | | |
|---|---|---|---|---|
| | Intermittent | Persistent | | |
| | | Mild | Moderate | Severe |
| Short-acting beta-agonist inhaler use | < 2 days a week | > 2 days a week but not daily | Daily | Several times a day |
| Symptoms | ≤ 2 days a week | > 2 days a week but not daily | Daily | Throughout the day |
| Nighttime awakenings | ≤ 2 times a month | 3-4 times a month | > 1 time a week but not nightly | Often, 7 times a weeks |
| Interference with normal activity | No limitation | Minor limitation | Some limitation | Extreme limitation |
| Lung function/ $FEV_1$ | > 80% predicted | > 80% predicted | 60%–80% predicted | < 60% predicted |

Source: Summary Report of the Expert Panel Report 3, p. 44
http://www.nhlbi.nih.gov/guidelines/asthma/asthsumm.pdf

### Table 2. Control

At each follow-up visit, the clinician should record the degree of control as good, fair, or poor (the NAEPP uses "well controlled," "not well controlled," and "very poorly controlled").

| Components of Control | Good Control (Well Controlled) | Fair Control (Not Well Controlled) | Poor Control (Very Poorly Controlled) |
|---|---|---|---|
| Beta-agonist inhaler use | No more than one canister per month | No more than one canister per month | More than one canister per month |
| Visits to an on-site urgent care center or community emergency department or hospital | None | No more than one in past month | More than one per month |
| Nighttime awakenings from asthma symptoms | None | No more than once a week | More than three times a week |

## Quality Improvement Measures

The following quality improvement measures are suggested, but they are not intended to be a complete list necessary to ensure a successful asthma management program in a correctional setting. We recommend that the improvement measures for a patient population be reported at a facility level and at a provider or team level. These indicators should be compared over time to correlate improvement.

- Percentage of patients with asthma whose severity classification and degree of control are assessed appropriately based on the NAEPP guidelines
- Percentage of patients with asthma evaluated by the primary care provider within the designated follow-up time frames based on their classification of severity and degree of control
- Percentage of patients with asthma who are well-controlled for 3 months or more who are evaluated for step-down therapy
- Percentage of patients with asthma whose degree of control is categorized as fair or poor who have a plan that includes a strategy for improving control
- Percentage of patients with asthma who have demonstrated good techniques in use of inhalers and spacers
- Percentage of patients classified as severe persistent asthma who have an asthma action plan
- Percentage of patients seen in an urgent or emergent care setting for an asthma exacerbation who were prescribed a burst of oral steroids (40-60 mg per day) for 5 to 10 days
- Percentage of patients prescribed SABA inhaler only compared to those prescribed ICS in addition to SABA; the ratio likely should be less than 2 to 1
- Percentage of patients with asthma who were offered influenza immunizations

## Recommended Resources to Support Evidence-Based Practice and Quality Improvement

| | |
|---|---|
| RESOURCE | Expert Panel Report 3 (EPR-3): Guidelines for the Diagnosis and Management of Asthma (2007) |
| SOURCE | National Asthma Education and Prevention Program; National Heart, Lung, and Blood Institute; National Institutes of Health |
| URL | http://www.nhlbi.nih.gov/guidelines/asthma |
| | |
| RESOURCE | Tools: Asthma |
| SOURCE | Institute for Healthcare Improvement |
| URL | http://www.ihi.org/IHI/Topics/ChronicConditions/Asthma/Tools |
| | |
| RESOURCE | National Guideline Clearinghouse |
| SOURCE | Agency for Healthcare Research and Quality |
| URL | http://www.guideline.gov |
| | |
| RESOURCE | Chronic Care Model (1998) |
| SOURCE | Developed by Ed Wagner MD, MPH, MacColl Institute for Healthcare Innovation, Group Health Cooperative of Puget Sound, and the Improving Chronic Illness Care program; available from the Institute for Healthcare Improvement |
| URL | http://www.ihi.org/IHI/Topics/ChronicConditions/AllConditions/Changes |
| | |
| RESOURCE | Model for Improvement (1997) |
| SOURCE | Associates in Process Improvement; available from the Institute for Healthcare Improvement |
| URL | http://www.ihi.org/IHI/Topics/Improvement/ImprovementMethods/HowToImprove |
| | |
| RESOURCE | Measures |
| SOURCE | Institute for Healthcare Improvement |
| URL | http://www.ihi.org/IHI/Topics/Improvement/ImprovementMethods/Measures |

RESOURCE   HEDIS & Quality Measurement
SOURCE     National Committee for Quality Assurance
URL        http://www.ncqa.org/tabid/59/Default.aspx

> Last reviewed: May 2011
> Updated: May 2011
> Next scheduled review: May 2012
>
> For the latest version, go to http://www.ncchc.org/resources

**YEAR DIAGNOSED:**

## PRIOR ASTHMA COMPLICATIONS

| | | |
|---|---|---|
| Y N Resp Hospitalizations (Lifetime) | Number: | Last: |
| Y N Resp Hospitalizations In Past 1 Yr | Number: | Last: |
| Y N Resp Hospitalizations In Past 2 Yr | Number: | Last: |
| Y N Intubations (Lifetime) | Number: | Last: |
| Y N ER/UC In Past Yr | Number: | Last: |

## CURRENT FLARE FREQUENCY

Y N Current Flare Frequency > Intermittent, as defined by:
    Y N a.m. > 1/week: ... per Day  ... per Week   ... per Month
    Y N p.m. > 2/month: ... per Month

## SEASONAL

Y N Seasonal Component To Asthma Flares
Spring: ......Best  Worst
Summer:...Best  Worst
Fall:..........Best  Worst
Winter:.....Best  Worst

## IDENTIFIED FLARE-UP TRIGGERS

Y N Cold
Y N ChangeInTemp
Y N Pollen
Y N Perfumes
Y N Pets
Y N Dust
Y N Humidity
Y N Heat
Y N Employment
Y N Exercise
Y N Other:

## SINUS

Y N Sinus Symptoms/Allergies
  Y N Sinus Congestion
  Y N Rhinorrhea
  Y N Seasonal
  Y N Perennial

## ALLERGY TESTING & DENSENSITIZATION

Y N Prior Allergy Testing
    Allergic To:
Y N Allergy Desensitization(s) Done
    For:

## GER

Y N GER (By PMH Dx Or By Sx)
Y N GER < 100% Controlled

## MEDICATIONS

Y N LABA

Y N BA-HFA
  Y N  RTC
  Y N  PRN

Y N BA-NEB
  Y N  RTC
  Y N  PRN

Y N CS-HFA

Y N CS-NASAL SPRAY

Y N ANTI HISTAMINE (H1B)
Y N DECONGESTANT

Y N LEUKOTRIENE BLOCKER (LTB)

Y N PPI
Y N H2B

Y N Mast Cell Stabilizer
   (Cromolyn & Nedocromil: modest benefit in Asthma.)

Y N Other Rx:

Most Recent Rx Change(s):

**STEROIDS**
Y N Prior Steroids Ever                  Date(s):
Y N Steroids In Past Yr                 Date(s):
Y N Steroids For > 2 Wk In Past Yr     Date(s):

**MEDICATION UNDERSTANDING**
Poor Fair Good

**MEDICATION COMPLIANCE**
Poor Fair Good

**ALARMS SINCE LAST EVALUATION**
Y N Steroids..................Date:
Y N ER/UC...................Date:
Y N Hospitalization.........Date:
Y N Intubation..............Date:

**PEAK FLOW**
**Peak Flow Nomogram-Based Norm**
Approximately:
Based On:
  Age: ...
  Height: ... (measured stated)
  Sex: M F
**Peak Flow- Office**
PF:
Nomogram-Based Norm:
PF %:
PF Coordination: Poor Fair Good
**Peak Flow- Home**
Y N Done/Doing
 Dates:
 Best %:
 Worst %:
 Variability %:

**NAEPP CLASS**
I - P1+ - P2+ - P3+

*(I = Intermittent; P1+ = Persistent, Mild; P2+ = Persistent, Moderate; P3+ = Persistent, Severe)*

**NAEPP Itemized Class**
| | | | |
|---|---|---|---|
| AM | I P1+ | P2+ | P3+ |
| PM | I P1+ | P2+ | P3+ |
| PF | I P1+ | P2+ | P3+ |
| VAR | I P1+ | P2+ | P3+ |

**AEPP Class Definitions**

|       | Symptoms<br>AM | Symptoms<br>PM | Peak Flow<br>Percent Of<br>Predicted | Peak Flow<br>Percent<br>Variability |
|-------|----------------|----------------|--------------------------------------|-------------------------------------|
|       | <1/Wk          | <2/Mon         | >80                                  | <20                                 |
| 1+:   | >1/Wk          | >2/Mon         | >80                                  | 20-30                               |
| 2+:   | 1/Day          | >4/Mon         | 61-79                                | >30                                 |
| 3+:   | Continuous     | >>4/Mon        | <60                                  | >30                                 |

**ACCINATIONS**

| u Vax   | Date:     |          |          |
|---------|-----------|----------|----------|
| Vax     | #1 Date:  | #2 Date: |          |
| 1N1 Vax | #1 Date:  | #2 Date: | #3 Date  |

MARYLAND DEPARTMENT OF PUBLIC HEALTH AND CORRECTIONAL SERVICES
CORRECTIONAL MEDICAL SERVICES
JAIL INITIAL MEDICAL MENTAL SCREENING QUESTIONAIRE

| Offender Name: | | | | DOB: | | | Booking ID | | |
|---|---|---|---|---|---|---|---|---|---|
| BP | mmhg | Pulse | /min | RR | /min | Temp | F | Pulse Ox | % |

If Diabetic, random fingerstick glucose:

If Asthmalic, document peak flow:

**Observations *These items require immediate intervention by the appropriate triage team**

| | | |
|---|---|---|
| *Does the offender appear to exhibit bizarre or unusual behaviors suggestive of mental health disorders such as being violent, unusually loud, confused or incoherent? | *☐ Yes | ☐ No |
| *Does the offender appear to be disoriented or not alert? | *☐ Yes | ☐ No |
| Is the offender sweating or suffering from tremors? | ☐ Yes | ☐ No |
| Does the offender have skin conditions such as open wounds, jaundice, rashes? | ☐ Yes | ☐ No |
| Does the offender have observable deformities or exhibit difficulty of movement? Blindness, deafness, uses wheelchair? | ☐ Yes | ☐ No |
| *Does the offender appear to be under the influence of, or withdrawing from, drugs or alcohol? | *☐ Yes | ☐ No |
| *Does the offender's behavior or physical appearance suggest the risk of suicide or assault on others? [e.g. Tearful, anxious, threatening etc] | *☐ Yes | ☐ No |

**Medical *These items require immediate intervention by the appropriate triage team**

| | | |
|---|---|---|
| *Do you have a history of tuberculosis or have you ever been treated for tuberculosis? | *☐ Yes | ☐ No |
| *Do you have a frequent cough with phlegm or blood? | *☐ Yes | ☐ No |
| *Do you suffer from frequent fevers or night sweats? | *☐ Yes | ☐ No |
| *Are you bleeding, do you have pain, cuts, bruises, open sores, broken bones, or gross oral abnormalities? | *☐ Yes | ☐ No |
| Are you currently prescribed medications for a medical condition? | ☐ Yes | ☐ No |
| Do you currently have allergies? | ☐ Yes | ☐ No |
| Do you have medical problems such as a rash, infection, hepatitis, VD or seizures or Diabetes? | ☐ Yes | ☐ No |
| Have you used any alcohol or drugs such as cocaine, heroin, PCP, LSD or Xanax in the past 72 hours? If yes ask next four questions and refer to triage team if any one or more of the four questions answered as Yes. | ☐ Yes | ☐ No |
| Are you currently experiencing withdrawal? If yes from what substance: | ☐ Yes | ☐ No |
| Have you had withdrawal problems, seizures, or blackouts from alcohol or drugs? | ☐ Yes | ☐ No |
| Do you drink alcohol or take drugs regularly and have never stopped? | ☐ Yes | ☐ No |
| Is person known to jail to have history of withdrawal problems in the past? | ☐ Yes | ☐ No |
| Are you in a methadone program? | ☐ Yes | ☐ No |
| Are you pregnant? | ☐ Yes | ☐ No |
| Do you have gynecological problems currently? | ☐ Yes | ☐ No |

**Mental Health *These items require immediate intervention by the appropriate triage team**

| | | |
|---|---|---|
| Have you ever or are you currently receiving treatment for any mental health conditions? | ☐ Yes | ☐ No |
| Have you ever been evaluated for a mental health problem or admitted to a psychiatric hospital? | ☐ Yes | ☐ No |
| *Do you feel disoriented, not thinking clearly, hearing voices, or seeing visions? | *☐ Yes | ☐ No |
| *Are you depressed, do you have thoughts of harming yourself, or have you ever attempted to hurt yourself in the past? | *☐ Yes | ☐ No |
| Are you now or have you ever been prescribed medication for a psychiatric illness? | ☐ Yes | ☐ No |

**Disposition**

☐ Referral to outside hospital

☐ Urgent Onsite Referral to Medical Triage Team

☐ Routine Onsite Referral to Medical Triage Team

☐ Urgent Onsite Referral to Mental Health Triage Team

☐ Routine Onsite Referral to Mental Health Triage Team

Proceed to Booking ☐ Yes ☐ No  NA for Females          Initial Heat Stratification:  H1  H2  H3

| Signature/Title | Date | Time |
|---|---|---|

CMS #7708 MD-Jail Intake Screening – revised 9/2007
Copyright © by Correctional Medical Services, Inc . All Rights Reserved

Case 2:12-cv-00592-TLN-CKD   Document 137   Filed 03/03/14   Page 172 of 185



# Division of Immigration Health Services
## In-Processing Health Screening Form



THIS FORM WILL BE SENT TO THE MEDICAL CLINIC AFTER IT IS COMPLETED        TODAY'S DATE:

### SECTION I: ASK THE DETAINEE (Check the appropriate box)

Please mark any bruises, scars, cuts or other marks or distinguishing physical characteristics in the diagrams below, and notify the DIHS medical officer if you feel that the detainee needs any kind of medical evaluation.

| Yes | No | Have you seen a doctor in the past year? If YES, for what? |
| Yes | No | Are you having any pain? If YES, where? |
| Yes | No | Have you been hospitalized in the past 6 months? If YES, for what? |
| Yes | No | Have you ever been treated for problems with drugs or alcohol? If YES, when, where, and for what? |

Do you now have or have you ever had any of the following?

| Yes | No | Your skin break out in bumps, or trouble breathing after taking medication? |
| Yes | No | Sores on your privates, or a drip from your privates? |
| Yes | No | Trouble peeing? |
| Yes | No | Fits or seizures? |
| Yes | No | The whites of your eyes or your nails turn yellow? |
| Yes | No | Persistent cough (of more than 3 weeks duration)? |
| Yes | No | Hemoptysis (coughing up blood)? |
| Yes | No | Not been able to eat with a significant weight loss? |
| Yes | No | A persistent fever? |
| Yes | No | Night sweats? |
| Yes | No | Weakness / lethargy (tired)? |
| Yes | No | Are you afraid you might lose your mind or go crazy? |
| Yes | No | Are you afraid you might hurt or kill yourself or others? |
| Yes | No | If female, are you pregnant? |

### SECTION II: YOUR OBSERVATIONS OF THE DETAINEE (Check the appropriate box)

Does the detainee appear to be:

| Yes | No | Not doing what you tell him to do? |
| Yes | No | Acting crazy or strange? |
| Yes | No | Sweating a lot? |
| Yes | No | Malnourished? |

Does the detainee appear to have:

| Yes | No | Shaking / tremors? |
| Yes | No | Skin broken out in bumps / rash? |
| Yes | No | Cuts or bruises? |
| Yes | No | Needle tracks? |
| Yes | No | A handicap? |

### SECTION III: DETAINEE SENT TO (Check the appropriate box)

General population

General population with referral to medical care

GReferral for immediate medical care

Isolation until medically evaluated

_Signature of individual completing the form_

_Printed name of individual completing the form_

| Last Name | First Name |
| A# | Country of Origin |
| Date of Camp Arrival (DCA) | DOB |
| Medical Clinic | Sex |

DIHS Form 794        7/2008        Page 1 of 1

# MASTER

# PROBLEM

# LIST

| | | |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

| atitis B Vaccine and Vaccine Information Statement Record | | | | | |
|---|---|---|---|---|---|
| e | Lot# | Mfr. | Date on VIS | Date VIS Given | Staff Init. |
| | | | | | |
| | | | | | |
| | | | | | |

Inmate # : _____

DOB: _____

# SAMPLE

# RECEIVING

# SCREENING

# FORMS

（header）

| уu соugшшg оf vоmшшg vıоod? | □ Ies | □ IVо |
|---|---|---|
| ou having any shortness of breath, use inhalers, have chronic ? | □ Yes | □ No |
| t are pregnant, do you have abdominal pain, bleeding or val symptoms? | □ Yes | □ No |
| are a dialysis patient, did you miss your last scheduled dialysis? | □ Yes | □ No |
| the arrestee have altered mental status? | □ Yes | □ No |
| ɔu suicidal, confused, disoriented, and depressed? | □ Yes | □ No |
| ck result | | |

**If arrestee answers YES to questions 8 he/she is to be escorted IMMEDIATELY urity staff to the mental health professional on-site for evaluation.**

ion:

   Accept
   Reject (Complete information below)

ιs: BP _____ Pulse _____ Resp _____ Temp _____ (Nurse Encounter Form)

ısons for Reject: (Answer YES to # 8 is NOT a reason to reject)

ed, copy of form listing reason for rejection should be sealed and given to the · hospital ER.)

Officer Notified:  YES _____  NO _____
ſotification:

Intake Screening

## Division of Immigration Health Services

### Intake Screening

Patient was identified by (check 2 sources)  ☐ Arm band  ☐ Picture  ☐ Verbally  ☐ Other _____
detainee was transferred from another facility, did a medical transfer summary accompany the detainee? ?  ☐ Yes  ☐ No  ☐ N/A

Time of arrival in camp: _____ _____     Time of initial screening: _____

5: 1. What language do you speak?  ☐ English  ☐ Spanish  ☐ Other _____ Interpreter # or name: _____

### Medical Screening

2  How do you feel today? (Explain in his/her own words)

3. Are you currently having any pain?  ☐No  ☐ Yes  If yes, complete pain assessment below:

| 3a. Character of pain: | 3b. Location: | 3c. Duration: | 3d. Intensity (0-10 pain scale) | 3e. What relieves pain or makes it worse? |
|---|---|---|---|---|
| | | | | |

4. Do you have any significant medical problems? ☐No     ☐ Yes  If yes, explain:

5. Do you take any medication on a regular basis, including over the counter and herbal?  ☐No    ☐ Yes   If yes, list medications:

6. Do you have any allergies to medication or food?  ☐No     ☐ Yes   If yes, explain:

7. Are you now or have you ever been treated by a doctor for a medical condition to include hospitalizations?  ☐No     ☐ Yes     If yes, explain:

8. Have you ever had a persistent cough for more than three weeks, coughed up blood, had a persistent fever, night sweats, or unexplained weight loss?
☐No     ☐ Yes   If yes, explain:

9. Are you pregnant?  ☐No  ☐ Yes  ☐ N/A (male)    If yes, date of last menstrual period:

10. . Have you had any recent acute changes with your vision?     ☐No  ☐ Yes    If yes, explain

### Oral Screening

11. Are you having any significant dental problems? ☐No     ☐ Yes    If yes, explain:

### Mental Health Screening

12. Have you ever tried to kill yourself?     ☐No     ☐ Yes

If yes, when did the suicide attempt occur _____     Method: ☐ Gun   ☐ Hanging  ☐ Cutting skin  ☐ Pills     ☐ Other
If attempt was within the last 90 days, make referral immediately and ensure safety.

13. Are you currently thinking about killing or harming yourself?? ☐No     ☐ Yes   If YES, make referral immediately and ensure safety.

14. Do you have a history of assaulting or attacking others or have you ever been locked up for fighting while in jail/prison?   ☐No     ☐ Yes
Do you know of someone in this facility whom you wish to attack?   ☐No    ☐ Yes   If yes, who is this person?
If YES, make referral immediately.

15. Do you now or have you ever heard voices that other people don't hear; seen things or people that others don't see; or felt others were trying to harm
you for no logical or apparent reason?   ☐ No  ☐ Yes   If yes, explain:

16. Have you ever received counseling, medication, hospitalization or any other form of treatment for mental health difficulties?     ☐No     ☐ Yes
If yes, explain:

17. Have you been a victim of physical or sexual abuse?  ☐ No  ☐ Yes   If yes, explain:

18. Do you feel that you are currently in danger of being physically or sexually assaulted?  ☐ No  ☐ Yes
If yes, explain:

19. Have you ever sexually assaulted anyone?   ☐ No  ☐ Yes   If yes, explain:

| Last Name | First Name | | |
|---|---|---|---|
| Alien # | Date of Camp Arrival (DCA) | DOB | Sex |
| Country of Origin | Facility | | |

DIHS-795-A (revised 10/23/2009)

: Screening

## tural/ Religious/Learning Assessment

Is there anything important for us to know about your religious or cultural beliefs that are of concern to you while in detention?
Jo ☐ Yes   If yes, explain:

Have you ever had difficulties learning or understanding written information? ☐ No ☐ Yes   If yes, explain:

### istance Use/Abuse Screening

Have you ever been treated for drug or alcohol problems or suffered withdrawal symptoms from drug use?   ☐No   ☐ Yes
s, explain:

Do you now or have you ever used tobacco products, drank alcohol or used drugs?   ☐ No ☐ Yes (if yes, give details below.)

| stance Used/Route of Use | Date of Last Use | Amount/Quantity Last Used |
|---|---|---|
| | | |
| | | |

## Screening

lave you had any of the following during the past 7 days?
- ☐No   ☐ Yes  If yes, when did it begin?
- hroat   ☐No   ☐ Yes  If yes, when did it begin?
- ☐No   ☐ Yes  If yes, when did it begin?
- \ches   ☐No   ☐ Yes       Chills        ☐No   ☐ Yes          Diarrhea  ☐No   ☐ Yes   Vomiting  ☐No   ☐ Yes
- e        ☐No   ☐ Yes       Nasal congestion  ☐No   ☐ Yes
- ess of breath  ☐No   ☐ Yes  If present check respiratory rate: _____

lave you been in contact with anyone who was ill with influenza, fever, cough or sore throat during the past 7 days?  ☐No        ☐ Yes  If yes, when
lere?

Patient appears to have normal physical/emotional characteristics and no barriers to communication
Patient appears to have the following abnormalities:

Patient appears oriented to person, place and time        ☐ Patient appears NOT to be oriented to: _____ person _____ place _____ time

| observe any of the following, check the appropriate box:: | ☐ None observed | |
|---|---|---|
| lizarre or crazy behavior | ☐ Agitation | ☐ Inability to focus or concentrate |
| xcessive sweating | ☐ Malnourished appearance | ☐ Shaking/tremors |
| kin broken out in bumps/ rash | ☐ Cuts or bruises | ☐ Needle tracks |
| rysical disabilities | ☐ Developmental disabilities | ☐ Patient wears glasses or contacts |

nents:

Signs: T _____        p _____        resp. _____        BP _____        hgt. _____        wt _____

Results: ☐Positive ☐ Negative   ☐ N/A (male)

itial Medical /Oral/Mental Health Screening:   ☐ Normal ☐ Abnormal

sposition:  ☐ General population        ☐ General population with referral for medical/mental health care
☐ Referral for immediate medical/mental health or dental care        ☐ Isolation until medically evaluated

ucation:   ☐ Tuberculosis and CXR explained to detainee and process completed with appropriate shielding
☐ Access to medical/dental/mental health care, grievance process explained to patient
☐ Patient given the Medical Orientation and Health Information and Dealing with Stress Brochures in their language
☐ Patient verbalized understanding of any teaching or instruction
☐ Patient was asked if he or she had any additional questions, and any questions were addressed

re/Interventions/Follow-up:
☐ See SF 600 for detailed assessment and plan        ☐ Physical exam scheduled for patient
☐ The following care/treatment was given during this intake screening:

| Provider Signature | Date | Stamp/Printed Name | | |
|---|---|---|---|---|
| Name | | First Name | | |
| 1# | | Date of Camp Arrival (DCA) | DOB | Sex |
| ntry of Origin | | Facility | | |



# Division of Immigration Health Services
## Medical Consent Form



Health Care Program

The major purpose of the clinic is to provide you with medical care. Medical information obtained will be kept in a confidential medical record. You will be expected to undergo a medical examination to determine your current health.

I, _____ , hereby consent to medical screening and medical examination to determine my current health status, other medical evaluations, diagnostic procedures, routine care and medical/dental treatments which the medical and professional staff of the clinic may deem necessary, advisable or appropriate.

I also consent to mental health care screening and mental health care which the medical and professional staff of the clinic may deem necessary, advisable or appropriate. With respect to a minor, this includes but is not limited to weekly well-child visits for mental health care purposes for the duration of the minor's residence at this facility.

I authorize disclosure of my medical records to a hospital, if hospitalization is deemed necessary, advisable or appropriate. I authorize disclosure of my medical records to a physical and/or mental health care provider who is not an employee of the clinic, if the medical and professional staff of the clinic deems care by such a provider to be necessary, advisable or appropriate. I authorize the disclosure of my medical information to federal and state reporting agencies for purposes of disease surveillance and control.

This form has been fully explained to me, and I understand its contents. I further understand that no guarantees have been made to me regarding the results of treatments or examinations done in the clinic or outside the clinic by health care professionals to whom I may be referred.

---

## Programa De Cuidado De Salud

La meta de esta clínica es proveerle a usted un cuidado de salud de alta calidad. La información clínica que se obtenga acerca de su caso, será mantenida de manera confidencial en su expediente médico. Usted será sometido a un examen médico para determinar su actual condición de salud.

Yo, _____ , voluntariamente doy mi consentimiento al personal médico de esta clínica para llevar a cabo una evaluación inicial y un examen médico para determinar mi actual condición de salud. También consiento a otras evaluaciones médicas, procedimientos diagnósticos, cuidados de rutina y a tratamientos médicos/dentales que el personal médico y profesional de esta clínica considere necesario, recomendable o apropiado.

Yo también consiento a una evaluación de salud mental y a los cuidados de salud mental que el personal médico  y profesional de esta clínica considere necesario, recomendable o apropiado. Con respecto a menores este proceso incluirá, pero no estará limitado, a entrevistas semanales para cerciorarse del bienestar del menor. Estas entrevistas serán efectuadas durante el tiempo que el menor permanezca en el Centro.

Yo autorizo a esta clínica a revelar la información en mi expediente médico a entidades hospitalarias, si una hospitalización es requerida o recomendada. Yo también autorizo a esta clínica a permitir el acceso a mi expediente médico a proveedores de salud mental y/o física que no sean empleados de esta clínica, si el personal médico de esta clínica entiende que sea pertinente o necesario para mi cuidado de salud. También autorizo el acceso a mi expediente médico a instituciones federales y estatales para propósito público de vigilancia y control de enfermedades.

Este documento me ha sido explicado y entiendo a cabalidad el contenido del mismo. Reconozco que no se me ha dado ninguna garantía en relación a los resultados de exámenes o tratamientos médicos, realizados en esta clínica o fuera de ella, por profesionales de la salud a los cuales se les ha referido mi caso.

---

| Patient, Parent or Guardian Signature | Date | Witness Signature | Date |
|---|---|---|---|

| Last Name | First Name |
|---|---|
| A# | Country of Origin |
| Date of Camp Arrival (DCA) | DOB |
| Medical Clinic | Sex |

DIHS Form 793        11/2008                    Page 1 of 1

## RECEIVING SCREENING

CORRECT CARE

**VISUAL OBSERVATION** Circle Y or N

| | | |
|---|---|---|
| 1. | Is inmate appearance abnormal in any way? (e.g., sweating, tremors, anxious, disheveled, evidence suggestive of trauma or abuse) | YES NO |
| 2. | Is detainee's movement restricted or compromised in any way? (e.g., body deformities, physical abnormality, unsteady gait, cast or splint intake, etc.) | YES NO |
| 3. | Is detainees breathing abnormal (cough, shortness of breath)? | YES NO |
| 4. | Does inmate exhibit characteristics of potentially being at risk for victimization (e.g., age, small build, femininity, 1st time offender, passive or timid appearance) If yes, explain: | YES NO |
| 5. | Does inmate's skin or scalp have obvious lesions or draining wounds, lice or scabies, jaundice, rashes, bruises, edema, scars, tattoos, needle marks or other indications of drug abuse? | YES NO |
| 6. | Is the detainees behavior abnormal, combative, disorderly, or confused? Has detainee experienced a head injury? | YES NO |

**INMATE QUESTIONNAIRE CONTACT MEDICAL IMMEDIATELY FOR ALL HIGHLIGHTED AREA QUESTIONS**

| | | |
|---|---|---|
| 1. | Did the detainee come to the facility from the Hospital or Emergency room? | YES NO |
| 2. | Have you ever or are you currently being treated for: asthma, diabetes, seizure disorder, thyroid disorder, heart condition, high blood pressure, bleeding disorder, or kidney disease? Do you take insulin? | YES NO |
| 3. | Have you in the last six months or are you currently being treated for any other illness or health problem not listed above? | YES NO |
| 4. | Are you currently taking any medication prescribed to you by a physician? If yes, list: Medication(s) Name: | YES NO |
| 5. | Are you allergic to any medications or do you have any other allergies? . List: | YES NO |
| 6. | Have you been exposed to or been diagnosed with Hepatitis, venereal or sexually transmitted disease, HIV/AIDS, or any other serious disease? | YES NO |
| 7. | Have you ever had a positive TB skin test, been exposed to TB, been diagnosed with TB or ever received treatment for exposure to diagnosis of TB? | YES NO |
| 8. | Do you currently have any of these symptoms: Persistent cough, shortness of breath, loss of appetite, fatigue, coughing up blood, night sweats or unexplained weight loss? | YES NO |
| 9. | Do you have a painful dental condition? | YES NO |
| 10. | Do you use drugs not prescribed by a physician? If yes, what kind? How often? | YES NO |
| 11. | Do you use alcohol? If yes, what kind? _____ Last use? _____ How much? _____ How often? _____ | YES NO |
| 12. | Have you ever received treatment for substance or alcohol abuse? | YES NO |
| 13. | Females: Are you pregnant, recently delivered or aborted; or experiencing female problems? Do you take methadone? | YES NO |

| Inmate Name | ID# | DOB | Date |
|---|---|---|---|
| | | | |

Revised 7/15/09

| 14 | Have you ever been a victim of a crime or have you ever been victimized during any pervious incarceration? | YES | NO |
|----|----|----|----|
| 15 | Have you ever been arrested for any crime that involves a sexual offense or received disciplinary action during any previous incarceration for sexual assault? | YES | NO |

| | SUICIDE POTENTIAL SCREENING | CIRCLE | |
|----|----|----|----|
| 1 | Arresting or transporting officer believes subject may be a suicide risk. | YES | NO |
| 2 | Lacks close family/friends in community. | YES | NO |
| 3 | Worried about major problems other than legal situation (terminal illness). | YES | NO |
| 4 | Family member or significant other has attempted or committed suicide (spouse/parent/sibling/close friend/lover). | YES | NO |
| 5 | Has psychiatric history (psychotropic medication or treatment). | YES | NO |
| 6 | Holds position of respect in community (professional/public official) and/or alleged crime is shocking in nature. Expresses feelings of embarrassment/shame. | YES | NO |
| 7 | Expresses thoughts about killing self. | YES | NO |
| 8 | Has a suicide plan and/or suicide instrument in possession. | YES | NO |
| 9 | Has previous suicide attempt. | YES | NO |
| 10 | Expresses feelings there is nothing to look forward to in the future (feelings of helplessness and hopelessness). | YES | NO |
| 11 | Shows signs of depression (crying or emotional flatness). | YES | NO |
| 12 | Appears overly anxious, afraid or angry. | YES | NO |
| 13 | Appears to feel unusually embarrassed or ashamed. | YES | NO |
| 14 | Is acting and/or talking in a strange manner. (cannot focus attention/hearing or seeing things not there). | YES | NO |
| 15 | Is apparently under the influence of alcohol or drugs. | YES | NO |
| 16 | If YES to #15, is individual incoherent or showing signs of withdrawal or mental illness? | YES | NO |
| 17 | Is this individual's first arrest? | YES | NO |
| 18 | Detainee's charges include: Murder, Kidnapping and / or Sexual Offense        ☐ Unknown | YES | NO |
| 19 | Does the detainee have a history of mental health hospitalization? | YES | NO |
| 20 | Does the detainee have a history of outpatient mental health treatment? | YES | NO |

**Immediate Action:** A "YES" from highlighted area, or a total of 8 or more "YES" responses, shall result in notification of Shift Commander and immediate referral to MH evaluation. If after hours, initiate suicide watch immediately until MH can evaluate

Education provided orally and in writing on Access to Healthcare     Y     N          Are you a veteran?                 Y     N
Education provided orally and in writing on Sexual Assault Awareness  Y     N          Do you receive VA services?   Y     N
COMPLETED BY:  (NAME AND NUMBER)

I have answered all questions fully. I have been instructed on and received information on how to obtain/access medical services. I have been instructed and have received information on sexual assault awareness. I hereby give my consent for Correct Care Solutions to provide health care services.

Inmate Signature _____          Date: _____

Health Care Signature/Title: _____          Date: _____     Time: _____

MEDICAL STAFF ONLY BELOW THIS LINE

REFERRALS: (check appropriate box)                          PLACEMENT/HOUSING:  (check appropriate box)
   ☐ Medical Provider                                   ☐ General Population (GP)
   ☐ Mental Health                                      ☐ Medical Observational Housing (I POD)
   ☐ Dental  .                                          ☐ Medical Isolation ( I POD)
   ☐ CIWA/Withdrawal Protocol                           ☐ Mental Health Unit (B3)
                        ☐ Emergency Room for evaluation/treatment
                        ☐ Immediate placement on Suicide Precautions ( IPOD)

| Inmate Name | ID# | DOB | Date |
|----|----|----|----|
| | | | |

Revised 7/15/09

*EMERGENCY MH REFERRAL: ALL "YES" RESPONSES TO BOLDED/ITALICIZED ITEMS and MH5*

*ON-SITE EVALUATION BY MH CLINICIAN: ALL "YES" RESPONSES TO "S" SUBCODE*
*If on-site MH clinician not available contact on-call MH*

**PART III  DISPOSITION**                              Urine obtained for screening (female only)  ☐ Yes  ☐ No

TST: Plant Date: _____  ☐ left ☐ right  ☐ deferred (explain) _____  ☐ Form HR104A TB Symptom Screening completed

Refer to: (Check all appropriate)

| Medical | | |
|---|---|---|
| Emergency *(on-site/on-call)* | ☐ | |
| Within 24 hrs. | ☐ | |
| Routine   *(within 72 hrs.)* | ☐ | |

| Mental Health | | |
|---|---|---|
| *Emergency (on-site/on-call)* | ☐ | |
| Within 24 hrs. | ☐ | |
| Routine   *(within 72 hrs.)* | ☐ | |

| Dental | | |
|---|---|---|
| Urgent  *(within 72 hrs.)* | ☐ | |
| Routine | ☐ | |

| HIV | Contact Nurse | ☐ | |
|---|---|---|---|

| HIV | Counselor | ☐ | |
|---|---|---|---|

| ADA | Coordinator | ☐ | |
|---|---|---|---|

☐ CN4401 Authorization to Obtain and/or Disclose Protected Health Information (ROI) signed

| Placement: | ☐ General Housing | ☐ RHU | ☐ Infirmary -- Medical | ☐ Infirmary – Mental Health |
|---|---|---|---|---|
| | ☐ Medical | ☐ Mental Health | ☐ Refer for Physical | |

REMARKS: _____

Emotional response to incarceration: (circle)   Cooperative   Angry   Tearful   Embarrassed   Uncooperative   Depressed

Today's Classification Scores and sub codes:

Medical _____      Mental Health _____      Entered into OBIS
                                                      ☐ Health Services
                                                      ☐ Custody

| STAFF NAME/TITLE (Printed) | Date/Time | STAFF SIGNATURE |
|---|---|---|

HR001 Rev. #2 07/06
CONNECTICUT DEPARTMENT OF CORRECTION
UNIVERSITY OF CONNECTICUT HEALTH CENTER
CORRECTIONAL MANAGED HEALTH CARE

**Intake Health Screening**

| OFFENDER NUMBER | | DATE OF BIRTH |
|---|---|---|
| OFFENDER NAME (LAST, FIRST, INITIAL) | | |
| SEX | RACE/ETHNIC | FACILITY |
| M F | B W H O | |

## CUSTODY INFORMATION

Charges: _____  Bond Amount: _____  Sentence: _____

Special *suicide* precautions advised because of: (check all that apply)    ☐ No special circumstances identified

☐ First CDOC incarceration                              ☐ Statement from family, friends, or community providers

☐ Court *mittimus* alert                                ☐ Statements from offender, or observations of offender behavior

☐ Placement in special housing                          ☐ Other _____

For returning offenders, most recent mental health classification    ☐ 1  ☐ 2  ☐ 3  ☐ 4  ☐ 5   "S" subcode? ☐ Yes  ☐ No

For returning offenders, most recent medical classification        ☐ 1  ☐ 2  ☐ 3  ☐ 4  ☐ 5

Offender's medications brought to facility? ☐ Yes  ☐ No     Meds forwarded to medical department?   ☐ Yes  ☐ No  ☐ N/A

Prostheses, braces, assistive devices brought by offender? ☐ Yes  ☐ No   Any such devices confiscated? ☐ Yes  ☐ No  ☐ N/A

Comments: _____

Interstate Compact  ☐ Yes  ☐ No

Date: _____  Time: _____ am / pm   A/P Officer _____ (printed) _____ (signature)

## HEALTH SERVICES INFORMATION

### PART I  OBSERVATION
☐ Yes ☐ No    Custody Info reviewed

Circle appropriate response

Oriented to time, place, person (check)    ☐ Yes ☐ No

1. Level of consciousness (circle only one);    alert    lethargic    obtunded    stuporous/comatose

2. Does the offender show signs of:

| | | | | | |
|---|---|---|---|---|---|
| A. Obvious pain/bleeding/trauma  (circle) | YES | NO | G. Disorderly or disorganized behavior  (circle) | YES | NO |
| B. Obvious fever; jaundice; infection  (circle) | YES | NO | H. Risk of assault to staff or other offenders | YES | NO |
| C. Barbiturate, heroin, cocaine, benzodiazepine, or alcohol intoxication/withdrawal (circle) (if Yes = Medical Urgent Referral) | YES | NO | I.  Breathing difficulties | YES | NO |
| D. Sweating; tremors; anxiety; self-neglect; disheveled (circle) | YES | NO | J. Recent weight loss | YES | NO |
| E. Scars; needle marks; rash; skin abnormalities   (circle) | YES | NO | K. Disabilities requiring special accommodations | YES | NO |
| F. Body vermin/infestation | YES | NO | L. Obvious oral/dental abnormality | YES | NO |

Vital signs: Temp_____  Pulse_____  Resp_____  B/P_____  $O_2$ Sat _____  Wgt _____

Does any of the above indicate a need for immediate intervention by? ☐ Medical   ☐ Mental Health   ☐ Neither

HR 001 Page 1 of 4

| Offender Name | Offender Number | Date |
|---|---|---|

**PART II  HEALTH STAFF-OFFENDER QUESTIONNAIRE**
Circle appropriate response. A 'Yes' answer requires specific information following each question.

1. Have you ever been told that you have cancer, diabetes, heart disease, thyroid problems, arthritis, HIV/AIDS, asthma, lung disease, kidney disease, ulcers, high blood pressure, hepatitis, TB, seizure activity, infectious disease, psychiatric disorder, mental retardation or traumatic brain injury? Problems controlling violent behavior? Other?  (Circle all that apply)                                                      YES  NO

2. Do you take any medication? (List / Last Taken)_____     YES  NO

_____

3. Are you allergic to any medication or other substance including food items? (Describe reaction)_____   YES  NO

_____

4. Are you presently on a diet ordered by a doctor? Diet name? _____ Doctor's name? _____     YES  NO

   Where? _____ When? _____ Why? _____

5. Within the last 6 months, have you been hospitalized or otherwise treated for any medical/surgical condition?     YES  NO

_____

6. Are you using alcohol?  Daily intake? _____ Last drink? _____    YES  NO

7. Are you using heroin, methadone, "street drugs" or other substances?  Specify _____   YES  NO

_____

   Amount? _____ Last use? _____ Mode/Route? _____

   (a) Are you or have you been an intravenous or injection drug user? _____   YES  NO

   (b) Have you shared needles or drug paraphernalia? _____   YES  NO

8. Have you ever been a patient in a "detox" or substance abuse program? (if yes, =Mental Health Routine within 72 hrs.)     YES  NO

   Where? _____ When? _____ Why? _____

_____

9. Have you ever received services from the Department of Mental Health and Addiction Services or the Department of     YES  NO
   Mental Retardation or the Department of Children and Family Services?  (If yes, =Mental Health Routine)

   Where? _____ When? _____ Case Manager's Name? _____

10. Have you ever been in a mental health hospital? (If <30days of release=Mental Health to see within 24 hrs.)     YES  NO

    Where? _____ When? _____ Why? _____

_____

11. Have you ever been in a mental health outpatient program/clinic? (If yes, =Mental Health Routine within 72 hrs.)     YES  NO

    Where? _____ When? _____ Why? _____

_____

12. Have you ever thought about or tried to hurt/kill yourself? Why? _____     YES  NO

    (If yes, < 3 yr. = Mental Health to see within 24 hrs./ >3 yr.  Mental Health Routine within 72 hrs. )

    Where? _____ When? _____ How? _____

_____

13. Are you thinking of hurting/killing yourself now?(If yes, ER MH REFERRAL)_____     YES  NO

    Do you have a plan? If yes, describe_____     YES  NO

_____

14. Has a parent, spouse or other close relative or friend attempted or committed suicide? (If yes, =Mental Health Routine within 72 hrs.)     YES  NO

| Offender Name | Offender Number | Date |
|---|---|---|

15. Has there been a recent death or change in your immediate support system? If yes, specify _____ YES NO

16. Have you ever experienced physical/emotional/sexual abuse? (circle)_____ YES NO

17. Have you ever been the victim of a violent crime? _____ YES NO

18. Are you having headaches, numbness in any part of your body, or changes in your vision or memory? (circle) YES NO

19. Have you fainted or had a head injury? Date _____ Details _____ YES NO

20. Do your teeth or gums hurt? _____ YES NO

21. Have you ever had a sexually transmitted disease or abnormal discharge? Specify _____ YES NO
How treated? _____ When? _____

22. Have you had multiple sexual partners, or unsafe sex with someone who you know has HIV/AIDS? _____ YES NO

23. Have you ever had a blood transfusion? When? _____ YES NO

24. Have you had a severe rash in the past two years? Describe_____ YES NO

25. Have you had any sores, infections, or white patches in your mouth? Describe_____ YES NO

26. Have you ever been tested for HIV? Where? _____ When? _____ Results? _____ YES NO

27. Have you received HIV/AIDS information while incarcerated? _____ YES NO

28. Have you ever had pneumonia? If yes, when? _____ YES NO

29. Do you sweat excessively at night, have a cough, or bring up sputum, phlegm, or blood? (circle all that apply) YES NO

30. Have you had fevers, chills, felt weak all over, lost your appetite, or lost weight? (circle all that apply) YES NO

31. Have you ever had a positive skin test for TB? _____ YES NO

32. Do you smoke? If yes, number of packs per day____ _____ YES NO

33. Do you have any other medical problems or disabilities that might require special accommodations? YES NO
If yes, identify (e.g., prosthesis, glasses, contacts, hearing aid) _____

34. Where do you go for medical care? _____

35. Will you sign a release of information form so we can get your health record? _____ YES NO

36. Do you understand how to get medical, mental health or dental services? _____ YES NO

| Check all that apply: | | Comments: |
|---|---|---|
| Attention | ☐ adequate attention span,  ☐ poor attention span,  ☐distractible,  ☐confused | |
| Attitude | ☐ cooperative, ☐ suspicious, ☐ guarded, ☐ hostile, ☐ uncooperative | |
| Speech | ☐ normal, ☐ slow, ☐ hesitant, ☐ rapid, ☐ slurred | |
| Movement | ☐ normal movements, ☐ abnormal movements, ☐ abnormal gait, ☐ motor retardation | |
| Mood/Affect | ☐ normal range (euthymic), ☐ anxious, ☐ irritable, ☐ depressed, ☐ angry, ☐ elated | |
| Thought content | ☐ normal content, ☐ preoccupations, ☐ delusions | |
| Perception | ☐ no perceptual distortions, ☐ auditory hallucinations, ☐ visual hallucinations | |
| Intellect | ☐ normal intellectual functioning, ☐ signs of mental retardation | |
| Memory | ☐ no impairment, ☐ memory impairment (specify) – ☐ remote, ☐ recent, ☐ immediate | |
| Homicidal | ☐ no homicidal ideation, ☐ *homicidal ideation* | |
| Judgment | ☐ adequate, ☐ mildly impaired, ☐ severely impaired | |

*I have received information describing health services at this facility and understand how to access health care.*
Offender Signature / Date _____